UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x
NEW YORK TAXI WORKERS ALLIANCE, BIGU
HAIDER, VIJAY SHANTI, HARJIT KHATRA,
INDERJEET PARMAR, DIOGENES CARRASCO,
TIMOTHY CAVARETTA, MAMADOU DIALLO,
CHERNO JALLOW, RANJIT KALER, and JAKIR
HOSSAIN, Individually, on Behalf of All Others Similarly
Situated, and as Class Representatives,

Plaintiffs,

-against-

UBER TECHNOLOGIES, INC., UBER LOGISTIK, LLC,
UBER USA LLC, ACHT-NY, LLC, ACHTZEHN-NY, LLC,
GARRET CAMP, ANDREW CHAPIN, DANACH-NY, LLC,
DREIST-NY, LLC, DREIZEHN-NY, LLC, DRINNEN-NY,
LLC, EINS-NY, LLC, ELF-NY, LLC, EINUNDZWANZIG-
NY, LLC, FUNF-NY, LLC, FUNFZEHN-NY LLC, GRUN,
LLC, J. WILLIAM GURLEY, HINTER, LLC, TRAVIS
KALANICK, JOSH MOHRER, NEUN-NY, LLC,
NEUNZEHN-NY, LLC, SCHMECKEN, LLC, SECHS-NY,
LLC, SIEBEN-NY, LLC, SIEBZEHN-NY, LLC, UNTER,
LLC, VIER-NY, LLC, VIERZEHN-NY, LLC, WEITER,
LLC, ZEHN-NY, ZWANZIG-NY LLC, ZWEI-NY, LLC,
ZWOLF-NY, LLC, jointly and severally,

Defendants.

-------------------------------------------------------------------------x

16 Civ _____

**COMPLAINT**

**JURY TRIAL
DEMANDED**

Plaintiffs, New York Taxi Workers Alliance, Bigu Haider, Vijay Shanti, Harjit Khatra

Inderjeet Parmar, Diogenes Carrasco, Timothy Cavaretta, Mamadou Diallo, Cherno Jallow,

Ranjit Kaler, and Jakir Hossain ("individual plaintiffs"), individually, and on behalf of all others

similarly situated and as class representatives, by and through counsel, Mirer, Mazzocchi,

Schalet & Julien PLLC, hereby allege as follows:

1

## NATURE OF THE CASE

1.      This is a class action complaint brought against Defendants Uber and its New York subsidiaries, officers and owners by a nonprofit organization and 10 individuals on behalf of themselves and all others similarly situated complaining of violations of the Fair Labor Standards Act, the New York Labor Law and asserting breach of contract and fraud claims on a class action basis.  (Hereinafter, unless the allegations in the complaint refer to a specific Plaintiff or to the "individual Plaintiffs", the term "Plaintiffs" refers collectively to New York Transit Workers Alliance, the individually named plaintiffs and the putative class action members and likewise, unless the allegations in the complaint refer to a specific Defendant or group of Defendants, any reference to "Uber," or "Defendants" refers collectively to all named Defendants.

2.      Uber is a key player in what some call the "gig" or "on-demand" economy, a supposedly new sector of the workforce, where workers are ostensibly employed for a particular task or specific project with little connection to their employer.

3.      Uber claims further that it is a star in the "on-demand" world where an individual can order something and receive it almost instantaneously.

4.      This "gig" or "on demand" economy cannot be viewed uncritically, for behind every customer seeking a fast ride is a worker, often working 60-80 hour weeks, who is denied the basic rights of employees.

5.      While investors and owners cheer their low overhead, the very people necessary to make the "gig" economy go forward have been unlawfully misclassified independent contractors and put into the precarious position of being denied the benefit of the laws which provide them certain rights.

2

6.      In or about December 2011, Uber made its first inroads into the New York market.  From that time to the present, Uber recruited heavily and expanded exponentially with promises that Drivers would be able to earn a decent wage.  However, Uber, through its practices and broken promises, severely harmed the thousands of Drivers they recruited and have contributed greatly to a "race to the bottom" causing broader income inequality, where Uber Drivers, Taxi Drivers, and others working in the private For-Hire Vehicle ("FHV") industry can barely survive.

7.      Uber Drivers must strictly follow a litany of very specific company imposed regulations that govern how, when, where and who gets to work, yet Uber enjoys the benefits of misclassifying its Drivers as "independent contractors."

8.      Uber's rules and regulations for its Drivers govern almost every facet of the job, and Drivers have little opportunity to deviate from Uber's proscribed means and methods of doing business.

9.      These Drivers must adhere closely to Uber's parameters in order to be eligible to drive in the first place.  Uber pushes potential Drivers to purchase or lease specific types of expensive vehicles, saddling the Drivers with enormous debt and costs.

10.     To avoid termination, all Uber Drivers must maintain these vehicles and achieve a certain star rating in a system devised and monitored closely by Uber.

11.     From fares and fees, to what to wear and what route to take, in addition to subjecting its employees to constant monitoring by GPS, Uber directs and sets the terms and conditions of the Drivers' work. Although Uber's rules are often described as "suggestions," Drivers understand clearly that failure to follow these guidelines results in temporary or permanent termination of their employment with Uber.

12.     After working for Uber continuously for years, laboring for twelve-hour-plus shifts, for six or seven days a week, these workers simply cannot be considered independent contractors performing a "gig."

13.     Further, Uber mandates that all Drivers enter into a contract with Uber.  As set forth below, Uber is in violation of its obligations pursuant to these contracts and has engaged in fraudulent practices with respect to the contract terms.  Uber's contract and fraud violations amount to nothing less than outright theft.

## PARTIES

### Plaintiffs

### New York Taxi Workers Alliance (NYTWA)

14.     Plaintiff New York Taxi Workers Alliance, (NYTWA) is a nonprofit membership organization founded in 1998.  NYTWA is based in Long Island City, Queens County, New York.  NYTWA works to ensure the fair treatment of its member Drivers, to improve their lives and to promote the dignity of all individuals who work in the private transportation sector in the New York City metropolitan area.

15.     NYTWA counts among its 19,000 members more than five thousand (5,000) Uber Drivers.

16.     NYTWA brings this action on its own behalf and in its representative capacity on behalf of its Uber-Driver members, including the ten drivers who are individual plaintiffs.

17.     NYTWA seeks to be a class representative in the class action described herein.

### Plaintiff Bigu Haider

18.     Plaintiff Bigu Haider ("Haider") is a resident of Flushing, Queens County, New York who has been actively working as a Taxi and/or Black Car Driver since in or about 1989.

4

19.     Haider has been employed by Uber from in or about March 2013 to the present.

20.     In 2013, at the encouragement of Uber's New York general manager Kyle (LNU), Haider purchased a Lincoln Town Car to satisfy the luxury vehicle requirement for Uber's luxury service fleet known as Uber Black.  Drivers could earn substantially more with the higher fares charged to customers ordering the Uber Black service.

21.     The purchase of a Lincoln Town Car, a luxury vehicle, as compared to a midrange sedan that could be used for Uber's basic service, UberX, was a significant additional expense that Haider undertook in reliance on the assurances made by Uber's manager regarding his ongoing eligibility for Uber Black dispatches.  Haider received absolutely no reimbursement from Uber for this expense.

22.     Haider financed his purchase of the Lincoln Town Car, making monthly payments of $509.17.  Initially, he paid $3800 for liability insurance and an additional $1500 for full coverage, annually. Currently, Haider only has liability coverage, for which he pays $294.25 per month. Haider affiliated this vehicle with the Defendant For-Hire Vehicle ("FHV") base, Unter, LLC.

23.     In or about May of 2014, after incurring this hefty expense, Uber unilaterally changed its rules and determined that Lincoln Town Cars were no longer acceptable vehicles for the Uber Black service.

24.     Subsequent to this rule change, Haider was locked into making these high monthly payments on the Lincoln Town Car that Uber had urged him to obtain although now, according to Uber, he could only accept lower categories of service, such as UberX, which command much lower fares. After Uber downgraded the status of his vehicle, Haider worked for

Uber's UberX service, which he could have done using a much less expensive mid-range sedan such as a Toyota Camry.

25.     Haider has formally opted out of the arbitration provision of Defendant Uber's contract that states that all disputes will be arbitrated rather than filed in court.

**Plaintiff Vijay Shanti**

26.     Plaintiff Vijay Shanti ("Shanti") is a resident of Springfield Gardens, Queens County, New York who has been a Black Car Driver since 1993.

27.     Plaintiff Shanti has been employed by Uber as a Driver from in or around October 2013 to the present.

28.     From in or about October 2013 to the present, Plaintiff Shanti was working part-time for Uber as a Driver typically for approximately thirty (30) hours per week.

29.     In or about May of 2014, Uber informed Mr. Shanti that his Lincoln Town Car was no longer eligible to receive Uber Black dispatches.

30.     Previously, Uber had informed Plaintiff Shanti that, on account of his tenure with Uber, he would not have to accept the UberX (lower fare) dispatches as long as he kept his star rating up.

31.     In or about September 2015, Shanti bought a new Lexus for use in Uber Black service. His monthly payments for the Lexus are $512. Additionally, he pays $500 per month for full coverage insurance.  Shanti's vehicle is affiliated with the FHV base Carlink, and he is dispatched by one of the Defendant FHV bases.

32.     Plaintiff Shanti has formally opted out of the arbitration provision of Uber's contract that states that all disputes will be arbitrated rather than filed in court.

**Plaintiff Harjit Khatra**

33.     Plaintiff Harjit Khatra ("Khatra") is a resident of Bellerose, Queens County, New York who has been driving yellow Taxis, Liveries or Black Cars since in or about 2001.

34.     Khatra has been employed by Uber on a full-time basis from in or about October 2013 to the present and drives a vehicle affiliated with the Uber base Unter, providing UberX and UberXL services.

35.     Khatra bought a Toyota Highlander for use in UberX and UberXL service. He later bought a Nissan Pathfinder for use in UberX and UberXL service. His monthly payment for both vehicles was $700. Additionally, he pays $700 per month for vehicle insurance.

**Plaintiff Inderjeet Parmar**

36.     Plaintiff Inderjeet Parmar ("Parmar") is a resident of New Hyde Park, Nassau County, New York.

37.     Parmar has been employed as a Driver by Uber from in or about October 2013 to the present.

38.     Parmar typically drives for Uber approximately fifty-five (55) hours per week.

39.     When he first signed up to work for Uber, Parmar owned a Lincoln MKT, which qualified him to accept Uber Black dispatches. His monthly payment for the MKT was $800 per month. Additionally, he paid $600 per month for vehicle insurance. Parmar's vehicle was affiliated with Defendant FHV base Unter.

40.     In May of 2014, after driving his Lincoln MKT for Uber Black, Parmar was told his vehicle no longer qualified for Uber Black service.

41.     Parmar then leased a Toyota Camry and started driving for UberX.  The cost to lease the Camry was $440 **per week**, including insurance and TLC registration costs.  When Parmar drove the Camry he was affiliated with Defendant FHV base Schmecken.

7

42.     In the fall of 2015, Parmar began driving a Chevrolet Suburban in order to qualify again for Uber Black and Uber SUV. He rents this vehicle by paying a portion of his fare revenue to the vehicle's owner.

43.     Parmar was not reimbursed for any expenses associated with such vehicle purchases and leases.

44.     Parmar has formally opted out of the arbitration provision of Uber's contract that states that all disputes will be arbitrated rather than filed in court.

**Plaintiff Diogenes Carrasco**

45.     Plaintiff Diogenes Carrasco ("Carrasco") is a resident of the Bronx, Bronx County, New York who had worked as a Yellow Taxi Driver for thirteen years prior to joining Uber.

46.     Mr. Carrasco was employed by Uber as a Driver from in or about March of 2014 to January 2016 and drove a vehicle affiliated with Defendant FHV base Hinter, LLC.

47.     Plaintiff Carrasco typically drove for Uber approximately 50 hours per week.

48.     In order to be eligible to provide the UberX services, Carrasco bought a Toyota Venza.   His monthly payment for the Venza is $455. Additionally, Carrasco pays $325 per month for vehicle insurance. Carrasco received no reimbursement for these expenses.

49.     In or about late January, 2016, Carrasco stopped working for Uber because Uber unilaterally cut the fares it charges to Uber customers.  Thereafter, plaintiff Carrasco realized that he would have to work approximately 12-14 hours a day, 6 days a week in order to maintain the same level of gross earnings he had before Uber unilaterially cut its fare rates.

50.     Carrasco has formally opted out of the arbitration provision of Uber's contract that states that all disputes will be arbitrated rather than filed in court.

**Plaintiff Timothy Cavaretta**

51.　　Plaintiff Timothy Cavaretta ("Cavaretta") is a resident of Woodside, Queens County, New York.

52.　　Cavaretta was employed as an UberX Driver from in or about October 2014 to February 2016.

53.　　Cavaretta typically drove for Uber approximately 30 hours per week.

54.　　Prior to his employment with Uber, Cavaretta worked as a Yellow Taxi and street-hail livery (Green Taxi) driver.

55.　　Cavaretta first worked for UberX while driving his Green Taxi, which he leased at a rate of $1750 per month while providing the UberX service.

56.　　In or about January 2015, Cavaretta bought a Chrysler Town & Country for use in UberX and XL service, which he affiliated with the Defendant FHV base Schmecken, LLC. The monthly payment for the Chrysler is $317.08. Additionally Cavaretta paid $356.51 per month for liability insurance and he paid $1312 in a lump sum for collision insurance during 2015. He was not reimbursed for any of these expenses by Uber.

57.　　Cavaretta has formally opted out of the arbitration provision of Uber's contract that states that all disputes will be arbitrated rather than filed in court.

**Plaintiff Mamadou Diallo**

58.　　Plaintiff Mamadou Diallo ("Diallo") is a resident of the Bronx, Bronx County, New York.

59.　　Diallo has been employed by Uber from March 2014 to the present.

60.　　In order to become an Uber Driver, Diallo had to purchase a car.

9

61.     As Diallo lacked the appropriate credit, Uber arranged for him to obtain a vehicle at a car dealership and guaranteed his purchase of the car, which he affiliated with Defendant FHV base Hinter, LLC.

62.     Uber also financed Diallo's down payment for the purchase of the vehicle.

63.     Diallo's monthly payment for the Camry is $943. Additionally, he pays $457 per month for vehicle insurance.

64.     Diallo has formally opted out of the arbitration provision of Uber's contract that states that all disputes will be arbitrated rather than filed in court.

**Plaintiff Cherno Jallow**

65.     Plaintiff Cherno Jallow ("Jallow") is a resident of Brooklyn, Kings County, New York.

66.     Jallow has been employed by Uber from in or about July 2014 to the present and drives a vehicle affiliated with the Defendant FHV base, Danach, LLC.

67.     Plaintiff Jallow typically drives for Uber approximately 60 hours per week.

68.     Jallow leased a car from an "Uber-approved" dealer for one month and then financed a Toyota Venza in order to qualify to provide UberX services. His monthly payment for the Venza is $925. Additionally, for full insurance coverage, he paid $527 per month until his insurance provider stopped offering full coverage. He now has lesser coverage for $294 per month.

69.     In order to make the car payments and to afford the other associated expenses, Jallow must work between 12 to 15 hours per day, sometimes all seven days of the week.

70.     Mr. Jallow has formally opted out of the arbitration provision of Uber's contract that states that all disputes will be arbitrated rather than filed in court.

**Plaintiff Ranjit Kaler**

71.     Plaintiff Ranjit Kaler ("Kaler") is a resident of Hicksville, Nassau County, New York.

72.     Kaler has been employed by Uber from in or about April 2015 to the present, although she is presently on leave due to injuries from an automobile accident where she was "rear-ended" while driving for Uber.

73.     From in or about April 2015 to July 2015, Kaler rented a Volkswagen Jetta for $475 per week from an "Uber-approved" dealer.

74.     When working, Kaler drives for Uber approximately 60 hours per week, working six days per week for an average of ten hours per day.

75.     In July 2015, Kaler purchased a Toyota Highlander so she would be eligible to provide both UberX and UberXL services. Her monthly payment for the Highlander is $800 per month. Additionally, she pays $660 per month for vehicle insurance. Kaler's vehicle is affiliated with Defendant FHV base Dreist-NY, LLC.

76.     Kaler has formally opted out of the arbitration provision of Uber's contract that states that all disputes will be arbitrated rather than filed in court.

**Plaintiff Jakir Hossain**

77.     Plaintiff Jakir Hossain ("Hossain") is a resident of Jamaica, Queens County, New York.

78.     Hossain was employed by Uber from in or about December of 2015 to on or about April 25, 2016, providing UberX services.

79.     In order to drive for Uber, Hossain leased a Toyota Camry from a dealer recommended by Uber. This vehicle was affiliated with Defendant FHV Base, Neunzehn-NY, LLC.

80.     Hossain paid $915 to obtain the lease, which included a $500 deposit and $415 one-week advance payment.

81.     Thereafter Hossain paid $415 **per week** for the leased car, which Uber deducted from his weekly earnings.   Additionally, Hossain paid approximately $100 per week in fuel expenses.

82.     At no time was Hossain reimbursed by Uber for these expenses.

83.     Mr. Hossain typically was working eight to ten hours a day, six days a week, or approximately fifty (50) hours per week.

84.     At all relevant times, all of the above-named individual plaintiffs were "employees" within the meaning of the FLSA and the NYLL.

**Defendants**

**Uber Technologies, Inc.**

85.     Uber Technologies, Inc. ("Uber Technologies") is a Delaware corporation.

86.     Uber Technologies maintains its headquarters at 1455 Market Street, 4th Floor, San Francisco, CA 94103.

87.     Uber Technologies operates twenty-eight (28) wholly owned subsidiaries in New York, each of which has held or currently holds a TLC license to operate a For-Hire Vehicle (FHV) Base.

88.     From December 31, 2011 to on or about November 9, 2014, Uber Technologies was a party to the contracts pursuant to which Drivers received dispatches from the Uber "app."

89.     Upon information and belief, Uber Technologies is the sole owner of Uber USA and Uber Logistik.

**Uber Logistik, LLC**

90.     Uber Logistik is a limited liability company organized under the laws of the state of Delaware on May 6, 2014.

91.     On or about November 10, 2014 to on or about April 2, 2015, Uber Logistik was a party to the contracts pursuant to which drivers received dispatches from the Uber "app."

**Uber USA, LLC**

92.     Uber USA, LLC ("Uber USA") is a Delaware limited liability company, solely owned by Uber Technologies.

93.     Uber USA states in its filings with the TLC that it is the "general member" of Uber's twenty-two (22) for hire vehicle bases.

94.     From on or about April 3, 2015 to the present, Uber USA has been a party to the contracts pursuant to which drivers received dispatches from the Uber "app."

**The Uber For Hire Vehicle  ("FHV") Bases**

95.     The Uber parents operate 28 wholly owned subsidiaries in New York, each of which has held or currently holds a TLC license to operate an FHV Base.

96.     All of the Defendant FHV bases listed below manage the Uber workforce as they are responsible for providing the dispatches to each of the plaintiffs.

97.     Upon information and belief, each and every Uber FHV base has held or currently holds a Certificate of Authority, issued by the New York State Department of Taxation and Finance for the collection of state taxes.

98.     The Uber FHV base subsidiaries are responsible under the N.Y. Tax Law for collection and payment of the 8.875% sales tax on black car rides.

99.     Similarly, under the New York Executive Law, each FHV base is responsible for collecting and remitting a 2.44% surcharge on rides to the Black Car Fund ("BCF"), an injured workers fund for Black Car Drivers.

100.     Upon information and belief, the Uber FHV bases deducted sales tax and Black Car Fund monies from driver earnings to remit to the state and the BCF, respectively.

**Unter, LLC (B02512)**

101.     Defendant Unter LLC ("Unter" or "Unter base") is a domestic limited liability company organized under the laws of the State of New York by Uber Technologies, its sole member, and, accordingly, Unter is a wholly owned subsidiary of Uber Technologies.

102.     Unter was Uber's first FHV base in New York, operating under FHV base license #B02512 since December 31, 2011.[1]

103.     At various times, Unter was also the payor of Drivers' wages, listed on direct deposit statements received by Drivers.

104.     Unter maintains an office at 27-55 Jackson Ave, Long Island City, NY 11101, which it shares with other Uber FHV Bases (hereafter "the Jackson Avenue Uber Offices").

**Hinter, LLC   (B02598)**

105.     Defendant Hinter LLC ("Hinter") is a domestic limited liability company organized under the laws of the State of New York by Uber Technologies, its sole member, and, accordingly, Hinter is a wholly owned subsidiary of Uber Technologies.

---

[1] FHV bases are listed herein in order of license number.

106.   Hinter operates a FHV base pursuant to license #B02598, issued between November 2012 and February 26, 2013, out of the Jackson Avenue Uber Offices.

**Weiter, LLC (B02617)**

107.   Defendant Weiter LLC ('Weiter") is a domestic limited liability company organized under the laws of the State of New York by Uber Technologies, its sole member, and, accordingly, Weiter is a wholly owned subsidiary of Uber Technologies.

108.   Weiter operates a FHV base pursuant to license # B02617, issued on or about February 26, 2013, out of the Jackson Avenue Uber Offices.

**Schmecken, LLC (B02682)**

109.   Defendant Schmecken LLC ("Schmecken") is a foreign limited liability company organized under the laws of the State of Delaware by Uber Technologies employee Josh Mohrer, its "sole member."

110.   Upon information and belief, Schmecken is a wholly owned subsidiary of Uber Technologies.

111.   Schmecken operates a FHV base pursuant to license # B02682, issued on or about August 29, 2013 out of the Jackson Avenue Uber Offices.

**Danach-NY, LLC (B02764)**

112.   Defendant Danach-NY LLC ("Danach-NY") is a foreign limited liability company organized under the laws of the State of Delaware by Uber Technologies employee Josh Mohrer, its sole member.

113.   Upon information and belief, Danach-NY is a wholly owned subsidiary of Uber Technologies.

114.   Danach-NY operates a FHV base pursuant to license # B02764, issued on or about June 13, 2014 out of the Jackson Avenue Uber Offices.

**Grun, LLC (B02765)**

115.   Defendant Grun LLC ("Grun") is a foreign limited liability company organized under the laws of the State of Delaware by Uber Technologies employee Josh Mohrer, its sole member.

116.   Upon information and belief, Grun is a wholly owned subsidiary of Uber Technologies.

117.   Grun operates a FHV base pursuant to license # B02765, issued for on May 24, 2014, out of the Jackson Avenue Uber Offices.

**Dreist-NY, LLC (B02835)**

118.   Defendant Dreist-NY LLC ("Dreist-NY") is a foreign limited liability company organized under the laws of the State of Delaware by Uber USA, its sole member, and, accordingly, Dreist-NY is a wholly owned subsidiary of Uber Technologies.

119.   Dreist-NY operates a FHV base pursuant to license # B02835, issued on or about May 7, 2015, out of the Jackson Avenue Uber Offices.

**Drinnen-NY, LLC (B02836)**

120.   Defendant Drinnen-NY LLC ("Drinnen-NY") is a foreign limited liability company organized under the laws of the State of Delaware by Uber USA, its sole member, and, accordingly, Drinnen-NY is a wholly owned subsidiary of Uber Technologies.

121.   Drinnen-NY operates a FHV base pursuant to license # B02836, issued on or about May 8, 2015, out of the Jackson Avenue Uber Offices.

**Sieben-NY, LLC (B02864)**

122. Defendant Sieben-NY LLC ("Sieben-NY") is a foreign limited liability company organized under the laws of the State of Delaware by Uber USA, its sole member, and, accordingly, Sieben-NY is a wholly owned subsidiary of Uber Technologies.

123. Sieben-NY operates a FHV base pursuant to license # B02864, issued in or about mid-2015, out of its offices at 628 W. 28th St, NY, NY 10001 (hereafter the "West 28th Uber Offices."

## Vier-NY, LLC (B02865)

124. Defendant Vier-NY LLC ("Vier-NY") is a foreign limited liability company organized under the laws of the State of Delaware by Uber USA, its sole member, and, accordingly, Vier-NY is a wholly owned subsidiary of Uber Technologies or USA.

125. Vier-NY operates a FHV base pursuant to license # B02865, issued on or about July 27, 2015, out of the West 28th Uber Offices.

## Zwei-NY, LLC (B02866)

126. Defendant Zwei-NY LLC ("Zwei-NY") is a foreign limited liability company organized under the laws of the State of Delaware by Uber USA, its sole member, and, accordingly, Zwei-NY is a wholly owned subsidiary of Uber Technologies.

127. Zwei-NY operates a FHV base pursuant to license # B02866, issued on or about August 27, 2015, out of the West 28th Uber Offices.

## Funf-NY, LLC (B02867)

128. Defendant Funf-NY LLC ("Funf-NY") is a foreign limited liability company organized under the laws of the State of Delaware by Uber USA, its sole member, and, accordingly, Funf-NY is a wholly owned subsidiary of Uber Technologies.

129.    Funf-NY operates a FHV base pursuant to license # B02867, issued on or about July 27, 2015, out the West 28th Uber Offices.

**Zehn-NY, LLC (B02869)**

130.    Defendant Zehn-NY LLC ("Zehn-NY") is a foreign limited liability company organized under the laws of the State of Delaware by Uber USA, its sole member, and, accordingly, Zehn-NY is a wholly owned subsidiary of Uber Technologies.

131.    Zehn-NY operates a FHV base pursuant to license # B02869, issued on or about August 12, 2015, out of the West 28th Uber Offices.

**Neun-NY, LLC (B02870)**

132.    Defendant Neun-NY LLC ("Neun-NY") is a foreign limited liability company organized under the laws of the State of Delaware by Uber USA, its sole member, and, accordingly, Neun-NY is a wholly owned subsidiary of Uber Technologies.

133.    Neun-NY operates a FHV base pursuant to license # B02870, issued on or about August 24, 2015, out of the West 28th Uber Offices.

**Acht-NY, LLC (B02871)**

134.    Defendant Acht-NY LLC ("Neun-NY") is a foreign limited liability company organized under the laws of the State of Delaware.

135.    Upon information and belief, Uber USA is its sole member, and, accordingly, Acht-NY is a wholly owned subsidiary of Uber Technologies.

136.    Acht-NY operates a FHV base pursuant to license # B02871, out of the West 28th Uber Offices.

**Eins-NY, LLC (B02872)**

137.   Defendant Eins-NY LLC ("Eins-NY") is a foreign limited liability company organized under the laws of the State of Delaware by Uber USA, its sole member, and, accordingly, Eins-NY is a wholly owned subsidiary of Uber Technologies.

138.   Eins-NY operates a FHV base pursuant to license # B02872, issued on or about mid-2015, out of the West 28th Uber Offices.

## Sechs-NY, LLC (B02875)

139.   Defendant Sechs-NY LLC ("Sechs–NY") is a foreign limited liability company organized under the laws of the State of Delaware by Uber USA, its sole member, and, accordingly, Sechs-NY is a wholly owned subsidiary of Uber Technologies.

140.   Sechs-NY operates a FHV base pursuant to license # B02875, issued on or about August 20 2015, out the West 28th Uber Offices.

## Vierzehn-NY, LLC    (B02876)

141.   Defendant Vierzehn-NY LLC ("Vierzehn-NY") is a foreign limited liability company organized under the laws of the State of Delaware by Uber USA, its sole member, and, accordingly, Vierzehn-NY is a wholly owned subsidiary of Uber Technologies.

142.   Sechs-NY operates a FHV base pursuant to license # B02876, issued on or about September 25, 2015, out of the West 28th Uber Offices.

## Zwolf-NY, LLC  (B02877)

143.   Defendant Zwolf-NY LLC (" Zwolf –NY") is a foreign limited liability company organized under the laws of the State of Delaware by Uber USA, its sole member, and, accordingly, Zwolf-NY is a wholly owned subsidiary of Uber Technologies.

144.   Zwolf-NY operates a FHV base pursuant to license # B02877, issued on or about September 11, 2015, out the West 28th Uber Offices.

**Elf-NY, LLC (B02878)**

145.    Defendant Elf-NY LLC("Elf-NY") is a foreign limited liability company organized under the laws of the State of Delaware by Uber USA, its sole member, and, accordingly, Elf-NY is a wholly owned subsidiary of Uber Technologies.

146.    Elf-NY operates a FHV base pursuant to license # B02878, issued on or about August 18, 2015, out of the West 28th Uber Offices.

**Funfzehn-NY LLC (B02879)**

147.    Defendant Funfzehn-NY LLC ("Funfzehn-NY") is a foreign limited liability company organized under the laws of the State of Delaware by Uber USA, its sole member, and, accordingly, Funfzehn-NY is a wholly owned subsidiary of Uber Technologies.

148.    Funfzehn-NY operates a FHV base pursuant to license # B02879, issued on or about September 22, 2015, out of the West 28th Uber Offices.

**Neunzehn-NY, LLC (B02880)**

149.    Defendant Neunzehn-NY LLC ("Neunzehn-NY") is a foreign limited liability company organized under the laws of the State of Delaware by Uber USA, its sole member, and, accordingly, Neunzehn -NY is a wholly owned subsidiary of Uber Technologies.

150.    Neunzehn -NY operates a FHV base pursuant to license # B02880, out of the West 28th Uber Offices.

**Zwanzig-NY, LLC (BO2882)**

151.    Defendant Zwanzig-NY LLC ("Zwanzing-NY") is a foreign limited liability company organized under the laws of the State of Delaware by Uber USA, its sole member, and, accordingly, Zwanzig -NY is a wholly owned subsidiary of Uber Technologies.

20

152.    Zwanzig-NY operates a FHV base pursuant to license # B02882, issued on or about October 13, 2015, out of the West 28th Uber Offices.

**Sechzehn-NY, LLC (B02883)**

153.    Defendant Sechzehn-NY LLC ("Sechzehn-NY") is a foreign limited liability company organized under the laws of the State of Delaware by Uber USA, its sole member, and, accordingly, Sechzehn-NY is a wholly owned subsidiary of Uber Technologies.

154.    Sechzehn -NY operates a FHV base pursuant to license # B02883, issued on or about September 22, 2015, out of the West 28th Uber Offices.

**Dreizehn-NY, LLC (BO2884)**

155.    Defendant Dreizehn-NY LLC ("Dreizehn-NY") is a foreign limited liability company organized under the laws of the State of Delaware by Uber USA, its sole member, and, accordingly, Dreizehn-NY is a wholly owned subsidiary of Uber Technologies.

156.    Dreizehn-NY operates a FHV base pursuant to license # B02884, issued on or about September 18, 2015, out of the West 28th Uber Offices.

**Einundzwanzig-NY, LLC (BO2887)**

157.    Defendant Einundzwanzig-NY LLC ("Einundzwanzig-NY") is a foreign limited liability company organized under the laws of the State of Delaware by Uber USA, its sole member, and, accordingly, Einundzwanzig-NY is a wholly owned subsidiary of Uber Technologies.

158.    Einundzwanzig-NY operates a FHV base pursuant to license # B02887, issued on or about September 4, 2015, out of the West 28th Uber Offices.

**Siebzehn-NY, LLC (BO2888)**

159.    Defendant Siebzehn-NY LLC ("Siebzehn-NY") is a foreign limited liability company organized under the laws of the State of Delaware by Uber USA, its sole member, and, accordingly, Siebzehn-NY is a wholly owned subsidiary of Uber Technologies.

160.    Siebzehn-NY operates a FHV base pursuant to license # B02888, issued on or about September 24, 2015, out of the West 28th Uber Offices.

**Achtzehn-NY, LLC (BO2889)**

161.    Defendant Achtzehn-NY LLC ("Achtzehn-NY") is a foreign limited liability company organized under the laws of the State of Delaware by Uber USA, its sole member, and, accordingly, Achtzehn-NY is a wholly owned subsidiary of Uber Technologies.

162.    Achtzehn-NY operates a FHV base pursuant to license # B02889, issued on or about October 28, 2015, out of the West 28th Uber Offices.

**Garret Camp**

163.    Upon information and belief, Defendant Garret Camp ("Camp") is an individual resident of the State of California.

164.    Defendant Camp is the cofounder and CEO of Uber Technologies, Inc. and is, upon information and belief, the chief architect of the New York operation and strategy, including the creation of the separate Defendant Uber FHV bases.

165.    Upon and information and belief, based on information obtained through Freedom of Information Law Requests Defendant Camp is a shareholder and Director of Unter and is personally liable for liabilities arising from the operation of Unter.

**J. William Gurley**

166.    Defendant J. William Gurley ("Gurley") is an individual resident of the State of California.

167.    Upon and information and belief, Defendant Gurley is a General Partner of Benchmark Capital Partners VIII, L.P.("Benchmark Capital"), and based on information obtained through Freedom of Information Law requests, Gurley and Benchmark are a unitholder or shareholder of Unter.

168.    Defendant Gurley is a Manager/Director of Unter and upon information and belief, a Director of Uber Technologies, Inc. is personally liable for liabilities arising from the operation of Unter, whether incurred by Unter or Uber Technologies.

**Travis Kalanick**

169.    Defendant Travis Kalanick ("Defendant Kalanick") is a resident of the state of California.

170.    Defendant Kalanick is the cofounder and CEO of Uber Technologies and is, upon information and belief, a chief architect of the New York operations and strategy, including the strategy of setting up the FHV bases as wholly owned subsidiary entities.

171.    Upon and information and belief, , Kalanick was the CEO and Manager of Defendant FHV base Unter, LLC.

172.    Upon information and belief, Defendant Kalanick substantially controls Uber's operations and business in New York, personally oversees the hiring or appointment of key personnel for Uber's operations and business in New York and/or the Uber bases.

173.    Upon information and belief, all Uber policies and Driver contracts are made with his express authority, approval and review.

174.    Upon information and belief, Defendant Kalanick was or is personally involved in the day-to-day operation, management and business strategy of the Defendant Uber bases and

23

enterprise in New York with the power to set Driver fares, Uber fees, and all policies and terms and conditions of Drivers employment.

**Josh Mohrer**

175.    Defendant Josh Mohrer ("Mohrer") is an individual resident of the State of New York.

176.    Mohrer is an employee of Uber Technologies appointed by Travis Kalanick to manage Uber's New York operations.

177.    Upon information and belief, Defendant Mohrer was or is personally involved in the day-to-day operation, management and business strategy of the Defendant Uber bases and enterprise in New York with the power to set Driver fares, Uber fees, and all policies and terms and conditions of Drivers' employment.

**Andrew Chapin**

178.    Upon information and belief, Defendant Andrew Chapin ("Chapin") is an individual resident of the State of California.

179.    Chapin was an Officer and Manager of Defendant FHV base Hinter, LLC and a Vice President of Defendant FHV base Unter, LLC.

180.    Upon information and belief, Chapin is an employee of Uber Technologies, appointed by Travis Kalanick, and served as Senior Operations Manager for Uber in New York from November 2011 through July 2013.

181.    Upon information and belief, Chapin was personally involved in the day-to-day operation, management and business strategy of the Defendant Uber FHV bases and enterprise in New York with the power to set Driver fares, Uber fees, and all policies and terms and conditions of Drivers' employment.

182.    All of the above-named Defendants are "employers" within the meaning of the FLSA and the NYLL.

183.    All of the above-named Defendants are engaged in commerce as defined in the FLSA, 29 U.S.C. §203(s).

## JURISDICTION AND VENUE

184.    Jurisdiction is proper as this Court has original federal question jurisdiction under 28 U.S.C. §1331 since this case is brought under the FLSA, 29 U.S.C. §§201, *et seq.* This Court has supplemental jurisdiction over the NYLL claims and common law claims, as they are so related that they form part of the same case or controversy under Article III of the United States Constitution.

185.    Defendants are subject to personal jurisdiction in the State of New York as they do business in New York.

186.    Venue is proper in this District because Defendants conduct business in this Judicial District, and the acts and/or omissions giving rise to the claims herein alleged took place in this District.

## COMMON FACTUAL ALLEGATIONS

187.    Uber operates in New York City as a group of Black Car bases and one luxury limousine base, each of which is licensed by the New York City TLC.

188.    Most Uber Drivers' vehicles are affiliated with these bases, each organized as a separate LLC.  Uber, however, effectively operates its FHV bases as a unified company known as "Uber."

189.    All requests for the Uber service are made through the Uber smartphone application (the Uber "app") and are dispatched to Uber Drivers through Uber's centralized dispatch network which also operates via the Uber app.

190.    All FHVs licensed by the New York City TLC are required to be affiliated with a FHV base.

191.    Regardless of whether Plaintiffs' vehicles were affiliated with an Uber FHV base, all Uber dispatches they received were dispatched to them from one of the Defendant Uber FHV bases via the Uber app.

192.    As with most other Black Car bases, many of whose workers have been found to be employees by state and federal government agencies, Uber pays its drivers on a "commission only" basis.  Uber passengers pay a full fare amount to Uber, which Uber, jointly with the Defendant FHV bases, remits to the Driver after deducting its fee of between 20 to 28%, depending on the type of service, vehicle used for the trip and tenure of the Driver.  As discussed below, a variety of additional items are also deducted from the Drivers' commission pay.

193.    At the time of their hire, and at varying times thereafter, all plaintiffs are required to enter into employment contracts with Uber.

194.    Uber is deeply involved in marketing its transportation services, setting prices for services, selecting and qualifying its Drivers, regulating and monitoring their performance, and disciplining or terminating those who don't measure up to Uber's expectations.

## UBER MISCLASSIFIES DRIVERS AS INDEPENDENT CONTRACTORS

195.    As an initial matter, Uber's contracts label all Drivers as "independent contractors" when they are/were in fact, employees of Uber.

196.    Although Uber's Driver contracts frame a relationship with its Drivers that is short on specifics, and explicitly disclaim any direction or control over its Drivers, these

26

contracts, in addition to Uber's practices, create a level of control more pervasive and far-reaching than many other Black Car bases which have already been recognized as or deemed to be employers by the National Labor Relations Board and the New York State Department of Labor and the United States Department of Labor.

## Uber Maintains Constant and Active Control Over How Its Drivers Perform Their Work.

197.    Plaintiffs claim that Uber exercises near total control over the means and method of their work.  For example, Uber controls the terms and conditions of employment from what to wear to what route to take, to setting customer fares and Uber's fee.

198.    Uber has the authority to hire, fire and discipline its Drivers.

## Ensuring Five Star Service: Uber's Employee Code of Conduct

199.    All Drivers were hired by Uber in a common manner and subject to similar training videos as to how to set up and use the Uber App, and provide customer service in line with Uber's standards.

200.    Further, Drivers were advised of the same set of rules and instructions and what discipline they might be subjected to for not abiding by the rules.

201.    In practice, Uber's control begins through a series of communications given by Uber to Drivers when they sign up to drive with Uber or to affiliate their vehicles with the company, including instructional tips, videos, a handbook and in person trainings that have the force of a code of conduct/employee rules.

202.    Uber's focus in such instruction is to provide riders a "Five-Star" service.  *See How to Be a Five-Star Uber Driver*, video, available at https://www.youtube.com/watch?v=5-GEn_WsMl4 (Accessed Sep. 29, 2015)

203.   All individual plaintiffs report that where the prescribed conduct is not followed, Drivers are subject to poor ratings, decreased access to dispatches, decreased access to the most profitable class of dispatches, and termination, or "deactivation" in Uber's parlance.

204.   First among these communications are various "on-boarding instructional" videos that Uber mandates each Driver view in order to affiliate a vehicle and or receive dispatches from Uber.

205.   These videos instruct Drivers on how to interact with customers in order to provide them with the desired Uber experience.

206.   Several of the individual plaintiffs recall viewing these videos and the specific rules and guidelines enumerated for Drivers by Uber.

207.   Uber mandates minute details of the Drivers' work experience in this manner. For example, Uber directs the Drivers' grooming and personal hygiene.

208.   Plaintiff Kaler was instructed on the importance of keeping a neat hair style.

209.   Uber seeks to control the type of conversation the Drivers have with the Uber customers, recommending they comment on how much they like working for Uber and instructing them to encourage the customer to recommend Uber to friends.

210.   Plaintiff Parmar recalls viewing the "onboarding instructional video" at Uber's Jackson Avenue office and its instructions that he open the door for passengers in addition to the aforementioned rules.

211.   Plaintiff Parmar was also instructed in person by Uber staff that as an Uber Black Driver, working in the luxury service class, he was to wear a "nice shirt and pants." He was prohibited from wearing jeans.

212.    Upon information and belief, all Uber Drivers providing Uber Black service or higher levels of Uber service are subject to a dress code.

213.    Upon information and belief, all Uber Drivers were required to watch such videos and were instructed to keep such items as candy, water, and phone chargers in their cars for the benefit of the passengers.

214.    Drivers received handbooks which gave detailed instructions on how to operate the app, how long to wait for passengers, and exactly how to respond to passengers who attempted to offer cash tips.

215.    Drivers who sign up to provide service to those customers requesting rides through Uber's "UberFamily" program must attend a car seat training offered by Uber and be able to demonstrate that they can properly install a car seat. *See Uberfam Onboarding*, available at www.driveubernyc.uberfamob/ (Accessed: Sep. 22, 2015)

216.    In order to qualify for UberFamily, Drivers are required to pass a test after attending a required training. Drivers who attended the training were forbidden from smoking and were warned by Uber that they would be disqualified from the training and would be unable to become "UberFamily Partners" if they smelled of smoke at the car seat training.

217.    Although Uber maintains no wheelchair accessible vehicles among its New York City fleet, the company has provided its employees with detailed instructions on how to pick up and interact with passengers who have disabilities, including what specific terms to avoid when speaking with passengers with disabilities.

218.    Further, Uber's code of conduct governs waiting time. The Driver handbook instructs Uber Drivers in no uncertain terms how to wait for a passenger, stating: "If the user is

not waiting at the pick-up location: *Wait at least 10 minutes *Call the user twice within the 10-minute wait period."

219.   The handbook gives detailed directions on exactly when a Driver can start charging for wait time. Drivers are instructed that, if the customer answers a phone call and requests the Driver to wait longer than ten minutes, the Driver should ask if the customer agrees to pay for wait time, and start the in-app meter at the ten-minute point.

220.   The Driver contract states that it is "recommended that Driver waits at least ten (10) minutes for a User to show up at the requested pick-up location."

221.   Drivers who start the in-app meter too early can be subject to low ratings and/or discipline.

222.   More recently, Uber informed its Drivers that it had adjusted the recommended wait time in New York from ten to five minutes. If a Driver does not wait the recommended period of time, and cancels a trip that Uber believes should not have been cancelled, he or she can be subject to discipline by Uber.

223.   Other instructions to Drivers include feedback sent by email to Drivers in response to customer comments and rating, such as the following:

> There were a few things your riders thought could be better. Here are some tips on how to improve: Service- Riders give the best ratings to Drivers who: *Never ask for a 5-star review but focus on providing an excellent experience. *Stay calm, patient and polite with riders and other cars on the road. *Go above and beyond to make the experience special, such as opening doors for riders when possible.

224.   Other feedback includes directions to "Always use GPS until you know the city well," to "Ask if the rider has a preferred route," and that riders "prefer for Drivers not to promote other businesses during the trip."

225.    In discussing the consequences of failing to heed this "feedback," an article posted in the "Newsroom" section of Uber's website reads, "Real-time feedback about Drivers means Uber can correct for issues big and small- while ensuring only the best Drivers stay on the road….Have partner Drivers been deactivated for consistently poor ratings? You bet."

226.    The handbook then details a list of behaviors that lead to one-star ratings and five star ratings, respectively. Actions that lead to 1-star ratings include: calling a rider unnecessarily, asking for five star ratings, asking for tips, taking an inefficient route, or accepting cash. Actions that lead to 5-star ratings include: asking if the passenger has a preferred radio station, communicating throughout the trip, always asking for the passenger's preferred route, and politely greeting the passenger and asking their name.

227.    Although, in conveying the above rules, Uber has, more recently, labeled its direction to Drivers as "tips" and "suggestions," this choice of words makes no practical difference to drivers; when these expectations are not met, Uber may discipline and even terminate the Driver's employment completely.

228.    Drivers also received consistent instruction throughout the term of their employment by way of mass e-mails sent by Uber to all drivers, reminding them, for example, that not accepting trips would lead to being locked out of the app, or that drivers could be deactivated for recommending that riders take trips with other transportation services.

**Uber Exercises Strict Control as to Type of Vehicle**

229.    Uber maintains a substantial interest not only in the behavior of its Drivers, but also the presentation of its cars and level of service. Uber sets vehicle standards and color requirements not required by any state or local regulations in New York. *See, Full Vehicle List*, available at http://www.driveubernyc.com/full-list (Accessed Sep. 22, 2015)

230.    Cars used in Uber Black service must be "black on black," that is painted black, with black upholstery.

231.    Further, a video on how to be a five-star Driver tells Uber Drivers to maintain cars above the levels required to pass TLC-mandated inspection: "Your contract with Uber requires that you keep your vehicle in great mechanical condition at all times. That means no visible body damage, no squeaky brakes." *How to Be a Five-Star Uber Driver*, video, available at https://www.youtube.com/watch?v=5-GEn_WsMl4 (Accessed Sep. 29, 2015)

232.    Moreover, Uber maintains relationships with a number of "Uber-approved" car dealers and urges Drivers to contract with those dealers for new cars and upgrades in order to be eligible for certain classes of service.

233.    In the on-boarding instructional video, Uber even suggests that the car dealerships they recommend will provide the Drivers with the best financial deals.

234.    Uber acts as a guarantor for Drivers without a credit history to lease cars at these affiliated dealerships and even finances the down payment when necessary.

235.    Uber has urged Drivers to buy or lease a particular car for a particular class of service and then unilaterally changed the cars eligible for such service, to Drivers' detriment.

236.    To those Drivers of Yellow or Green Taxis who drove under Uber T (Uber's service which dispatches trips to licensed Yellow and Green Taxis for a flat $1 or $2 booking fee), Uber sent a barrage of messages urging them to purchase a Black Car and sign up to drive for UberX rather than drive a Taxi, apparently in an effort to bolster the more profitable side of Uber's business.

**Dispatch and Acceptance of Fares**

237.    Uber's control extends to its dispatch of fares, which it does in order of preference based on Drivers' acceptance rate and star rating, in addition to a Driver's proximity to the customer.

238.    Based on passenger-provided positive ratings, Uber rewards Drivers by upgrading their status to allow Drivers more opportunities to pick up passengers, and to pick up more lucrative classes of passengers; these opportunities are not available to Drivers with lower rankings.

239.    Drivers who achieve higher ratings are automatically classified as "UberVIP" Drivers. Drivers who achieve this status/ranking will be eligible for trips with Uber passengers who select UberVIP service, knowing that they will be driven by a top-rated Uber Driver. The passenger rating system rewards Drivers who follow Uber's customer service expectations by providing them with more fares than non-VIP Drivers would receive.

240.    VIP drivers were also singled out by Uber to receive dispatches for lucrative trips in the Hamptons during the summer months, at rates roughly twice those Uber charges in New York City. Uber marketed these trips as an exclusive opportunity, despite the fact that Uber was not authorized to provide service in the Hamptons, and over twenty drivers were ultimately arrested for illegal operations.

241.    Further, on airport dispatches, Uber will dispatch Drivers from the Black Car lot in the order they arrive. Given the distances and traffic at the airport, sometimes it takes twenty minutes to reach the passenger pick-up point at a terminal,  and often the passenger will have cancelled, having taken another service. Nonetheless, Uber requires the drivers to return to Black Car Lot, in order to get another airport fare.

242.     Once a Driver receives a dispatch, Uber specifies the pick-up location, but withholds the drop-off location until the passenger has entered the vehicle.

243.     Drivers are instructed that they will be penalized should they not accept an Uber dispatch.

244.     A page on Uber's website titled "How to Use Uber," instructs Drivers that "you should accept a least 80% of trip requests to retain your account status."

245.     More specifically, all of the individual plaintiffs were told they had to accept at least 90% of the dispatches offered, and had to maintain at least a 4.5-star rating of customer satisfaction in order not to be deactivated/terminated.

246.     All of the individual plaintiffs were told that if they declined two dispatches in a row, they would be locked out of the Uber app for a period of time.

247.     When Drivers do not comply, Uber reprimands Drivers for cancelling too many trips during the course of a week, sending e-mails that read, "Please reduce your cancellation rate if you want to continue using the Uber platform."

248.     All individual plaintiffs were informed that if they were deactivated based on a low rating, in order to be reinstated they would have to take a course from Uber and pay a fee for the course.

**Direction of the Route**

249.     Uber's control extends even to the routes taken by its Drivers.

250.     While the Driver contract requires Drivers to accept responsibility for the effectiveness and efficiency of Uber rides, Uber unilaterally decides what route a Driver should take or, after the fact, should have taken, and will reduce a Driver's pay accordingly, without first consulting the Driver, or even examining the surrounding traffic conditions.

251.    All of the individual plaintiffs were instructed to follow the GPS route, if they were unfamiliar with the area, and to deviate only if the customer preferred a different route.

**Drop Off Order**

252.    Similarly, Drivers who accept dispatches pursuant to Uber's "Uber Pool" service, in which drivers pick up more than one passenger from various pick-up points, are directed not only with respect to route but also the order in which they drop off passengers.

253.    Uber materials for Drivers, such as instructional videos, explicitly state to Drivers, "You need to drop off the riders in the order provided by the app." UberPool NYC Partner Video, available at http://www.driveubernyc.com/pool-video (date accessed, September 29, 2015).

254.    The video provides instructions on how, when a Driver responds to a second pick-up, the Uber app will automatically reroute the Driver, directing them to the second pick-up point.

255.    Even if the Driver thinks it would be more convenient to drop off one rider first, or would want to make sure the first rider picked up is the first dropped off, Uber's control trumps the Driver's independent judgment, and instructs the Driver not to do so.

256.    The video also "suggests" that Drivers wait one-minute before calling a second passenger who is not present when the Driver arrives; this is a significant difference from the five-minute suggestion for other Uber trips.

257.    Like all of Uber's suggestions, these "suggestions" carry the force of work rules as not following such "suggestions" leads to discipline by Uber.

**Deactivation for Non-Compliance**

258.    In pursuit of maintaining consistent five-star service, Uber reserves the right to deactivate Drivers based on passenger ratings, and indeed encourages passengers to offer feedback on its Drivers to create a more uniform experience.

259.    On information and belief, in addition to deactivating for failing to accept 90% of dispatches or failing to maintain a 4.5-star rating, Uber's practice is to deactivate its Drivers in the bottom 5% of its ratings, regardless of whether Drivers' activity has prompted any specific complaints.

260.    Deactivated Drivers must take an Uber-mandated re-training course before Uber will reactivate their accounts and continue to dispatch jobs to them. Drivers who attended such classes were made to watch training videos and discuss actions that they should take or avoid when transporting passengers.

261.    Uber states that it may permanently deactivate Drivers for actions that would not warrant suspension or revocation under TLC's regulatory framework, such as accepting cash tips from riders.

**Uber, Not Drivers, Unilaterally Controls the Opportunity for Profit Or Loss**

262.    Although Uber could have chosen to operate merely as a dispatch service open to customers and for use by a variety of Black Car bases, or to more broadly offer its Uber T service which passengers use to find Taxis via their smartphone app, Uber chose to organize itself as a joint enterprise car service consisting of the above-listed licensed Defendant Black Car bases.

263.    As opposed to a mere dispatch service, by choosing to become a Black Car service, Uber benefits from the control over profit and loss it may exercise by raising fares,

lowering Drivers' commission rates and increasing the number of cars it affiliates with, none of which it could do if it chose merely to register as a TLC-licensed e-hail or e-dispatch provider.

264.    All aspects of the business affecting the bottom line are set by Uber, in its sole discretion, not the purported business "partner" Drivers.

**Uber Sets the Fare and Fees and Accepts Payment**

265.    When the passenger completes the trip, Uber's control extends to all aspects of the financial transaction.

266.    That is, Uber unilaterally sets fares. When fares were slashed in New York in August 2014 and again in January 2016, it was good for Uber, increasing its market share, but bad for Drivers, as drivers had to work more trips to make the same gross pay.

267.    Drivers are denied all independent judgment or control about what fare to set to meet their bottom line.

268.    Further, as Uber has slashed fares it has also increased its own fees unilaterally.

269.    When Uber entered the New York market on or about December 31, 2011 it took a fee of 10% on fares in the lowest class of service. Today its lowest fee is 20% (for drivers who Uber hired before April 13, 2015) and is as high as 28% in the highest classes of service. Drivers who sign up to work for Uber today will pay a minimum of 25% of gross earnings to Uber, before Uber takes further deductions for sales tax and the BCF surcharge.

270.    Uber collects all monies from passengers and disburses such monies according to its own accounting procedures and policies.

271.    Drivers' opportunity to challenge any accounting errors pursuant to the contract is limited to three days.

**Goodwill Accrues to Uber Not Drivers**

272.   Just as Uber's control of the bottom line is inconsistent with Drivers' operation of an independent business, so too is Uber's requirement that customer goodwill flow to it, not to Drivers.

273.   That is, New York City Uber Drivers do not operate independent businesses, but work to serve the interests of their employer.

274.   Drivers working for Uber provide a branded service; most Drivers place a small sign in a front window that reads "Uber" or a black square with a large "U" for Uber in their front windshields. Uber e-mails Drivers who have not picked up such signs from the office, encouraging them to do so.

275.   Consistent with this Uber branding, the Uber website provides conversation topics to broach with passengers, all serving to inure to Uber's goodwill as a brand.

276.   Further, Uber Drivers are encouraged to promote Uber and increase Uber's business, acting not only as third-party Drivers, but as promoters of Uber's business and brand. The Driver handbook encourages Drivers to "grow your business" by promoting Uber.

277.   For example, Drivers are encouraged to give cards to passengers in a group who may not have used Uber yet, and to teach people how to use Uber "at large events or busy areas" when Drivers are offline. Although such corporate promotion may increase the overall number of Uber riders, Drivers are not creating more direct business for themselves by promoting Uber.

278.   Meanwhile, Drivers are barred from promoting other businesses to passengers, which would include their own services as an independent Black Car driver on a future trip.

**Uber Directs Drivers To Purchase Vehicles to Uber's Specifications**

279.     In order to drive for Uber, Drivers must purchase or lease a vehicle that meets Uber's specifications. Drivers have no opportunity to receive profits directly from Uber's business. Rather, the amount of their earnings, like other employees, depends solely on the amount of time that they work, and the number of rides that Uber dispatches to them during that time.

280.     Further, with respect to Drivers' investment in vehicles, these are largely directed by Uber.

281.     Uber specifies the brand and class of car that is eligible for each level of service.

282.     Even in the lowest level of service, UberX, Uber representatives at the Jackson Avenue and Manhattan Offices direct Drivers as to which entry level vehicle to purchase.

283.     Uber specifies where to purchase and lease these vehicles and is involved in the financing terms and guaranteeing of such loans where needed. While signing up for Uber, Drivers are shown a video that refers them to "Uber-approved" brokers of vehicles who, Drivers are told, offer special deals for Uber Drivers.

284.     After significant investments, Uber Drivers' only way to gain higher earnings is to work longer hours, similar to any other employee.

**Uber Drivers Require No Special Skill Or Independent Initiative To Perform Their Work**

285.     While some of the representative Plaintiffs are experienced, longtime drivers, driving for hire has not been considered a skilled occupation, even where it may require brief additional training or additional state or municipal licensure.

286.     In New York City, other than a TLC License, no qualifications are required, or preferred, for Uber Drivers to perform their work.

287.    Indeed, Uber's recruitment platform to potential Drivers is that *anyone* with a car can become an Uber Driver. In New York City, anyone with a valid Driver's license, who can pass a drug test and criminal background check (required to receive a TLC-issued FHV Driver's license) can work for Uber.

288.    Uber does not require a skilled workforce, as it can better impose its branded service through extensive rules and ceaseless monitoring and supervision.

289.    Uber Drivers are subject to supervision by Uber, whether the work is done with or without a passenger.

290.    Uber's app maintains constant GPS contact with the Driver. Indeed, this constant tracking is required in order for Uber to match potential customers with its Drivers based on proximity.

**Drivers' Working Relationship With Uber Is Indefinite and Often Long-lasting**

291.    Uber Drivers' contracts are indefinite and not renewed on a job-to-job basis.

292.    Indeed, Uber's guaranteed payment model is based on Drivers working multiple trips during set blocks of time. Those contracts, which promise Drivers guaranteed net income amounts if a Driver works a full three, or six or twelve-month period (and satisfies all conditions), envision Drivers entering into long-term engagements with Uber.

293.    Likewise, the "Uber-approved" vehicle dealers that Uber markets to new drivers offer long-term vehicle financing of commercial vehicles for use with Uber.

294.    Uber has been in operation in New York City for only five years.

295.    Measured by this timeframe, the individual Plaintiffs, members of the FLSA collective action and upon information and belief, the members of the class action have had a

long-lasting relationship with Defendants, many working for the majority of the time that Uber has been in business in New York.

**Drivers Are Integral To Uber's Business**

296. Despite its claims that it is merely a technology company, Uber is in the transportation business, and depends entirely on its Drivers to operate its business.

297. Indeed, Uber's previous corporate motto described Uber as "Everyone's Private Driver." The current homepage of Uber's website states that "Uber is the smartest way to get around," a marketing tag that could well apply to another car service, but would make little sense as a description of Microsoft or Google.

298. Specifically, in New York City, Uber is a Black Car service operating under the regulatory framework established for a Black Car Service by the New York City TLC. In New York, "Uber" operates a Black Car company made up of 27 subsidiary LLCs, which are FHV bases, licensed by and registered with the TLC, to provide transportation services.

299. As a car service, Uber simply could not be in business without its Drivers. A video available on the Uber website admits as much, saying: "Drivers are the engine of the Uber network. Without you, we just wouldn't get anywhere." *Uber, Preferred Financing Program*, available at https://vimeo.com/103542779 (Accessed, May 26, 2016).

**Practically, Uber Pays Its Workers By The Hour, Not By the Job**

300. In addition to the above indicia of an employment relationship between Uber and Plaintiffs, Uber's pay structure also demonstrates the existence of an employment relationship.

301. Although Uber's basic structure for Driver payments is based on per-trip payments, Uber's formula differs from those of other Black Car companies in that Uber pays the Driver for the time and mileage covered rather than merely charging passengers a flat rate.

302.    While New York Black Car companies traditionally set fare prices with their passengers in a binding flat rate quote for a specific distance or trip, Uber does not do so.

303.    Rather, Uber offers a potential passenger a "fare estimate" before the trip has been agreed to, and then Uber bases the amount of the fare on the distance travelled and the travel time.

304.    Uber then measures the fare amount by using a virtual meter that assesses a per-minute charge for every minute of the trip, regardless of the vehicle's speed.

305.    The notion that Uber pays its Drivers for the time they work, rather than by the job becomes clearer when considering how Uber compensates its Drivers for UberPool trips.

306.    When a Driver works an UberPool trip during flat-rate promotion periods he/she is paid solely based on the time and distance, regardless of the fact that the passenger pays a flat rate.

307.    If, for example, a Driver transports one passenger who has requested UberPool service, the passenger may pay Uber a flat rate of $5, but the Driver is paid based on the time and distance calculation used for UberX trips. In such cases, regardless of the price of the fare that the passenger has contracted for, the Driver is paid for the time he works for Uber.

308.    Further, Uber's fare and wage payment structure regularly compels Drivers to work exclusively for Uber for set blocks of time if they wish to earn an adequate amount of gross bookings, by qualifying for hourly minimum earnings.

309.    That is, periodically, Uber will offer Drivers a certain amount of guaranteed net fare income if they sign in to work during specified hours and meet certain conditions. To meet these conditions, Drivers must, effectively, work exclusively for Uber.

310.    For example, Uber makes similar earnings guarantees based on a year, or remainder of a year. Uber guaranteed $25,000 in annual income for any Driver who signed up to work with Uber before September 10, 2015, so long as the Driver stayed logged in for at least 200 hours per month (roughly a minimum 45-hour work week), accepted 90% of trips in each month, and completed at least 200 trips within New York City in that month. Requiring Drivers to work so many hours per work, and to complete so many trips for Uber, effectively requires Drivers to work exclusively for Uber to qualify for Uber's minimum earnings payments.

311.    Other income plans clearly restrict where Uber Drivers may   work. For example, a long-term guaranteed income agreement that applied to the last months of 2014 required Drivers to stay in Manhattan south of 110th Street, and in nearby neighborhoods in Brooklyn, such as Williamsburg and Park Slope to qualify for monthly minimum earnings. A more recent promotion offers an additional payment to any driver who makes a pick-up in Manhattan on a weekday between 5:00 and 5:59 PM.

312.    Although Uber expanded its opportunities for wage payments unrelated to actual fare revenue after it cut its fare rates in January 2016, these rates only apply if drivers meet other conditions. For example, if Uber cannot provide enough work (namely, 1.3 trips per hour), a driver will not qualify for the guarantees, and with the new lower rates, is much more likely to earn below the minimum wage.

313.    As Uber wrote to its Drivers in or about late January 2016: "Beginning Friday, we will be reducing UberX and UberXL prices to get more riders on the road and increase your hourly earnings."

314.    After making these fare cuts, during select weeks during 2016, Uber has offered a minimum guarantee of $1500 for 50 hours worked, which required the following conditions be met by Drivers:

> This offer is for Driver-partners only who directly received this message. Be logged in online in the Uber app in New York City at least 50 hours, 15 of those hours within the time periods specified above. Maintain the above required trips per hour. Trips per hour (TPH) is calculated by taking your total number of completed trips in a given incentive period divided by the total hours that you were online during that same incentive period. Repeat trips with the same riders will not be counted toward your completed trips for the guarantee. Maintain a 90% acceptance rate over all hours driven. Acceptance rate is calculated by taking the total number of trip requests that you accepted during the incentive period divided by the total number of trip requests that were sent to you during that same incentive period. Maintain a completion rate of 25%. Completion rate is calculated by taking your total number of completed trips in a given incentive period divided by the total number of trip requests that you received in the given incentive period. Qualification parameters reset at the beginning of each new incentive period. Guaranteed amounts are weekly net fares, based on hours online per incentive period. Net earnings are net of Uber service fee, Black Car Fund, and sales tax. We reserve the right to withhold or deduct payments that we determine or believe were in error, fraudulent, illegal, or in violation of Driver terms or these terms. Guarantee available for a limited time only. Terms are subject to change.

315.    As part of its promotion of these guarantees, Uber admits that it has failed to pay any wages for many hours worked. One Driver received an email stating, "In the last month, you spent 176 hours online waiting for a trip request, not earning money. Our goal is to turn your unpaid time online into paid time."

316.    That is, Uber admits that it has failed to pay wages for all hours worked and views the payment of wages as a "goal" rather than a legal requirement.

**Uber's Minimum Wage and Overtime Violations**

317.    The individual representative Plaintiffs and members of the Class they seek to represent at times worked in excess of forty (40) hours per workweek, without overtime pay.

318.   Defendants unlawfully failed to pay plaintiffs and the Class they seek to represent in accordance with minimum wage requirements of federal and state law.

319.   Defendants failed to provide plaintiffs and members of the Class they seek to represent with a statement with each payment of wages as required by the NYLL.

320.   Defendants violated NYLL §195(3) by failing to furnish plaintiffs and the Class they seek to represent with a statement with every payment of wages, listing hours worked, gross wages, hourly rate, deductions and net wages. In addition, defendants failed to furnish an explanation of how such wages were computed when plaintiffs requested such an explanation.

321.   All individual plaintiffs are paid on a weekly basis. Most have access to all of their records from which it is possible to determine how many hours they worked and how much they received in gross and net compensation. However, until recently, Uber has not included a driver's weekly hours worked and weekly earnings in a single e-mailed document.

322.   Defendants violated NYLL §195(1) by failing to provide Plaintiffs with a yearly notice which includes rates of pay including straight time and overtime; how and when Plaintiffs are paid; the official name of Plaintiffs' employer and any other names used for business; the address and telephone number of the employer's main office or principal location.

323.   Defendants committed the foregoing acts against the individual plaintiffs and the Class they seek to represent.

**Uber's Unlawful Equipment and Tools Deductions**

324.   Federal regulations prohibit employers from requiring a minimum wage employee to purchase the tools of their trade or give any money back to his or her employer, if the cost of such tools would bring the employee's pay below the established minimum wage and overtime rate. 29 C.F.R. §531.35.

325.    The NYLL prohibits employers from making any deductions from an employee's wages except those permitted by law. N.Y. Lab. Law §193.

326.    Defendants required Plaintiffs to purchase vehicles and other supplies at their own expense for use in fulfilling their duties as Uber Drivers, including but not limited to vehicular expenses, gas, insurance, i-Phone lease, snacks, and other miscellaneous items Uber required Drivers to stock in their vehicles.

327.    Defendants deducted the cost of an Uber iPhone lease, vehicle financing or lease expenses, and fuel payments directly from the wages of some of the individual plaintiffs and members of the Class they seek to represent.

328.    Defendants also unlawfully directed Plaintiffs to engage in passenger pick-ups in violation of state law and local regulations, which resulted in Plaintiffs being subjected to fines from law enforcement agents in jurisdictions outside of New York City, such as Nassau County.

329.    For example, Defendants have consistently dispatched trips to its New York City TLC-licensed Drivers that begin and end within Nassau County, despite the fact that Nassau County laws prohibit Drivers and vehicles not registered with the Nassau County Taxi & Limousine Commission ("Nassau County TLC") from doing such work.

330.    When Defendants directed Plaintiffs to make illegal pickups, Uber knew that such trips were illegal trips as customers may have already input their destination information. Unlike Defendants, drivers were not able to learn of the unlawful destination of such trips until they had already accepted the trips, and the passengers were seated in the vehicle. At the time it dispatched these trips, Uber was aware that the trips neither began nor would end in New York City, making these dispatches illegal under local regulations and New York State Vehicle and Traffic Law §498.

331.    The maximum fine for such a violation, as assessed by the Nassau County TLC is $1500.

332.    Additionally, Uber required Drivers who were deactivated for a low rating or any reason whatsoever to pay $100 for instructional classes which were required in order to be reactivated.

333.    The expenses described in the preceding paragraphs were exclusively for the benefit of Defendants and constituted *de facto* deductions from Plaintiffs' wages.

334.    With respect to the fines resulting from unlawful passenger pickups, not only were these unlawful actions for Defendants' benefit, but also they were at Defendants' behest and over Plaintiffs' objections.

335.    Drivers were not reimbursed for these expenses by Defendants.

336.    These deductions were not permitted deductions under N.Y. Lab. Law §193 and brought Drivers at various times to earn wages that were under prevailing minimum wage standards.

**Uber's Unlawful Tax and Surcharge Deductions**

337.    The NYLL prohibits employers from making any deductions from an employee's wages except those permitted by law. N.Y. Lab. Law §193.

338.    Drivers' rates of pay were set forth in the form of fare rates published on its website and its app, and by the commission rates/Uber fees charged to Drivers, established by Defendants.

339.    At all times relevant, Defendant made additional deductions from Drivers' pay to cover the cost of taxes and contributions to a Drivers Workers' Compensation Fund, the Black Car Fund.

340.    In order to receive Uber dispatches, all Plaintiffs and similarly situated persons were required to either sign a paper copy, or electronically "accept" a "Software License and Services Agreement" (hereafter "Licensing Agreement" or "Agreement") on their phones to use the Uber App.

341.    Uber's Licensing Agreement is over twenty pages long, but these Agreements did not specify the trip fare schedule set by Uber, a percentage of which Plaintiffs received as consideration for driving.

342.    The trip fare schedule pertaining to a given Territory is set forth in a separate "Driver Addendum Related to Uber Services" and the "City Addendum" that Drivers did not view or sign at the time they accepted.

343.    Trip fare schedules were subject to unilateral change by Uber and percentages due to Drivers under the Agreement could be changed unilaterally by Uber in subsequent addendums offered to Drivers.

344.    In order to receive dispatches after a new Licensing Agreement, a Driver was required to agree to the new contract, which appeared on his or her phone, before any new dispatch could come in.

345.    All Drivers were bound by contract with Uber to provide driving services in exchange for receipt of a percentage of the fare collected by Uber from passengers.

346.    Pursuant to the Agreements in force from at least June 2013 until November 10, 2014, Uber, defined the word "Fare" as "the amount (including applicable taxes and fees) that the [Driver] is entitled to charge the User for the Ride, based on the recommended fares for the City as set out on http://www.uber.com or on the App."

347.    That is, "Fare" meant the total amount Uber charged its passengers for a ride.

348.    Uber's Agreements from at least June 2013 until November 10, 2014, at Section 5.2.1 states that the Driver will pay Uber a fee per ride, that is "calculated as a percentage of each Fare," subject to change by Uber and set forth in a City Addendum for each city or market.

349.    During this time, Drivers contracted with Uber to pay fees of 10%, 20%, 25% or 28%, depending on the service offered and the period during which services were offered.

350.    The 2013 and 2014 Agreements state that the Driver (referred to as "Transportation Company" or "Customer"), agrees that Uber will "deduct its Fee payable on all Fares earned by the Transportation Company and remit the remainder of the Fare to the Transportation Company."

351.    Quite simply, the Agreements require Uber to collect the gross fare, and remit the fare to Drivers, minus Uber's Service Fee.

352.    Nothing in these Agreements empowers Uber or any of its subsidiaries to remove any additional amounts from the fare.

353.    Yet, at all relevant times, Uber and its subsidiaries collected the entire Fare from passengers, and remitted to Drivers the Fare minus Uber's fee, and additionally, minus sales tax and BCF surcharge amounts.

354.    The Agreements plainly did not permit Uber to take the taxes and BCF surcharge amounts entirely from the Driver's portion, on top of the Service Fee that Uber states will be the only deduction from Driver-earned fares.

355.    By so doing, Uber violated the Agreement to Plaintiffs' detriment.

356.    Pursuant to the Agreements in force from November 10, 2014 up to and including the present, the Licensing Agreements likewise defined "Fare" to mean the total amount charged to the customer. Section 4.1 of these Agreements states that the Fare would be "calculated based

upon a base fare amount plus/mileage and/or time amounts, as detailed for the applicable Territory."

357.   From November 10, 2014 to the present, Section 4.1 of Uber's Agreements has stated that the Driver will "pay Uber a service fee on a per Transportation Services transaction basis calculated as a percentage of the Fare ... as provided or otherwise made available by Uber from time to time for the applicable Territory."

358.   Section 4.4 of Uber's more recent Agreements states that Uber will remit to drivers the Fare minus Uber's Service Fee.  As with its earlier Agreements, nothing in Uber's 2014 and 2015 Agreements entitles Uber to take any additional amounts from Driver earnings aside from Uber's percentage commission or "Service Fee."

359.   While the more recent Agreements state that, in addition to charging a passenger for the "Fare," the Driver is "also entitled" to charge User for taxes, and that the Driver is responsible for collecting and remitting taxes, Uber knows that under the New York Tax Law, black car bases are the vendor for sales tax purposes with a non-delegable to duty to collect and remit sales taxes.

360.   At all times relevant, by dispatching under this Agreement, Uber, jointly with Uber's subsidiary Black Car bases, were the vendors of transportation services under applicable New York Tax Law.

361.   As the vendor, Uber and its subsidiary Black Car bases were responsible to collect and remit the tax.

362.   At all times relevant, Uber was required to, and acknowledged that it was responsible for, complying with the Tax Law.

363.    Indeed, as Uber completely controls the electronic payment process, and Drivers are forbidden from accepting cash, there would be no way for the Driver to collect additional amounts independently.

364.    At all times, Uber has itemized its receipts to show that every part of the Fare charged to the customer represents part of the consumer sales price for transportation services, broken down into separate charges for the base fare, the charge for distance, and the charge for time, respectively.

365.    While payment for trips would be made from the passenger to Uber, consumer receipts state that rides were dispatched by an Uber subsidiary FHV base.

366.    Uber and its subsidiaries, treating the tax as included within the fare charged to the passenger, then paid its Drivers the fare minus Uber's Service Fee and sales tax amounts.

367.    Uber and its subsidiaries also treat the BCF surcharge as included within the fare charged to the passenger, then paid its Drivers the fare minus Uber's commission and the BCF surcharge amount.

368.    At all times, by deducting sales tax and BCF amounts from Driver earnings, Uber and its subsidiary Black Car bases made unlawful deductions from Plaintiffs' wages.

369.    As the payor of sales tax monies, the Defendant subsidiary Uber FHV bases unlawfully deducted tax amounts from driver wages, in order to remit these amounts to the state.

370.    As the payor of BCF contributions, the Defendant subsidiary Uber FHV bases unlawfully deducted BCF surcharge amounts from driver wages, in order to remit these amounts to the BCF.

371.   Plaintiffs have not been presented with any contracts from the Defendant FHV bases, and therefore they have not assented to arbitrate any disputes with any of the Uber subsidiary FHV bases who made these unlawful deductions.

372.   Alternatively, although the Contract defines "Fare" to mean the total amount charged to the passenger (a combination of separate charges for a base fare amount, distance, and time, respectively), even if Defendants were to claim that the "Fare" referred to in the contract is the total charged fare, minus the portions that Uber has removed for sales tax and BCF surcharges, or that the Agreement somehow authorized Uber to deduct sales tax and BCF amounts from the Fare, Defendants would still have violated its Agreement by allowing the assessment of the Service Fee on the gross fare, including tax and BCF surcharges.

373.   From November 10, 2014 to the present, the Agreements explicitly state that if the Fare includes any taxes, then Uber will assess its Service Fee on the Fare net of taxes. However, payment records state that Uber continued to assess its Service Fee on the gross fare, including amounts for tax and the BCF surcharge.

374.   Since November 14, 2014, by Defendants apparently, at times, choosing to define the "Fare" as less than the amount Uber charged the passenger, Uber has not complied with its Agreement  as it is assessing its commission on the gross fare, inclusive of sales tax and the Black Car Fund surcharge not received by the Driver.

375.   Under this interpretation of "Fare" to mean a type of implied base fare, Defendants also increased its commission by assessing the New York State sales tax, not only on the amount that Uber seemed to designate as the fare for sales tax purposes, but on the Black Car Fund surcharge, a non-taxable item.

376.    Under any interpretation of the term "Fare," Uber has unlawfully deducted from Driver pay by profiting on the assessment of sales tax and a surcharge intended to benefit injured workers.

377.    Although the Agreement at all times clearly defines "Fare" to mean the total charges for base fare, distance and time charged to the passenger, regardless of how Uber might try to define the term, Uber has violated its Agreement by unlawfully deducting amounts from Driver pay that the Agreement did not allow for.

378.    Regardless of Plaintiffs' employment status, Defendants owe Plaintiffs and the class they seek to represent the amount calculated to be wrongfully withheld from their wages.

## UBER ACTED SYSTEMATICALLY AND KNOWINGLY, INTENTIONALLY AND WILLFULLY.

379.    On information and belief, all of the above common allegations as to Uber's treatment of the individual plaintiffs are typical of the way all Uber Drivers in New York were hired, instructed, and/or disciplined.

380.    Defendants committed the acts alleged in this complaint knowingly, intentionally and willfully.

381.    On information and belief, Travis Kalanick authorized and was involved in the development of all policies and practices relating to the terms and conditions of Plaintiff's employment by Uber.

382.    As CEO of Uber, Kalanick made frequent trips to New York to set up the Uber's FHV licensed bases, serving as CEO and Manager of Unter Base, President of Hinter base, and the CEO of Weiter.

383.    In such capacity he was involved in overseeing the day-to-day operation of these bases.

384.    Further, Defendant Kalanick has assumed personal liability for liabilities arising from the operation of Unter, as required by the TLC.

385.    Upon information and belief, Defendant Kalanick substantially controls Uber's operations and business in New York, personally oversees the hiring or appointment of key personnel for Uber's operations and business in New York and/or the Uber bases.

386.    Upon information and belief, Defendants Camp and Gurley played a similar role as Kalanick with respect to the operation of the Unter base.

387.    Josh Mohrer, as General Manager of Uber New York, developed, authorized and implemented all policies and practices relating to the terms and conditions of Plaintiffs' employment by Uber.

388.    Upon information and belief, Defendant Mohrer personally oversees and directs the day-to-day operations of Uber's New York Black Car operation, dispatching more than 30,000 Drivers, along with Defendant Chapin.

389.    Upon information and belief, during his tenure in New York, Defendant Andrew Chapin substantially controlled Uber's operations and business in New York, personally oversaw the hiring or appointment of key personnel for Uber's operations and business in New York and/or the Uber bases.

390.    Upon information and belief, during his tenure in New York, Defendant Chapin personally oversaw and directed the day-to-day operations of Uber's New York Black Car operation, dispatching more than 30,000 Drivers along with Defendant Mohrer.

391.    Defendants knew that the nonpayment of minimum wage would economically injure Plaintiffs and violate federal and New York State laws.

392.   Defendants knew that the nonpayment of overtime would economically injure Plaintiffs and violate federal and New York State laws.

393.   Defendants knew that the taking of unlawful deductions would economically injure Plaintiffs and violate federal and New York State laws.

## FLSA COLLECTIVE ACTION ALLEGATIONS

394.   The individual representative Plaintiffs bring their claims pursuant to the Fair Labor Standards Act ("FLSA") §216(b) on behalf of themselves and all other similarly-situated persons (the "FLSA collective action plaintiffs"), who are/were employed by Defendants as Drivers in New York State and who were improperly classified as independent contractors and not employees, and who were either not paid enough wages to meet the prevailing minimum wage or who did not receive overtime premium pay, at the rate of one and one-half of their regular pay for all hours they worked in excess of forty in a work week ("overtime premium pay") for the period of December 31, 2011, to the date of the final disposition of this matter (hereafter the "collective action period.")

395.   The FLSA collective action plaintiffs at times worked more than forty hours in a work week and sometimes even put in 12-hour shifts, six days per week, which comes to an average of over 72 "on the clock" hours per work week.  For example, see below charts, which are based on weekly pay statements issued to the drivers and weekly summaries e-mailed to the drivers.

**Bigu Haider**

396.   The following chart demonstrates the hours worked for individual plaintiff Bigu Haider during weeks in which he worked over 40 hours:

| Name | Pay Period | Hours Worked |
|------|-----------|--------------|
|      |           |              |

| Haider, Bigu | 10/21/13-10/28/13 | 58.8 |
| Haider, Bigu | 11/4/13-11/11/13 | 46.7 |
| Haider, Bigu | 11/11/13/-11/18/13 | 41.5 |
| Haider, Bigu | 12/2/13-12/9/13 | 62.4 |
| Haider, Bigu | 12/9/13-12/16/13 | 44.1 |
| Haider, Bigu | 1/20/14-1/27/16 | 43.0 |
| Haider, Bigu | 1/27/14-2/2/14 | 50.8 |
| Haider, Bigu | 2/10/14-2/16/14 | 41.3 |
| Haider, Bigu | 2/17/14-2/23/14 | 44.9 |
| Haider, Bigu | 2/24/14-3/2/14 | 51.6 |
| Haider, Bigu | 3/17/14-3/24/14 | 50.8 |
| Haider, Bigu | 3/24/14-3/30/14 | 59.3 |
| Haider, Bigu | 3/31/14-4/6/14 | 46.7 |
| Haider, Bigu | 4/7/14-4/13/14 | 45.3 |
| Haider, Bigu | 4/28/14-5/4/14 | 44.2 |
| Haider, Bigu | 5/19/14-5/25/14 | 69.3 |

397.    As demonstrated above, Haider at times worked over forty hours per workweek for Uber. At no time, did he receive overtime pay.

398.    When Haider's expenses were accounted for, it is possible that during some weeks he did not earn the minimum wage as well as overtime.

**Harjit Khatra**

399.    The following chart demonstrates the hours worked for Uber by individual plaintiff Harjit Khatra during weeks in which he worked over 40 hours:

| Name | Pay Period | Hours Worked |
|------|-----------|--------------|
| Khatra, Harjit | 8/3/15-8/10/15 | 44.6 |
| Khatra, Harjit | 9/21/15-9/28/15 | 57.1 |
| Khatra, Harjit | 9/28/15-10/5/15 | 47.5 |
| Khatra, Harjit | 11/30/15-12/7/15 | 48.4 |
| Khatra, Harjit | 12/7/15-12/14/15 | 54.7 |
| Khatra, Harjit | 12/14/15-12/21/15 | 56.6 |
| Khatra, Harjit | 12/28/15-1/4/16 | 56.0 |
| Khatra, Harjit | 1/4/16-1/11/16 | 58.3 |
| Khatra, Harjit | 1/11/16-1/18/16 | 60.2 |
| Khatra, Harjit | 2/8/16-2/15/16 | 50.2 |
| Khatra, Harjit | 2/22/16-2/29/16 | 44.0 |
| Khatra, Harjit | 2/29/16-3/7/16 | 49.3 |

400.   As demonstrated above, Khatra at times worked over forty hours a workweek for Uber. At no time did he receive overtime pay.

401.   When Khatra's expenses were accounted for, it is possible that during some weeks he did not earn the minimum wage as well as overtime.

**Diogenes Carrasco**

402.   The following chart demonstrates the hours worked for Uber by individual plaintiff Diogenes Carrasco during weeks in which he worked over 40 hours:

| Name | Pay Period | Hours Worked |
|------|-----------|--------------|
| Carrasco, Diogenes | 5/19/14-5/25/14 | 59.9 |

| Carrasco, Diogenes | 5/26/14-6/1/14 | 43.9 |
|---|---|---|
| Carrasco, Diogenes | 6/2/14-6/8/14 | 53.7 |
| Carrasco, Diogenes | 6/9/14-6/15/14 | 47.3 |
| Carrasco, Diogenes | 6/16/14-6/22/14 | 50.0 |
| Carrasco, Diogenes | 6/23/14-6/29/14 | 55.3 |
| Carrasco, Diogenes | 6/30/14-7/6/14 | 57.0 |
| Carrasco, Diogenes | 7/14/14-7/20/14 | 54.8 |
| Carrasco, Diogenes | 7/21/14-7/27/14 | 55.4 |
| Carrasco, Diogenes | 7/28/14-8/3/14 | 49.8 |
| Carrasco, Diogenes | 8/4/14-8/10/14 | 49.4 |
| Carrasco, Diogenes | 8/11/14-8/17/14 | 42.3 |
| Carrasco, Diogenes | 8/18/14-8/24/14 | 50.8 |
| Carrasco, Diogenes | 9/1/14-9/7/14 | 49.5 |
| Carrasco, Diogenes | 9/29/14-10/5/14 | 45.6 |
| Carrasco, Diogenes | 10/6/14-10/12/14 | 44.5 |
| Carrasco, Diogenes | 10/20/14-10/26/14 | 44.3 |
| Carrasco, Diogenes | 11/10/16-11/16/14 | 42.1 |
| Carrasco, Diogenes | 12/1/14-12/8/14 | 48.2 |
| Carrasco, Diogenes | 12/8/14-12/15/14 | 47.6 |
| Carrasco, Diogenes | 2/9/15-2/16/15 | 47.3 |
| Carrasco, Diogenes | 4/27/15-5/4/15 | 41.8 |
| Carrasco, Diogenes | 6/815-6/15/15 | 41.1 |
| Carrasco, Diogenes | 7/6/15-7/13/15 | 41.1 |
| Carrasco, Diogenes | 7/20/15-7/27/15 | 40.9 |

| Carrasco, Diogenes | 8/3/15-8/10/15 | 40.3 |
| Carrasco, Diogenes | 8/24/15-8/31/15 | 47.0 |
| Carrasco, Diogenes | 9/28/15-10/5/15 | 42.6 |

403.   As demonstrated above, Carrasco at times worked over forty hours per workweek for Uber. At no time, did he receive overtime pay.

404.   When Carrasco's expenses were accounted for, it is possible that during some weeks he did not earn the minimum wage as well as overtime.

**Mamadou Diallo**

405.   The following chart demonstrates the hours worked for individual plaintiff Mamadou Diallo during weeks in which he worked over 40 hours:

| Name | Pay Period | Hours Worked |
|------|-----------|--------------|
| Diallo, Mamadou | 5/4/15-5/11/15 | 42.4 |
| Diallo, Mamadou | 6/29/15-7/6/15 | 42.7 |
| Diallo, Mamadou | 7/6/15-7/13/15 | 49.2 |
| Diallo, Mamadou | 7/20/15-7/27/15 | 48.6 |
| Diallo, Mamadou | 5/2/16-5/9/16 | 44.4 |
| Diallo, Mamadou | 5/9/16-5/16/16 | 51.8 |

406.   Thus, as demonstrated above, Diallo at times worked over 40 hours per workweek for Uber. At no time, did he receive overtime pay.

407.   When Diallo's expenses were accounted for, it is possible that during some weeks he did not earn the minimum wage as well as overtime

**Cherno Jallow**

408.    The  following  chart  demonstrates  the  hours  worked  for  individual  plaintiff
Cherno Jallow during weeks in which he worked over 40 hours:

| Name | Pay Period | Hours Worked |
|---|---|---|
| Jallow, Cherno | 9/1/14-9/7/14 | 78.0 |
| Jallow, Cherno | 11/10/14-11/16/14 | 88.3 |
| Jallow, Cherno | 11/24/14-12/1/14 | 43.8 |
| Jallow, Cherno | 12/8/14-12/15/14 | 42.6 |
| Jallow, Cherno | 12/15/14-12/22/14 | 85.5 |
| Jallow, Cherno | 1/5/15-1/12/15 | 55.1 |
| Jallow, Cherno | 1/12/15-1/19/15 | 65.6 |
| Jallow, Cherno | 1/26/15-2/2/15 | 64.3 |
| Jallow, Cherno | 2/2/15-2/9/15 | 66.3 |
| Jallow, Cherno | 2/9/15-2/16/15 | 70.8 |
| Jallow, Cherno | 3/9/15-3/16/15 | 43.1 |
| Jallow, Cherno | 3/23/15-3/30/15 | 41.2 |
| Jallow, Cherno | 3/30/15-4/6/15 | 64.0 |
| Jallow, Cherno | 4/13/15-4/20/15 | 51.5 |
| Jallow, Cherno | 4/20/15-4/27/15 | 41.0 |
| Jallow, Cherno | 4/27/15-5/4/15 | 49.5 |
| Jallow, Cherno | 5/4/15-5/11/15 | 64.0 |
| Jallow, Cherno | 5/11/15-5/18/15 | 63.4 |
| Jallow, Cherno | 5/18/15-5/25/15 | 51.0 |
| Jallow, Cherno | 5/25/15-6/1/15 | 42.9 |

| Jallow, Cherno | 9/7/15-9/14/15 | 46.6 |
|---|---|---|
| Jallow, Cherno | 9/21/15-9/28/15 | 43.0 |
| Jallow, Cherno | 9/28/15-10/5/15 | 42.0 |
| Jallow, Cherno | 10/5/15-10/12/15 | 41.9 |
| Jallow, Cherno | 10/12/15-10/19/15 | 44.0 |
| Jallow, Cherno | 11/30/15-12/7/15 | 54.0 |
| Jallow, Cherno | 1/4/16-1/11/16 | 52.3 |
| Jallow, Cherno | 1/18/16-1/25/16 | 48.4 |
| Jallow, Cherno | 2/15/16-2/22/16 | 49.1 |
| Jallow, Cherno | 2/22/16-2/29/16 | 57.0 |
| Jallow, Cherno | 2/29/16-3/7/16 | 89.3 |
| Jallow, Cherno | 3/7/16-3/14/16 | 63.7 |

409.    Thus, Jallow, as demonstrated above, at times worked at times worked over forty hours per workweek for Uber. At no time, did he receive overtime pay.

410.    When Jallow's expenses were accounted for, it is possible that during some weeks he did not earn the minimum wage as well as overtime.

**Ranjit Kaler**

411.    Upon information and belief, Kaler at times worked at times worked over forty hours per workweek for Uber. At no time did she receive overtime pay. Kaler no longer has possession of the weekly summary e-mails that list her total number of hours worked per week, however these records are in Defendants' possession.

412.    When Kaler's expenses were accounted for, it is possible that during some weeks she did not earn the minimum wage as well as overtime.

**Inderjeet Parmar**

413.   The following chart demonstrates the hours worked for individual plaintiff Inderjeet Parmar during weeks in which he worked over 40 hours:

| Name | Pay Period | Hours Worked | Gross Uber Pay | Tolls | Actual Gross Pay |
|------|-----------|--------------|----------------|-------|------------------|
| Parmar, Inderjeet | 9/29/14-10/5/14 | 51.8 | $1,386.37 | ($152.87) | $1,233.50 |
| Parmar, Inderjeet | 10/6/14-10/12/14 | 74.8 | $1,623.65 | ($119.25) | $1,504.40 |
| Parmar, Inderjeet | 10/13/14=10/19/14 | 44.8 | $1,325.19 | ($122.51) | $1,202.68 |
| Parmar, Inderjeet | 11/3/14-11/9/14 | 72.4 | $1,983.64 | ($187.52) | $1,796.12 |
| Parmar, Inderjeet | 11/10/14-11/16/14 | 68.8 | $1,955.83 | ($104.65) | $1,851.18 |
| Parmar, Inderjeet | 11/24/14-12/1/14 | 57.3 | $1,577.57 | ($150.41) | $1,427.16 |
| Parmar, Inderjeet | 12/1/14-12/8/14 | 68.5 | $2,174.06 | ($105.08) | $2,068.98 |
| Parmar, Inderjeet | 12/8/14-12/15/14 | 59.1 | $2,482.82 | ($77.31) | $2,405.51 |
| Parmar, Inderjeet | 12/15/14-12/22/14 | 55.6 | $1,541.60 | ($122.67) | $1,418.93 |
| Parmar, Inderjeet | 12/22/14-12/29/14 | 56.5 | $1,262.04 | ($96.58) | $1,165.46 |
| Parmar, Inderjeet | 1/5/15-1/12/15 | 54.7 | $1,364.03 | ($133.30) | $1,230.73 |
| Parmar, Inderjeet | 1/12/15-1/19/15 | 69.2 | $1,798.12 | ($169.61) | $1,628.51 |

| Parmar, Inderjeet | 1/19/15-1/26/15 | 57.7 | $1,352.58 | ($90.12) | $1,262.46 |
|---|---|---|---|---|---|
| Parmar, Inderjeet | 1/26/15-2/2/15 | 59.3 | $1,560.45 | ($73.30) | $1,487.15 |
| Parmar, Inderjeet | 2/2/15-2/9/15 | 49.5 | $1,742.73 | ($93.30) | $1,649.43 |
| Parmar, Inderjeet | 2/9/15-2/16/15 | 59.1 | $1,727.91 | ($134.83) | $1,593.08 |
| Parmar, Inderjeet | 2/16/15-2/23/15 | 63.5 | $1,934.29 | ($132.57) | $1,801.72 |
| Parmar, Inderjeet | 2/23/15-3/2/15 | 64.9 | $2,165.12 | ($156.28) | $2,008.84 |
| Parmar, Inderjeet | 3/9/15-3/16/15 | 57.1 | $1,695.39 | ($126.65) | $1,568.74 |
| Parmar, Inderjeet | 3/16/15-3/23/15 | 44.4 | $1,310.56 | ($142.10) | $1,168.46 |
| Parmar, Inderjeet | 3/23/15-3/30/15 | 51.6 | $1,517.38 | ($62.16) | $1,455.22 |
| Parmar, Inderjeet | 3/30/15-4/6/15 | 52.6 | $1,433.03 | ($64.32) | $1,368.71 |
| Parmar, Inderjeet | 4/13/15-4/20/15 | 42.4 | $1,428.38 | ($189.51) | $1,238.87 |
| Parmar, Inderjeet | 4/27/15-5/4/15 | 40.4 | $1,202.22 | ($123.03) | $1,079.19 |
| Parmar, Inderjeet | 5/11/15-5/18/15 | 41.9 | $1,149.04 | ($80.78) | $1,068.26 |
| Parmar, Inderjeet | 5/25/15-6/1/15 | 56.8 | $1,896.07 | ($219.74) | $1,676.33 |
| Parmar, Inderjeet | 6/1/15-6/8/15 | 43.4 | $1,266.84 | ($147.76) | $1,119.08 |

| | | | | | |
|---|---|---|---|---|---|
| Parmar, Inderjeet | 6/8/15-6/15/15 | 46.7 | $1,126.67 | ($82.54) | $1,044.13 |
| Parmar, Inderjeet | 7/13/15-7/20/15 | 54.8 | $1,817.44 | ($138.80) | $1,678.64 |
| Parmar, Inderjeet | 7/20/15-7/27/15 | 53.7 | $1,439.47 | ($80.77) | $1,358.70 |
| Parmar, Inderjeet | 10/12/15-10/19/15 | 43.9 | $719.65 | ($16.62) | $703.03 |
| Parmar, Inderjeet | 10/26/15-11/2/15 | 53.4 | $1,101.06 | ($29.70) | $1,071.36 |
| Parmar, Inderjeet | 11/2/15-11/9/15 | 47.3 | $834.00 | ($70.64) | $763.36 |
| Parmar, Inderjeet | 11/9/15-11/16/15 | 58.2 | $1,147.95 | ($78.07) | $1069.88 |
| Parmar, Inderjeet | 11/16/15-11/23/15 | 59.6 | $1,495.17 | ($69.70) | $1,425.47 |
| Parmar, Inderjeet | 11/23/15-11/30/15 | 42.3 | $467.03 | ($16.62) | $450.41 |
| Parmar, Inderjeet | 11/30/15-12/7/15 | 55.6 | $1,231.21 | ($49.41) | $1,181.80 |
| Parmar, Inderjeet | 12/14/15-12/21/15 | 57.1 | $1,872.57 | ($98.78) | $1,773.79 |
| Parmar, Inderjeet | 12/21/15-12/28/15 | 57.0 | $976.47 | ($16.62) | $959.85 |
| Parmar, Inderjeet | 12/28/15-1/4/16 | 59.4 | $1,610.78 | ($52.56) | $1,558.22 |
| Parmar, Inderjeet | 1/4/16-1/11/16 | 51.0 | $273.77 | --------- | $273.77 |
| Parmar, Inderjeet | 1/11/15-/1/18/16 | 56.2 | $503.41 | ($5.54) | $497.87 |

| Parmar, Inderjeet | 1/18/16-1/25/16 | 43.8 | $488.34 | ($5.54) | $482.80 |
|---|---|---|---|---|---|
| Parmar, Inderjeet | 1/25/16-2/1/16 | 47.9 | $835.83 | ($52.14) | $783.69 |
| Parmar, Inderjeet | 2/1/16-2/8/16 | 58.3 | $922.83 | ($57.13) | $865.70 |
| Parmar, Inderjeet | 2/8/16-2/15/16 | 48.0 | $1,151.44 | ($72.94) | $1,078.50 |
| Parmar, Inderjeet | 2/15/16-2/22/16 | 45.7 | $537.56 | ($5.54) | $532.02 |
| Parmar, Inderjeet | 2/22/16-2/29/16 | 41.0 | $538.34 | ($5.54) | $532.80 |
| Parmar, Inderjeet | 2/29/16-3/7/16 | 44.8 | $488.75 | ($5.54) | $483.21 |
| Parmar, Inderjeet | 3/7/16-3/14/16 | 41.5 | $523.47 | ($29.14) | $494.33 |
| Parmar, Inderjeet | 3/21/16-3/28/16 | 48.0 | $477.13 | ($5.54) | $471.59 |
| Parmar, Inderjeet | 3/28/16-4/4/16 | 51.7 | $322.82 | ($31.08) | $291.74 |
| Parmar, Inderjeet | 4/4/16-4/11/16 | 41.2 | $336.04 | ($28.62) | $307.42 |

414.    Thus, Parmar, as demonstrated above, at times worked over forty hours per workweek for Uber. At no time, did he receive overtime pay.

415.    For several weeks, notably in 2016, Parmar earned less than the minimum wage after deducting all expenses.

**Timothy Cavaretta**

416.   The following chart demonstrates the hours worked for individual plaintiff Timothy Cavaretta during weeks in which he worked over 40 hours:

| Name | Pay Period | Hours Worked | Gross Uber Pay | Tolls | Actual Gross Pay |
|---|---|---|---|---|---|
| Cavaretta, Tim | 9/29/14-10/5/14 | 41.3 | $595.17 | ($30.66) | $564.51 |
| Cavaretta, Tim | 10/6/14-10/12/14 | 50.2 | $1,067.53 | ($42.64) | $1,024.89 |
| Cavaretta, Tim | 12/1/14-12/8/14 | 54.9 | $1358.85 | ($77.31) | $1,281.54 |
| Cavaretta, Tim | 12/8/15-12/15/14 | 44.9 | $1,189.09 | ($10.66) | $1,178.43 |
| Cavaretta, Tim | 1/12/15-1/19/15 | 48.9 | $1,122.26 | ($21.32) | $1,101.94 |
| Cavaretta, Tim | 4/20/15-4/27/15 | 55.0 | $1,820.57 | ($93.24) | $1,727.33 |
| Cavaretta, Tim | 4/27/15-5/4/15 | 40.1 | $1,536.77 | ($76.62) | $1,460.15 |

417.   Thus, Cavaretta at times worked over forty hours per workweek for Uber. At no time, did he receive overtime pay.

418.   For several weeks, Cavaretta earned less than the minimum wage after deducting all expenses.

**Jakir Hossain**

419.   The following chart demonstrates the hours worked for individual plaintiff Jakir Hossain during weeks in which he worked over 40 hours:

| Name | Pay Period | Hours Worked | Gross Uber Pay | Tolls | Actual Gross Pay |
|---|---|---|---|---|---|
| Hossain, Jakir | 1/4/16-1/11/16 | 45.7 | $103.81 | ($98.77) | $5.04 |
| Hossain, Jakir | 1/11/16-1/18/16 | 47.4 | $34.25 | ($36.62) | -$2.37 |
| Hossain, Jakir | 3/21/16-3/28/16 | 50.9 | $780.16 | ($53.24) | $726.92 |
| Hossain, Jakir | 4/4/16-4/11/16 | 52.0 | $1,083.75 | ($75.40) | $1008.35 |

| Hossain, Jakir | 4/11/16-4/18/16 | 50.3 | $1,085.00 | ($27.70) | $1,057.30 |
| Hossain, Jakir | 4/18/16/-4/25/16 | 50.3 | $1, 085.00 | ($115.70) | $969.30 |

420. Thus, Hossain, as demonstrated above, at times worked over forty hours per workweek for Uber. At no time, did he receive overtime pay.

421. For several weeks, Hossain earned less than the minimum wage after deducting all expenses.

### CLASS ACTION ALLEGATIONS PURSUANT TO FRCP 23

422. Plaintiffs' claims are also brought pursuant to Rule 23 of the Federal Rules of Civil Procedure (Fed. R. Civ. P.) so as to remedy (1) violations of Article 6, §§190 *et seq*., and Article 19 §§650 *et seq*. of the New York Labor Law and the supporting New York State Department of Labor regulations (collectively referred to herein as "NYLL"); and, (2) violations of the contract discussed above. Plaintiffs bring this case on behalf of themselves and on behalf of all others similarly situated, and in the case of NYTWA all those members who are similarly affected (hereafter, the "class action Plaintiffs". They seek to represent a class of New York City Uber Drivers who have been subject to misclassification as independent contractors as well as to the violations for NYLL and contract violations set forth in this complaint for the period of December 31, 2011 to the date of the final disposition of this matter (hereafter the "class action period.")

423. Defendants, in violation of the NYLL, have also unlawfully made deductions from the class action Plaintiffs' wages since at least on or about December 31, 2011.

424. The class action Plaintiffs, at various times, electronically accepted Uber's Licensing Agreement in order to receive Uber dispatches.

425.    The class action Plaintiffs also bring various common law claims for breach of contract and fraud, arising from Defendants' violations of their contractual obligations and various fraudulent misrepresentations made therein by Defendants.

426.    The contract purports to require arbitration. However, the contract also gives Uber Drivers the opportunity to opt-out of this arbitration provision.

427.    Individual plaintiffs Bigu Haider, Vijay Shanti, Inderjeet Parmar, Diogenes Carrasco, Timothy Cavaretta, Cherno Jallow, Mamadou Diallo and Ranjit Kaler opted-out of the arbitration provision as permitted by Uber.   Plaintiffs Haider, Shanti, Parmar, Carrasco, Cavaretta, Jallow, Diallo and Kaler bring claims on behalf of themselves and a subclass of Uber Drivers who have also opted out of the arbitration provision (hereinafter the "arbitration opt out plaintiffs").

## RULE 23 CLASS ALLEGATIONS

428.    The class action Plaintiffs and the arbitration opt-out plaintiffs are readily ascertainable since the identity, addresses, time records, work schedules, positions and rates of pay for each such Class member are determinable from the Defendants' records that were required to have been kept under FLSA and NYLL. Notice can be provided pursuant to Rule 23 of the Fed. R. Civ. P.

429.    Joinder of all Class members is impracticable since, upon information and belief, there are approximately 35,000 Uber Drivers who could potentially be in the Class.

430.    The representative Plaintiffs' claims are typical of those claims that could be alleged by any member of the class.  The relief sought by the Plaintiffs is typical of the relief that would be sought by each member of the Class or subclass in separate actions. All members of either group were subject to the same policies and practices alleged herein, including being

misclassified as independent contractors, failure to pay minimum wages, failure to pay overtime, and failure to provide wage statements and notices, as well as Defendants' taking of unlawful deductions through retention of portions of Plaintiffs' wages. The aforesaid policies and practices of Defendants similarly affect all Plaintiffs. The Plaintiffs and members of the class or any subclass have sustained similar injuries and damages as a result of Defendants' unlawful acts and/or omissions.

431.    The representative Plaintiffs are fit to fairly and competently represent and protect the interests of the class action Plaintiffs or the arbitration opt out subclass plaintiffs. For the purposes of this action, the named Plaintiffs have no interests that conflict with those of the two groupings. Named Plaintiffs' attorneys have considerable experience in the field of employment litigation as well as class action litigation.

432.    Disposition of the claims as a class action is superior to any other available means of adjudication for the foregoing reasons:

- Class members are workers who individually lack the necessary resources to effectively litigate against a corporate defendant;

- A class action is in the interests of judicial economy as individual litigation would result in the expenditure of considerable public resources;

- Injuries suffered by each Class member individually are small in comparison to the cost of individual litigation, dissuading and precluding redress of their claims;

- The claims shared by Class members involve important public policy interests that would otherwise go unaddressed due to aforesaid barriers to and limitations of individual litigation, and;

- A class action will provide anonymity for those Class members whose fear of retaliation would otherwise dissuade them from asserting their rights as many Class members are still employed by defendants.

- Numerous questions of law and fact are common to all Class members and predominate over those of any individual Class member, including:

- Whether Plaintiffs and Class members were misclassified as independent contractors;

- Whether Plaintiffs and Class members were paid the amounts they should have received as employees including minimum wage and overtime - one and one half times their hourly rate for all hours worked in excess of (40) per workweek;

- Whether Defendants complied with the record-keeping requirements of the NYLL;

- Whether Defendants complied with the requirements for tools of the trade, and

- Whether Defendants complied with the requirements for taking deductions or reimbursing expenses, and

- Whether Defendants breached its contract with these workers regardless of whether they were misclassified.

## DEFENDANTS MAY NOT SEEK TO COMPEL ARBITRATION AS THE ARBITRATION AGREEMENT IS UNCONSCIONABLE AND UNENFORCEABLE AS AGAINST LAW AND PUBLIC POLICY

433.     Defendants have placed in their Agreements, which Drivers must accept as a precondition of being assigned any dispatches, a provision which contains an arbitration agreement.    The Driver has no bargaining power to resist this agreement, which is totally one sided in favor of Uber.

434.    The Agreements, including the arbitration agreement, have changed somewhat over the years as have other provisions of the different versions of the Agreements given to Drivers.

435.    The reasons for the changes over the years include litigation and court orders.

436.    The Agreement which includes an arbitration provision requires Drivers who have complaints about improper payments (known as seeking corrections to the Drivers receipts) to bring their claims within 3 days of the improper payment.

437.    The arbitration agreement requires all claims to be arbitrated and if there is no mutual agreement on the arbitrator, the Arbitrator shall come from Judicial Arbitration and Mediation services. (JAMS).   The prior arbitration agreements called for the workers to split the fees with Uber.

438.    The arbitration agreement prohibits any class claims, so for example if the approximately 35,000 Uber Drivers in New York City were to arbitrate the question of their misclassification as independent contractors, conceivably there would have to be 35,000 individual arbitrations on the same issue.

439.    The arbitration agreement requires all claims generally applicable to workers to be arbitrated while exempting claims that an employer would bring.

440.    Defendants have been sued by Drivers in multiple jurisdictions. Many of the cases allege that Uber Drivers have been misclassified as independent contractors and the workers have sought to represent a class.

441.    Defendants in every case have sought to compel arbitration.

442.    In June of 2015, the District Court in *Mohamed v Uber Technologies et. al*. 109 F. Supp. 3d 1185, (N.D. Calif. 2015) found that all Uber contracts with arbitration agreements

through 2014, were either unconscionable or unenforceable under California law. As a result, in December 2015, Uber changed the arbitration agreement and circulated it to the Drivers.

443. Drivers were given an opportunity to opt out of the agreement. All of the individual plaintiffs except Jakir Hossain and Harjit Khatra opted out.

444. The New York Taxi Workers Alliance, which is representing its members in this case, was never a party to an arbitration agreement.

445. Plaintiffs allege that the arbitration provisions of the Agreements are unconscionable and against public policy.

446. The agreement which prevents class claims violates substantive rights under the National Labor Relations Act. The National Labor Relations Board in both *D. R. Horton*, 357 NLRB 184 (2012) and *Murphy Oil*, 363 NLRB 77 (2015) specifically determined prohibitions on class claims do interfere with workers' ability to band together to protest their working conditions and thus interfere with their rights to engage in protected concerted activity and to organize under Section 7 of the National Labor Relations Act.

447. The U.S. Court of Appeals for the Seventh Circuit has affirmed Plaintiffs' position that an arbitration clause prohibiting employee class or collective actions violates the National Labor Relations Act. *Lewis v. Epic Sys. Corp.*, 2016 U.S. App. LEXIS 9638 (7th Cir. May 26, 2016).

448. Simultaneous with the filing of this complaint the Plaintiffs have also filed unfair labor practice charges with the NLRB in order to challenge the prohibition on class and collective actions in the arbitration provisions, as well as the issue of misclassification, which also prevents workers who are labeled as independent contractors from organizing a union and

collectively bargaining. Plaintiffs are seeking injunctive relief from the NLRB to enjoin the application of the arbitration provision in this case.

449.    As noted in this complaint, the factual allegations support a finding that Plaintiffs are employees and not independent contractors. They also establish that Uber has been unlawfully deducting amounts to be paid in taxes from the Drivers' wages thus engaging in both unlawful deductions as well as a breach of their own contracts.

450.    Plaintiffs further allege that the arbitration agreement has no impact on the claims plaintiffs are making against the FHV bases with respect to unlawful deductions from wages or breach of contract as there are no contracts with the Uber bases which, on information and belief, are involved in the unlawful deductions from Plaintiffs' wages.

## FIRST CLAIM FOR RELIEF

### (FLSA Minimum Wage Claim, 29 U.S.C. §§201 *et seq.*, Brought by the Individual Plaintiffs on Behalf of Themselves and the FLSA Collective Action Plaintiffs)

451.    Plaintiffs, on behalf of themselves and the FLSA Collective Action Plaintiffs, repeat, reallege and incorporate each and every preceding paragraph as if set forth fully herein.

452.    At all times relevant, each Defendant has been, and/or continues to be, an "employer" engaged in interstate "commerce" and/or in the production of "goods" for "commerce," within the meaning of FLSA, 29 U.S.C. §203.

453.    At all times relevant, Defendants employed Plaintiffs and FLSA Collective Action Plaintiffs as "employees" within the meaning of FLSA, 29 U.S.C. §203.

454.    Defendants were required to pay Plaintiffs and the FLSA Collective Action Plaintiffs at a rate not less than the minimum wage rate under the FLSA for all hours worked.

455.   Upon information and belief, Defendants knowingly failed to pay Plaintiffs and FLSA Collective Action Plaintiffs the required minimum wage under the FLSA for each hour worked.

456.   Plaintiffs, on behalf of themselves and the FLSA Collective Action Plaintiffs, seek damages for their unpaid compensation, liquidated damages as provided by the FLSA, attorneys' fees and costs, along with such other relief as this Court deems just and proper.

### SECOND CLAIM FOR RELIEF

**(FLSA Overtime Claim, 29 U.S.C. §201 *et seq.* Brought by Plaintiffs on Behalf of Themselves and the FLSA Collective Action Plaintiffs)**

457.   Plaintiffs, on behalf of themselves and the FLSA Collective Action Plaintiffs, repeat, reallege and incorporate each and every preceding paragraph as if set forth fully herein.

458.   Throughout the period covered by the applicable statute of limitations and upon information and belief, Plaintiffs and other FLSA Collective Action Plaintiffs regularly worked in excess of forty (40) hours per workweek.

459.   At all times relevant, and upon information and belief, Defendants have repeatedly and willfully failed to pay the named plaintiffs and the FLSA Collective Action Plaintiffs in accordance with the overtime provisions of the FLSA for work performed in excess of forty (40) hours per workweek.

460.   Plaintiffs, on behalf of themselves and the FLSA Collective Action Plaintiffs, seek and are entitled to recover damages for their unpaid overtime compensation, liquidated damages as provided by the FLSA, attorneys' fees and costs along with such other relief as this Court deems just and proper.

### THIRD CLAIM FOR RELIEF

**(New York State Minimum Wage Act Claim, NYLL Article 19 §§650 *et seq.*, Brought by Plaintiffs on Behalf of Themselves and the Class)**

461.    Plaintiffs, on behalf of themselves and those similarly situated, repeat, reallege and incorporate each and every preceding paragraph as if set forth fully herein.

462.    Throughout the period covered by the applicable statute of limitations and upon information and belief, defendants knowingly paid plaintiffs less than the minimum wage as required by NYLL and the supporting regulations of the New York State Department of Labor.

463.    Defendants did not pay the minimum wage for all hours worked by Plaintiffs.

464.    Upon information and belief, defendants' failure to pay Plaintiffs the minimum wage was willful within the meaning of the NYLL.

465.    Plaintiffs seek to recover their unpaid compensation, liquidated damages pursuant to NYLL, Article 6, §198, attorneys' fees, costs, pre- and post-judgment interest along with such other relief as this Court deems just and proper.

## FOURTH CLAIM FOR RELIEF

**(New York State Minimum Wage Act - Overtime Claim, NYLL §650 *et seq.*, Brought by Plaintiffs on Behalf of Themselves and the Class)**

466.    Plaintiffs, on behalf of themselves and those similarly situated, repeat, reallege and incorporate each and every preceding paragraph as if set forth fully herein.

467.    Throughout the period covered by the applicable statute of limitations and upon information and belief, Defendants willfully and repeatedly failed to pay Plaintiffs at the overtime rate for hours worked in excess of forty (40) hours per workweek as required by NYLL.

468.   Plaintiffs seek and are entitled to recover their respective unpaid compensation, damages pursuant to NYLL, Article 6, §198, attorneys' fees, costs, pre- and post-judgment interest along with such other relief as this Court deems just and proper.

469.   Plaintiffs have been damaged in an amount as yet determined, plus liquidated damages.

## FIFTH CLAIM FOR RELIEF

### (Recovery of Equipment Costs, Brought by Plaintiffs on Behalf of Themselves and the FLSA Collective Action Plaintiffs)

470.   Plaintiffs, on behalf of themselves and the FLSA Collective Action Plaintiffs, repeat, reallege and incorporate each and every preceding paragraph as if set forth fully herein.

471.   Throughout the period covered by the applicable statute of limitations, Defendants required Plaintiffs and the FLSA Collective Action Plaintiffs to pay, without reimbursement, the costs and expenses for purchasing, insuring and maintaining equipment required to perform their jobs, at times, reducing their wages below the minimum wage in violation of the FLSA. 29 U.S.C. §206(a); 29 C.F.R. §531.35.

472.   Because of Defendants' willful violation of the FLSA, Plaintiffs and the FLSA Collective Action Plaintiffs are entitled to recover from the Defendants, jointly and severally, all monies paid for the "tools of the trade" used in furtherance of the Defendants' enterprise, plus liquidated damages, as well as reasonable attorneys' fees and costs of the action, including pre-judgment interest, all in an amount to be determined.

## SIXTH CLAIM FOR RELIEF

### (Unlawful Deductions For Taxes and Surcharges, or Deductions of Any Kind Including iPhone Leases, Fines for Unlicensed Operation at Uber's Behest, Fuel Cards or Car Payments, NYLL §§193, Brought by Plaintiffs on Behalf of Themselves and the Class)

473.    Plaintiffs, on behalf of themselves and the FLSA Collective Action Plaintiffs and the class action Plaintiffs or any subclass, repeat, reallege and incorporate each and every preceding paragraph as if set forth fully herein.

474.    Throughout the period covered by the applicable statute of limitations, Defendants required Plaintiffs to pay from their wages, without reimbursement, taxes and surcharges for which Defendants were responsible to collect and remit, in violation of N.Y. Lab. Law §§193.

475.    Because of Defendants' willful violation of the NYLL, Plaintiffs are entitled to recover from the Defendants, jointly and severally, all monies paid in furtherance of the Defendants' enterprise, plus liquidated damages, as well as reasonable attorneys' fees and costs of the action, including pre-judgment interest, all in an amount to be determined.

## SEVENTH CLAIM FOR RELIEF
### Breach of Contract

476.    Plaintiffs, on behalf of themselves and those similarly situated, repeat, reiterate and incorporate each and every preceding paragraph as if set forth fully herein.

477.    Throughout the period covered by the applicable statute of limitations, defendants' action and omissions, as alleged above, in paragraphs 337 to 378 constituted independent and separate breaches of the Licensing Agreement (contract) entered into by Plaintiffs and those similarly situated and Defendants.

478.    As a direct and proximate result of Defendants' breaches, Plaintiffs and others similarly situated, have been damaged in an amount as yet to be determined.

## EIGHTH CLAIM FOR RELIEF
### (Promissory Estoppel)

479.    Plaintiffs, on behalf of themselves and those similarly situated, repeat, reiterate and incorporate each and every preceding paragraph as if set forth fully herein.

480.    Throughout the period covered by the applicable statute of limitations, Defendants made a clear and unambiguous promise to Plaintiffs and those similarly situated to allow Plaintiffs to provide certain levels of service if they had a specific type of vehicle.

481.    Plaintiffs and those similarly situated, in reasonable and foreseeable reliance by them on defendants' promise, purchased various specific types of vehicles.

482.    Defendants subsequently changed the type of vehicle necessary to provide the particular service in question and thus, Plaintiffs had purchased a vehicle which was no longer eligible to provide the service level and thus, had higher monthly car payments than were necessary as they could have avoided the purchase or lease of certain vehicles.  Thus, Plaintiffs were injured by reason of their reliance on defendants' promises.

## RELIEF SOUGHT

**WHEREFORE**, plaintiffs, on behalf of themselves and the FLSA Collective Action Plaintiffs, the class action Plaintiffs and any subclass, request relief as follows:

A.  Designation of this action as a collective action for the purposes of the claims brought on behalf of the FLSA Collective Action Plaintiffs, along with prompt issuance of opt-in notice pursuant to 29 U.S.C. §216(b) to all similarly situated members of the opt-in class;

B.  Designation of Plaintiffs as representatives of the FLSA Collective Action Plaintiffs ;

C.  Designation of this action as a class action pursuant to Rule 23 of the Fed. R. Civ. P. for the purposes of the claims brought on behalf of the class action plaintiffs;

D.  Designation of this action as a class action pursuant to Rule 23 of the Fed. R. Civ. P. for the purposes of the claims brought on behalf of the arbitration opt out subclass plaintiffs;

E.  An order declaring that Plaintiffs are employees not independent contractors;

F.  An order declaring that Defendants violated the FLSA in the manners stated in this complaint;

G.  An order declaring that Defendants' violations of the FLSA were willful;

H.  An order declaring that Defendants violated the NYLL in the manners stated in this complaint;

I.  An order declaring that Defendants' violations of the NYLL were willful;

J.  An award of overtime compensation under the FLSA and NYLL;

K.  An award of minimum wage compensation under the FLSA and NYLL;

L.  A declaration that, based on violations of law, Defendants were not entitled to take deductions for tools of the trade and an award of deductions pursuant to the FLSA ;

M.  An award of liquidated damages pursuant to the FLSA;

N.  An award of damages for violations of NYLL;

O.  An award of damages for all breach of contract claims;

P.  An award of damages for all promissory estoppel injuries suffered by any of the Plaintiffs, the class action Plaintiffs or the arbitration opt out subclass plaintiffs;

Q.  All penalties available under the applicable laws;

R.  Attorneys' fees pursuant to 29 U.S.C. §216, NYLL §663 and all other applicable statutes;

S.  Interest as provided by law;

T.  Stay any effort by Defendants to seek to compel arbitration while the unfair labor practice case related to Defendants' arbitration provision is pending at the NLRB.

U.  Such other relief as this Court deems just and proper.

**<u>JURY TRIAL</u>**

Plaintiffs demand a jury trial for all causes of action and claims for which they have a right to a jury trial.

Dated: New York, New York
       June 1, 2016

Respectfully submitted,

MIRER MAZZOCCHI SCHALET & JULIEN, PLLC

 /s/Jeanne E. Mirer_____

By: Jeanne E. Mirer
*Attorney for Plaintiffs*
150 Broadway, 12th floor
New York, NY 10031
(212) 231-2235
Jmirer@mmsjlaw.com