UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------------x

BIGU HAIDER, VIJAY SHANTI, INDERJEET PARMAR,
DIOGENES CARRASCO, TIMOTHY CAVARETTA,
CHERNO JALLOW, and, Individually, on Behalf of All
Others Similarly Situated, and as Class Representatives,

                Plaintiffs,

                     -against-

UBER TECHNOLOGIES, INC., UBER LOGISTIK, LLC,
UBER USA LLC, ACHT-NY, LLC, ACHTZEHN-NY, LLC,
GARRET CAMP, ANDREW CHAPIN, DANACH-NY, LLC,
DREIST-NY, LLC, DREIZEHN-NY, LLC, DRINNEN-NY,
LLC, EINS-NY, LLC, ELF-NY, LLC, EINUNDZWANZIG-
NY, LLC, FUNF-NY, LLC, FUNFZEHN-NY LLC, GRUN,
LLC, J. WILLIAM GURLEY, HINTER, LLC, TRAVIS
KALANICK, JOSH MOHRER, NEUN-NY, LLC,
NEUNZEHN-NY, LLC, SCHMECKEN, LLC, SECHS-NY,
LLC, SIEBEN-NY, LLC, SIEBZEHN-NY, LLC, UNTER,
LLC, VIER-NY, LLC, VIERZEHN-NY, LLC, WEITER,
LLC, ZEHN-NY, ZWANZIG-NY LLC, ZWEI-NY, LLC,
ZWOLF-NY, LLC, jointly and severally,

                Defendants.

-------------------------------------------------------------------------------x

16 Civ 4098 (AKH)

**SECOND AMENDED**

**COMPLAINT**

**JURY TRIAL
DEMANDED**

      Plaintiffs Bigu Haider, Vijay Shanti, Inderjeet Parmar, Diogenes Carrasco, Timothy

Cavaretta, and Cherno Jallow, ("individual plaintiffs"), individually, and on behalf of all others

similarly situated ("Plaintiffs") and as class representatives, by and through counsel, Mirer,

Mazzocchi, Schalet Julien & Chickedantz PLLC, hereby allege as follows:

## NATURE OF THE CASE

1

1.      This is a class and collective action brought against Defendants Uber and its New York subsidiaries, officers and owners by Plaintiffs, Uber drivers, on behalf of themselves and all other similarly situated persons complaining of violations of the Fair Labor Standards Act as well as all pendant New York Labor Law claims. Additionally, Plaintiffs assert promissory estoppel claims for a smaller class of drivers, all of whom are who are also members of the class and collective action. Alternatively Plaintiffs assert pendant breach of contract claims on a class basis.

2.      Specifically this lawsuit seeks to recover unpaid minimum wages, unpaid overtime, reimbursement for unlawful deductions, tools of the trade expenses, kickbacks, uncompensated on-app time including hours shorted by Uber's false records of time on the app. Plaintiffs and all others similarly situated (hereafter "Plaintiffs," inclusive of similarly situated individuals) further seek statutory penalties for notice-and-recordkeeping violations. These named Plaintiffs are employees and former employees of Uber who drive black cars and limousines as part of Uber's New York City fleet who have been unlawfully misclassified as independent contractors.

3.      Uber is a key player in what some call the "gig" or "on-demand" economy. This "gig" or "on demand" economy cannot be viewed uncritically, for behind every customer seeking a fast ride is a worker, often working 60-80 hour weeks, who is unlawfully denied the basic rights of employees.

4.      While investors and owners cheer their low overhead, the very people necessary to make the "gig" economy go forward have been unlawfully misclassified as independent contractors and put into the precarious position of being denied the benefit of worker protection and wage and hour laws.

2

5.      Indeed in describing Uber's business plan Defendant Kalanick told Vanity Fair in 2014, "We want to get to the point that using Uber is cheaper than owning a car." [1] However Uber has been able to set prices for chauffeured service lower than the costs of owning a car precisely by unlawfully shifting such costs to the drivers, whom it calls independent contractors to insulate itself from the costs of running its transportation business.

6.      From car insurance to maintenance and gas, as misclassified independent contractors Uber drivers must provide not only the labor but also the tools to make Uber's business run at little or no cost to Uber.

7.      This amounts to a massive subsidy from drivers to Uber gained through Uber's unlawful manipulation of the wage and hour laws.

8.      That is, Uber initiated a race to the bottom that grows Uber's business while often paying drivers, whom it perhaps ironically calls "Partners," subminimum wages.

9.      Dubbing itself a "technology company," Uber has unlawfully sought to flip the independent contractor model on its head, saddling drivers with Uber's business expenses, while exercising strict control over drivers, monitoring their movements, setting their fares, determining what they may or may not say to customers and generally subjecting them to terms and conditions that are consistent with an employer-employee relationship.

10.      Further, far from drivers each owning their own business, drivers are at Uber's service and have even been used as pawns in Uber's price wars with Uber's competitors to drivers' detriment and Uber's benefit, wherein the companies battle for "supply," meaning

---

[1] http://www.vanityfair.com/news/2014/12/uber-travis-kalanick-controversy

drivers, through a series of covert programs called variously God View, Heaven View, and Hell View.[2]

11.     Uber made its first inroads into the New York market in or about May 2011. From that time to the present, Uber has recruited heavily and expanded exponentially with promises that drivers would be able to earn a decent wage. However, Uber, through its practices and broken promises, severely harmed the thousands of drivers they recruited and have contributed greatly to a "race to the bottom" causing broader income inequality, where Uber drivers, Taxi drivers, and others working in the private For-Hire Vehicle ("FHV") industry can barely survive.

12.     Uber drivers must strictly follow a litany of very specific company-imposed regulations that govern how, when, where and who gets to work, yet Uber enjoys the benefits of misclassifying its drivers as "independent contractors."

13.     Uber's rules and regulations for its drivers govern almost every facet of the job, and strivers have little chance to deviate from Uber's proscribed means and methods of doing business without suffering consequences.

14.     These drivers must adhere closely to Uber's parameters in order to be eligible to drive in the first place. Uber pushes potential drivers to purchase or lease specific types of vehicles, including expensive luxury vehicles, saddling the drivers with debt and costs.

15.     To avoid termination, all Uber drivers must maintain these vehicles and achieve a certain star rating in a system devised and monitored closely by Uber.

16.     From fares and fees, to what to wear and what route to take, in addition to subjecting its employees to constant monitoring by GPS, Uber directs and sets the terms and conditions of the drivers' work. Although Uber's rules are often described as "suggestions,"

---

[2] See http://www.vanityfair.com/news/2017/04/uber-used-a-secret-program-called-hell-to-track-rival-drivers

drivers understand clearly that failure to follow them will result in temporary or permanent termination of their employment with Uber.

17.     After working for Uber continuously for years, laboring for twelve-hour-plus shifts, for six or seven days a week, these workers simply cannot be considered independent contractors performing a "gig."

18.     At the same time, Uber's control of drivers establishes that they are employees like any others entitled to minimum wage and overtime for all hours worked—that is, for all hours logged on to the Uber app.

19.     Plaintiffs have dutifully gone to work, spending long hours in their cars waiting to be dispatched, driving to pick up customers and taking customers from pick up to their destination, all the while building Uber's multibillion dollar transportation business.

20.     Nonetheless Uber has failed to pay Plaintiffs minimum wage and overtime for all hours worked.

21.     Instead they have unlawfully paid drivers *by the ride* based on a base charge plus distance plus time formula, at a rate chosen solely at Uber's discretion.

22.     From this per-ride fare Uber deducts its service fee, which ranges from 20-28% of the fare regardless of whether Plaintiff has earned minimum wage or overtime in the period.

23.     That is Uber has unlawfully deducted its service fee from drivers pay before ensuring its minimum wage and overtime obligations are met, as well as deducting sales taxes which should be paid from Defendants portion of the fare, thus taking a kickback from Plaintiffs wages.

24.     Further Uber has unlawfully failed to reimburse drivers for tools of the trade and other expenses incurred by Plaintiffs related to the operation of Uber's business, such as gas and vehicular expenses.

25.     While cheating drivers in this way, Uber is well aware of its obligations under the wage and hour laws to pay workers for all time spent in the employers service.

26.     Uber is acutely aware of the hours each driver spends on the app and provides a tally of such hours to drivers weekly.

27.     Defendants' knowledge of its obligations further establishes the willfulness of Uber's actions.

28.     Plaintiffs brings this action on behalf of themselves and similarly situated current and former employees who elect to opt-in to this action pursuant to 29 U.S.C. §§201 *et seq.* of the FLSA, and specifically, the collective action provision of 29 U.S.C. §216(b), to remedy violations of the wage-and-hour provisions of the FLSA.

29.     Plaintiffs also bring this action on behalf of themselves and similarly situated current and former employees pursuant to Rule 23 of the Federal Rules of Civil Procedure (Fed. R. Civ. P.) to remedy violations of Article 6, §§190 *et seq.*, and Article 19 §§650 *et seq.* of the NYLL and the supporting New York State Department of Labor regulations.

30.     Further Plaintiffs allege in the alternative that, even in the absence of a finding that drivers have employee status that Defendants have violated the terms of the contract with the driver and have made actionable fraudulent promises to Plaintiffs.

31.     Uber's contract and fraud violations amount to nothing less than outright theft.

32.     These contract violations consist of unlawfully shifting expenses to drivers by deducting taxes and other fees from drivers share in violation of the contract.

6

33.     They also consist of keeping a double set of books in a scheme called "Upfront Pricing" introduced in Fall 2016, during which time Uber charged different fares to customers than what was reported to the driver. This surreptitious use of double definitions of the "Fare" a defined term under the contract has resulted in Uber charging customers marked up fares to passengers, while paying drivers a fee based on the normal base, time and distance formula, which is often lower than the fare charged to the customer. Uber then pockets the difference, excluding the driver entirely from receiving a share of any surplus between the upfront fare and the driver fare, and increases the amount of the already unlawful tax deductions, which are based on the consumer price. This is expressly forbidden by the contract.

34.     Finally Plaintiffs also bring common law claims against Uber related to Uber's inducement to drivers to obtain particular cars on the basis that with such cars drivers will be eligible for higher classes of fares. When Uber unilaterally changed the criteria for such classes of service, drivers were left with leases they cannot afford.

35.     This fraud has echoes with the recent $20 million Federal Trade Commission settled with Uber reached in January 2017 in which the Commission alleged (3:17-cv-00261 Northern District of California) that in its efforts to attract prospective drivers, Uber exaggerated the yearly and hourly income drivers could make.

## PARTIES

### Plaintiffs

### Plaintiff Bigu Haider

36.     Plaintiff Bigu Haider ("Haider") is a resident of Flushing, Queens County, New York who has been actively working as a Taxi and/or Black Car Driver since in or about 1989.

37.     At all times relevant Haider was an employee of Defendants, misclassified as an independent contractor.

38.     Haider has been employed by Uber from in or about March 2013 to the present.

39.     Haider has formally opted out of the arbitration provision of Defendant Uber's contract.

**Plaintiff Vijay Shanti**

40.     Plaintiff Vijay Shanti ("Shanti") is a resident of Springfield Gardens, Queens County, New York who has been a Black Car Driver since 1993.

41.     At all times relevant Shanti was an employee of Defendants', misclassified as an independent contractor.

42.     Plaintiff Shanti has been employed by Uber as a Driver from in or around October 2013 to the present.

43.     Plaintiff Shanti has formally opted out of the arbitration provision of Uber's contract.

**Plaintiff Inderjeet Parmar**

44.     Plaintiff Inderjeet Parmar ("Parmar") is a resident of New Hyde Park, Nassau County, New York.

45.     At all times relevant Parmar was an employee of Defendants', misclassified as an independent contractor.

46.     Parmar has been employed as a Driver by Uber from in or about October 2013 to the present.

47.     Parmar has formally opted out of the arbitration provision of Uber's contract.

**Plaintiff Diogenes Carrasco**

8

48.     Plaintiff Diogenes Carrasco ("Carrasco") is a resident of the Bronx, Bronx County, New York who had worked as a Yellow Taxi Driver for thirteen years prior to joining Uber.

49.     At all times relevant Carrasco was an employee of Defendants', misclassified as an independent contractor.

50.     Mr. Carrasco was employed by Uber as a Driver from in or about March of 2014 to October 2016 and drove a vehicle affiliated with Defendant FHV base Hinter, LLC.

51.     Carrasco has formally opted out of the arbitration provision of Uber's contract.

**Plaintiff Timothy Cavaretta**

52.     Plaintiff Timothy Cavaretta ("Cavaretta") is a resident of Woodside, Queens County, New York.

53.     At all times relevant Cavaretta was an employee of Defendants', misclassified as an independent contractor.

54.     Cavaretta was employed as an UberX Driver from in or about October 2014 to February 2016.

55.     Cavaretta has formally opted out of the arbitration provision of Uber's contract.

**Plaintiff Cherno Jallow**

56.     Plaintiff Cherno Jallow ("Jallow") is a resident of Brooklyn, Kings County, New York.

57.     At all times relevant Jallow was an employee of Defendants', misclassified as an independent contractor.

58.     Jallow has been employed by Uber from in or about July 2014 to the present and drives a vehicle affiliated with the Defendant FHV base, Danach, LLC.

9

59.     Jallow has formally opted out of the arbitration provision of Uber's contract.

**Defendants**

**Uber Technologies, Inc.**

60.     Uber Technologies, Inc. ("Uber Technologies") is a Delaware corporation.

61.     Uber Technologies maintains its headquarters at 1455 Market Street, 4th Floor, San Francisco, CA 94103.

62.     Uber Technologies operates twenty-eight (28) wholly owned subsidiaries in New York, each of which has held or currently holds a TLC license to operate a For-Hire Vehicle (FHV) Base.

63.     From December 31, 2011 to on or about November 9, 2014, Uber Technologies was a party to the contracts pursuant to which drivers received dispatches from the Uber "app."

64.     Upon information and belief, Uber Technologies is the sole owner of Uber USA and Uber Logistik.

**Uber Logistik, LLC**

65.     Uber Logistik is a limited liability company organized under the laws of the state of Delaware on May 6, 2014.

66.     On or about November 10, 2014 to on or about April 2, 2015, Uber Logistik was a party to the contracts pursuant to which drivers received dispatches from the Uber "app."

**Uber USA, LLC**

67.     Uber USA, LLC ("Uber USA") is a Delaware limited liability company, solely owned by Uber Technologies.

68.     Uber USA states in its filings with the TLC that it is the "general member" of Uber's twenty-two (22) for hire vehicle bases.

69.     From on or about April 3, 2015 to the present, Uber USA has been a party to the contracts pursuant to which drivers received dispatches from the Uber "app."

**The Uber For Hire Vehicle ("FHV") Bases**

70.     The Uber parents operate 28 wholly owned subsidiaries in New York, each of which has held or currently holds a TLC license to operate an FHV Base.

71.     All of the Defendant FHV bases listed below manage the Uber workforce as they are responsible for providing the dispatches to each of the plaintiffs.

72.     Each and every Uber FHV base has held or currently holds a Certificate of Authority, issued by the New York State Department of Taxation and Finance for the collection of state taxes.

73.     The Uber FHV base subsidiaries are responsible under the N.Y. Tax Law for collection and payment of the 8.875% sales tax on black car rides.

74.     Similarly, under the New York Executive Law, each FHV base is responsible for collecting and remitting a 2.44% surcharge on rides to the Black Car Fund ("BCF"), an injured workers fund for Black Car Drivers.

75.     Upon information and belief, the Uber FHV bases deducted sales tax and Black Car Fund monies from driver earnings to remit to the state and the BCF, respectively.

**Unter, LLC (B02512)**

76.     Defendant Unter LLC ("Unter" or "Unter base") is a domestic limited liability company organized under the laws of the State of New York by Uber Technologies, its sole member, and, accordingly, Unter is a wholly owned subsidiary of Uber Technologies.

77.     Unter was Uber's first FHV base in New York, operating under FHV base license #B02512 since December 31, 2011.[3]

78.     At various times, Unter was also the payor of drivers' wages, listed on direct deposit statements received by drivers.

79.     Unter maintains an office at 27-55 Jackson Ave, Long Island City, NY 11101, which it shares with other Uber FHV Bases (hereafter "the Jackson Avenue Uber Offices").

**Hinter, LLC   (B02598)**

80.     Defendant Hinter LLC ("Hinter") is a domestic limited liability company organized under the laws of the State of New York by Uber Technologies, its sole member, and, accordingly, Hinter is a wholly owned subsidiary of Uber Technologies.

81.     Hinter operates a FHV base pursuant to license #B02598, issued between November 2012 and February 26, 2013, out of the Jackson Avenue Uber Offices.

**Weiter, LLC (B02617)**

82.     Defendant Weiter LLC ('Weiter") is a domestic limited liability company organized under the laws of the State of New York by Uber Technologies, its sole member, and, accordingly, Weiter is a wholly owned subsidiary of Uber Technologies.

83.     Weiter operates a FHV base pursuant to license # B02617, issued on or about February 26, 2013, out of the Jackson Avenue Uber Offices.

---

[3] FHV bases are listed herein in order of license number.

**Schmecken, LLC (B02682)**

84.     Defendant Schmecken LLC ("Schmecken") is a foreign limited liability company organized under the laws of the State of Delaware by Uber Technologies employee Josh Mohrer, its "sole member."

85.     Upon information and belief, Schmecken is a wholly owned subsidiary of Uber Technologies.

86.     Schmecken operates a FHV base pursuant to license # B02682, issued on or about August 29, 2013 out of the Jackson Avenue Uber Offices.

**Danach-NY, LLC (B02764)**

87.     Defendant Danach-NY LLC ("Danach-NY") is a foreign limited liability company organized under the laws of the State of Delaware by Uber Technologies employee Josh Mohrer, its sole member.

88.     Upon information and belief, Danach-NY is a wholly owned subsidiary of Uber Technologies.

89.     Danach-NY operates a FHV base pursuant to license # B02764, issued on or about June 13, 2014 out of the Jackson Avenue Uber Offices.

**Grun, LLC (B02765)**

90.     Defendant Grun LLC ("Grun") is a foreign limited liability company organized under the laws of the State of Delaware by Uber Technologies employee Josh Mohrer, its sole member.

91.     Upon information and belief, Grun is a wholly owned subsidiary of Uber Technologies.

92.     Grun operates a FHV base pursuant to license # B02765, issued for on May 24, 2014, out of the Jackson Avenue Uber Offices.

## Dreist-NY, LLC (B02835)

93.     Defendant Dreist-NY LLC ("Dreist-NY") is a foreign limited liability company organized under the laws of the State of Delaware by Uber USA, its sole member, and, accordingly, Dreist-NY is a wholly owned subsidiary of Uber Technologies.

94.     Dreist-NY operates a FHV base pursuant to license # B02835, issued on or about May 7, 2015, out of the Jackson Avenue Uber Offices.

## Drinnen-NY, LLC (B02836)

95.     Defendant Drinnen-NY LLC ("Drinnen-NY") is a foreign limited liability company organized under the laws of the State of Delaware by Uber USA, its sole member, and, accordingly, Drinnen-NY is a wholly owned subsidiary of Uber Technologies.

96.     Drinnen-NY operates a FHV base pursuant to license # B02836, issued on or about May 8, 2015, out of the Jackson Avenue Uber Offices.

## Sieben-NY, LLC (B02864)

97.     Defendant Sieben-NY LLC ("Sieben-NY") is a foreign limited liability company organized under the laws of the State of Delaware by Uber USA, its sole member, and, accordingly, Sieben-NY is a wholly owned subsidiary of Uber Technologies.

98.     Sieben-NY operates a FHV base pursuant to license # B02864, issued in or about mid-2015, out of its offices at 628 W. 28th St, NY, NY 10001 (hereafter the "West 28th Uber Offices."

## Vier-NY, LLC (B02865)

99.   Defendant Vier-NY LLC ("Vier-NY") is a foreign limited liability company organized under the laws of the State of Delaware by Uber USA, its sole member, and, accordingly, Vier-NY is a wholly owned subsidiary of Uber Technologies or USA.

100.   Vier-NY operates a FHV base pursuant to license # B02865, issued on or about July 27, 2015, out of the West 28th Uber Offices.

## Zwei-NY, LLC (B02866)

101.   Defendant Zwei-NY LLC ("Zwei-NY") is a foreign limited liability company organized under the laws of the State of Delaware by Uber USA, its sole member, and, accordingly, Zwei-NY is a wholly owned subsidiary of Uber Technologies.

102.   Zwei-NY operates a FHV base pursuant to license # B02866, issued on or about August 27, 2015, out of the West 28th Uber Offices.

## Funf-NY, LLC (B02867)

103.   Defendant Funf-NY LLC ("Funf-NY") is a foreign limited liability company organized under the laws of the State of Delaware by Uber USA, its sole member, and, accordingly, Funf-NY is a wholly owned subsidiary of Uber Technologies.

104.   Funf-NY operates a FHV base pursuant to license # B02867, issued on or about July 27, 2015, out the West 28th Uber Offices.

## Zehn-NY, LLC (B02869)

105.   Defendant Zehn-NY LLC ("Zehn-NY") is a foreign limited liability company organized under the laws of the State of Delaware by Uber USA, its sole member, and, accordingly, Zehn-NY is a wholly owned subsidiary of Uber Technologies.

106.    Zehn-NY operates a FHV base pursuant to license # B02869, issued on or about August 12, 2015, out of the West 28th Uber Offices.

**Neun-NY, LLC (B02870)**

107.    Defendant Neun-NY LLC ("Neun-NY") is a foreign limited liability company organized under the laws of the State of Delaware by Uber USA, its sole member, and, accordingly, Neun-NY is a wholly owned subsidiary of Uber Technologies.

108.    Neun-NY operates a FHV base pursuant to license # B02870, issued on or about August 24, 2015, out of the West 28th Uber Offices.

**Acht-NY, LLC (B02871)**

109.    Defendant Acht-NY LLC ("Neun-NY") is a foreign limited liability company organized under the laws of the State of Delaware.

110.    Upon information and belief, Uber USA is its sole member, and, accordingly, Acht-NY is a wholly owned subsidiary of Uber Technologies.

111.    Acht-NY operates a FHV base pursuant to license # B02871, out of the West 28th Uber Offices.

**Eins-NY, LLC (B02872)**

112.    Defendant Eins-NY LLC ("Eins-NY") is a foreign limited liability company organized under the laws of the State of Delaware by Uber USA, its sole member, and, accordingly, Eins-NY is a wholly owned subsidiary of Uber Technologies.

113.    Eins-NY operates a FHV base pursuant to license # B02872, issued on or about mid-2015, out of the West 28th Uber Offices.

**Sechs-NY, LLC (B02875)**

114.   Defendant Sechs-NY LLC ("Sechs–NY") is a foreign limited liability company organized under the laws of the State of Delaware by Uber USA, its sole member, and, accordingly, Sechs-NY is a wholly owned subsidiary of Uber Technologies.

115.   Sechs-NY operates a FHV base pursuant to license # B02875, issued on or about August 20 2015, out the West 28th Uber Offices.

## Vierzehn-NY, LLC    (B02876)

116.   Defendant Vierzehn-NY LLC ("Vierzehn-NY") is a foreign limited liability company organized under the laws of the State of Delaware by Uber USA, its sole member, and, accordingly, Vierzehn-NY is a wholly owned subsidiary of Uber Technologies.

117.   Sechs-NY operates a FHV base pursuant to license # B02876, issued on or about September 25, 2015, out of the West 28th Uber Offices.

## Zwolf-NY, LLC (B02877)

118.   Defendant Zwolf-NY LLC (" Zwolf –NY") is a foreign limited liability company organized under the laws of the State of Delaware by Uber USA, its sole member, and, accordingly, Zwolf-NY is a wholly owned subsidiary of Uber Technologies.

119.   Zwolf-NY operates a FHV base pursuant to license # B02877, issued on or about September 11, 2015, out the West 28th Uber Offices.

## Elf-NY, LLC (B02878)

120.   Defendant Elf-NY LLC("Elf-NY") is a foreign limited liability company organized under the laws of the State of Delaware by Uber USA, its sole member, and, accordingly, Elf-NY is a wholly owned subsidiary of Uber Technologies.

121.     Elf-NY operates a FHV base pursuant to license # B02878, issued on or about August 18, 2015, out of the West 28th Uber Offices.

**Funfzehn-NY LLC (B02879)**

122.     Defendant Funfzehn-NY LLC ("Funfzehn-NY") is a foreign limited liability company organized under the laws of the State of Delaware by Uber USA, its sole member, and, accordingly, Funfzehn-NY is a wholly owned subsidiary of Uber Technologies.

123.     Funfzehn-NY operates a FHV base pursuant to license # B02879, issued on or about September 22, 2015, out of the West 28th Uber Offices.

**Neunzehn-NY, LLC (B02880)**

124.     Defendant Neunzehn-NY LLC ("Neunzehn-NY") is a foreign limited liability company organized under the laws of the State of Delaware by Uber USA, its sole member, and, accordingly, Neunzehn -NY is a wholly owned subsidiary of Uber Technologies.

125.     Neunzehn -NY operates a FHV base pursuant to license # B02880, out of the West 28th Uber Offices.

**Zwanzig-NY, LLC (BO2882)**

126.     Defendant Zwanzig-NY LLC ("Zwanzig-NY") is a foreign limited liability company organized under the laws of the State of Delaware by Uber USA, its sole member, and, accordingly, Zwanzig -NY is a wholly owned subsidiary of Uber Technologies.

127.     Zwanzig-NY operates a FHV base pursuant to license # B02882, issued on or about October 13, 2015, out of the West 28th Uber Offices.

**Sechzehn-NY, LLC (B02883)**

18

128.    Defendant Sechzehn-NY LLC ("Sechzehn-NY") is a foreign limited liability company organized under the laws of the State of Delaware by Uber USA, its sole member, and, accordingly, Sechzehn-NY is a wholly owned subsidiary of Uber Technologies.

129.    Sechzehn -NY operates a FHV base pursuant to license # B02883, issued on or about September 22, 2015, out of the West 28th Uber Offices.

**Dreizehn-NY, LLC (BO2884)**

130.    Defendant Dreizehn-NY LLC ("Dreizehn-NY") is a foreign limited liability company organized under the laws of the State of Delaware by Uber USA, its sole member, and, accordingly, Dreizehn-NY is a wholly owned subsidiary of Uber Technologies.

131.    Dreizehn-NY operates a FHV base pursuant to license # B02884, issued on or about September 18, 2015, out of the West 28th Uber Offices.

**Einundzwanzig-NY, LLC (BO2887)**

132.    Defendant Einundzwanzig-NY LLC ("Einundzwanzig-NY") is a foreign limited liability company organized under the laws of the State of Delaware by Uber USA, its sole member, and, accordingly, Einundzwanzig-NY is a wholly owned subsidiary of Uber Technologies.

133.    Einundzwanzig-NY operates a FHV base pursuant to license # B02887, issued on or about September 4, 2015, out of the West 28th Uber Offices.

**Siebzehn-NY, LLC (BO2888)**

134.    Defendant Siebzehn-NY LLC ("Siebzehn-NY") is a foreign limited liability company organized under the laws of the State of Delaware by Uber USA, its sole member, and, accordingly, Siebzehn-NY is a wholly owned subsidiary of Uber Technologies.

19

135.   Siebzehn-NY operates a FHV base pursuant to license # B02888, issued on or about September 24, 2015, out of the West 28th Uber Offices.

**Achtzehn-NY, LLC (BO2889)**

136.   Defendant Achtzehn-NY LLC ("Achtzehn-NY") is a foreign limited liability company organized under the laws of the State of Delaware by Uber USA, its sole member, and, accordingly, Achtzehn-NY is a wholly owned subsidiary of Uber Technologies.

137.   Achtzehn-NY operates a FHV base pursuant to license # B02889, issued on or about October 28, 2015, out of the West 28th Uber Offices.

**Garret Camp**

138.   Defendant Garret Camp ("Camp") is an individual resident of the State of California.

139.   Defendant Camp is the cofounder and CEO of Uber Technologies, Inc. and is, the chief architect of the New York operation and strategy, including the creation of the separate Defendant Uber FHV bases.

140.   Defendant Camp is a shareholder and Director of Unter and is personally liable for liabilities arising from the operation of Unter.

141.   Upon information and belief, Defendant Camp was involved in decisions related to and had the authority and power to impact the rate and methods of pay and had personal responsibility for making decisions about the conduct of the Defendants' business that contributed to violations of the FLSA and NYLL.

142.   Upon information and belief, Defendant Camp was involved in drafting or approving materials for the Uber websites for Uber drivers and for potential Uber drivers that discuss how much drivers earn and other terms and conditions of employment.

143.    Defendant Camp is responsible for the pay practices and employment policies of Uber nationwide.

144.    Defendant Camp had personal responsibility for making decisions about the conduct of the Defendants' business that contributed to violations of the FLSA and NYLL.

145.    All allegations regarding Camp that are based on information and belief are based on information obtained through Freedom of Information Law Requests.

**J. William Gurley**

146.    Defendant J. William Gurley ("Gurley") is an individual resident of the State of California.

147.    Defendant Gurley is a General Partner of Benchmark Capital Partners VIII, L.P. ("Benchmark Capital").

148.    Gurley is a unitholder or shareholder of Unter.

149.    Defendant Gurley is a Manager/Director of Unter and a Director of Uber Technologies, Inc. is personally liable for liabilities arising from the operation of Unter, whether incurred by Unter or Uber Technologies.

150.    Upon information and belief, Defendant Gurley was involved in decisions related to and had the authority and power to impact the rate and methods of pay, schedules and other terms and conditions of employment and had personal responsibility for making decisions about the conduct of the Defendants' business that contributed to violations of the FLSA and NYLL.

151.    Upon information and belief, Defendant Gurley involved in drafting or approving materials for the Uber websites for Uber drivers and for potential Uber drivers that discuss how much drivers earn and other terms and conditions of employment.

21

152.    Defendant Gurley is responsible for the pay practices and employment policies of Uber nationwide.

153.    Defendant Gurley had personal responsibility for making decisions about the conduct of the Defendants' business that contributed to violations of the FLSA and NYLL.

154.    All allegations regarding Gurley that are based on information and belief are based on information obtained through Freedom of Information Law Requests.

**Travis Kalanick**

155.    Defendant Travis Kalanick ("Defendant Kalanick") is a resident of the state of California.

156.    Defendant Kalanick is the cofounder and CEO of Uber Technologies and is a chief architect of the New York operations and strategy, including the strategy of setting up the FHV bases as wholly owned subsidiary entities.

157.    Kalanick was the CEO and Manager of Defendant FHV base Unter, LLC.

158.    Defendant Kalanick substantially controls Uber's operations and business in New York, personally oversees the hiring or appointment of key personnel for Uber's operations and business in New York and/or the Uber bases.

159.    All Uber policies and Driver contracts are made with Kalanick's express authority, approval and review.

160.    Defendant Kalanick was or is personally involved in the day-to-day operation, management and business strategy of the Defendant Uber bases and enterprise in New York with the power to set Driver fares, Uber fees, and all policies and terms and conditions of drivers' employment.

161.    Defendant Kalanick has the power and authority, and did in fact exercise such power and authority, to control or supervise the work schedules of Uber drivers, the rate and method of payment and other terms and conditions of employment.

162.    Defendant Kalanick had personal responsibility for making decisions about the conduct of the Defendants' business that contributed to violations of the FLSA and NYLL.

163.    Upon information and belief, Defendant Kalanick was involved in drafting or approving materials for the Uber websites for Uber drivers and for potential Uber drivers that discuss how much drivers earn and other terms and conditions of employment.

164.    Defendant Kalanick is responsible for the pay practices and employment policies of Uber nationwide.

**Josh Mohrer**

165.    Defendant Josh Mohrer ("Mohrer") is an individual resident of the State of New York.

166.    Mohrer is an employee of Uber Technologies appointed by Travis Kalanick to manage Uber's New York operations.

167.    Defendant Mohrer was or is personally involved in the day-to-day operation, management and business strategy of the Defendant Uber bases and enterprise in New York with the power to set Driver fares, Uber fees, and all policies and terms and conditions of drivers' employment.

168.    Defendant Mohrer has the power and authority, and did in fact exercise such power and authority, to control or supervise the work schedules of Uber drivers, the rate and method of payment and other terms and conditions of employment.

169.    Defendant Mohrer had personal responsibility for making decisions about the conduct of the Defendants' business that contributed to violations of the FLSA and NYLL.

170.    Defendant Mohrer is responsible for the pay practices and employment policies of Uber nationwide.

**Andrew Chapin**

171.    Upon information and belief, Defendant Andrew Chapin ("Chapin") is an individual resident of the State of California.

172.    Chapin was an Officer and Manager of Defendant FHV base Hinter, LLC and a Vice President of Defendant FHV base Unter, LLC.

173.    Chapin is an employee of Uber Technologies, appointed by Travis Kalanick, and served as Senior Operations Manager for Uber in New York from November 2011 through July 2013.

174.    Chapin was personally involved in the day-to-day operation, management and business strategy of the Defendant Uber FHV bases and enterprise in New York with the power to set Driver fares, Uber fees, and all policies and terms and conditions of drivers' employment.

175.    Defendant Chapin has the power and authority, and did in fact excesses such power and authority, to control or supervise the work schedules of Uber drivers, the rate and method of payment and other terms and conditions of employment.

176.    Defendant Chapin had personal responsibility for making decisions about the conduct of the Defendants' business that contributed to violations of the FLSA and NYLL.

177.    All of the above-named Defendants are "employers" within the meaning of the FLSA and the NYLL .

178.    All of the above-named Defendants are engaged in commerce as defined in the FLSA, 29 U.S.C. §203(s).

## JURISDICTION AND VENUE

179.    Jurisdiction is proper as this Court has original federal question jurisdiction under 28 U.S.C. §1331 since this case is brought under the FLSA, 29 U.S.C. §§201, *et seq.* This Court has supplemental jurisdiction over the NYLL claims and common law claims, as they are so related that they form part of the same case or controversy under Article III of the United States Constitution.

180.    Defendants are subject to personal jurisdiction in the State of New York as they both individually and as corporate entities do business in New York.

181.    Venue is proper in this District because Defendants conduct business in this Judicial District, and the acts and/or omissions giving rise to the claims herein alleged took place in this District.

## UBER'S NEW YORK CITY FOR-HIRE VEHICLE OPERATION: HAILING AN UBER

182.    Uber operates in New York City as a group of Black Car bases and one luxury limousine base, each of which is licensed by the New York City Taxi Limousine Commission (TLC).

183.    These bases are subsidiaries of Uber Technologies, which is the owner of the app.

184.    All black cars operating in New York City must be affiliated with a base in order to accept dispatches, but drivers are permitted to accept dispatches from any base under TLC rules.

185.    Most Uber drivers' operate vehicles affiliated with these bases, each organized as a separate LLC. Uber, however, effectively operates its bases as a unified company known as "Uber."

186.    All requests for the Uber service are made through the Uber smartphone application (the Uber "app") and are dispatched to Uber drivers through Uber's centralized dispatch network that also operates via the Uber app.

187.    In order to accept dispatches from Uber drivers must enter into a contract with Uber that specifies that Uber will set the fare based on a base-charge-plus-time-plus-distance formula, that Uber will collect the monies, and pass through to drivers, whose earning are net of Uber's service fee of 20-28% of the fare.

188.    As with most other Black Car bases, many of whose workers have been found to be employees by state and federal government agencies, Uber effectively pays its drivers a percentage of the fare for each trip. Uber passengers pay a full fare amount to Uber, which Uber, jointly with the Defendant FHV bases, remits to the Driver after deducting its fee, or kickback, of between 20 to 28%, depending on the type of service, and/or vehicle used for the trip and tenure of the Driver. As discussed below, a variety of additional items are also deducted from drivers' percentage of the fare.

189.    While on the app, drivers must be able to respond whether they will accept a dispatch within 15 seconds and thus they must be in the car, as Uber requires drivers to accept more than 80% of dispatches, previously 90%, offered. Upon accepting a dispatch the driver drives to the pickup location, with a route suggested by Uber. At the time of acceptance of the trip drives do not know the passenger's destination. Nor do they know the fare being charged to the customer.

190.    The driver then waits at the location for the passenger to arrive. Only when the passenger is in the car does the driver become informed of the passenger's destination, and begin to be paid. Drivers then drop the passenger at his or her destination and are available to be dispatched again through the app. After the customer has been dropped off the fare is charged directly to the customer's credit card account and the customer receives a receipt.

191.    Drivers learn of the fare charged the passenger only some time after the trip is complete.

## UBER MISCLASSIFIES DRIVERS AS INDEPENDENT CONTRACTORS AND CONTROLS DRIVERS AS COMMON EMPLOYERS

192.    Uber is deeply involved in marketing its transportation services, setting prices for services, selecting and qualifying its drivers, regulating and monitoring their performance, and disciplining or terminating those who don't measure up to Uber's expectations.

193.    In short, Uber is a transportation company masquerading as a technology company in order to enrich its bottom line.

194.    As an initial matter, Uber's contracts label all drivers as "independent contractors" when they are/were in fact, employees of Uber.

195.    Although Uber's Driver contracts frame a relationship with its drivers that is short on specifics, and explicitly disclaim any direction or control over its drivers, these contracts, in addition to Uber's practices, create a level of control more pervasive and far-reaching than many other Black Car bases which have already been recognized as employers by the National Labor Relations Board and the New York State Department of Labor.

## Uber Maintains Constant and Active Control Over How Its Drivers Perform Their Work.

196.    Plaintiffs claim that Uber exercises near total control over the means and method of their work. For example, Uber controls the terms and conditions of employment from what to wear to what route to take, to setting customer fares and Uber's fee.

197.    Uber has the authority to hire, fire and discipline its drivers.

198.    Through the GPS technology in the Uber app, Uber even monitors the smoothness of a driver's braking and acceleration while working for Uber. At the end of a shift, Uber presents this information to the driver in the app, and classifies each observed instance of braking or acceleration as sufficiently smooth or not.

**Ensuring Five Star Service: Uber's Employee Code of Conduct**

199.    All drivers were hired by Uber in a common manner and subject to similar training videos as to how to set up and use the Uber App, and provide customer service in line with Uber's standards.

200.    Further, drivers were advised of the same set of rules and instructions and what discipline they might be subjected to for not abiding by the rules.

201.    In practice, Uber's control begins through a series of communications given by Uber to drivers when they sign up to drive with Uber or to affiliate their vehicles with the company, including instructional tips, videos, a handbook and in person trainings that have the force of a code of conduct/employee rules.

202.    Uber's focus in such instruction is to provide riders a "Five-Star" service. *See How to Be a Five-Star Uber Driver*, video, available at https://www.youtube.com/watch?v=5-GEn_WsMl4 (Accessed Sep. 29, 2015).

203. All individual Plaintiffs report that where the prescribed conduct is not followed, drivers are subject to poor ratings, decreased access to dispatches, decreased access to the most profitable class of dispatches, and termination, or "deactivation" in Uber's parlance.

204. First among these communications are various "on-boarding instructional" videos that Uber mandates each Driver view in order to affiliate a vehicle and or receive dispatches from Uber.

205. These videos instruct drivers on how to interact with customers in order to provide them with the desired Uber experience.

206. Several of the individual Plaintiffs recall viewing these videos and the specific rules and guidelines enumerated for drivers by Uber.

207. Uber mandates minute details of the Drivers' work experience in this manner. For example, Uber directs the drivers' grooming and personal hygiene.

208. Uber seeks to control the type of conversation the drivers have with Uber customers, recommending they comment on how much they like working for Uber and instructing them to encourage the customer to recommend Uber to friends, and to avoid "inappropriate" topics of conversation.

209. Plaintiff Parmar recalls viewing the "onboarding instructional video" at Uber's Jackson Avenue office and its instructions that he open the door for passengers in addition to the aforementioned rules.

210. Plaintiff Parmar was also instructed in person by Uber staff that as an Uber Black Driver, working in the luxury service class, he was to wear a "nice shirt and pants." He was prohibited from wearing jeans.

211.   Upon information and belief, all Uber drivers providing Uber Black service or higher levels of Uber service are subject to a dress code.

212.   Upon information and belief, all Uber drivers were required to watch such videos and were instructed to keep such items as candy, water, and phone chargers in their cars for the benefit of the passengers.

213.   Drivers received handbooks that gave detailed instructions on how to operate the app, how long to wait for passengers, and exactly how to respond to passengers who attempted to offer cash tips.

214.   Drivers who sign up to provide service to those customers requesting rides through Uber's "UberFamily" program must attend a car seat training offered by Uber and be able to demonstrate that they can properly install a car seat. *See Uberfam Onboarding*, available at www.driveubernyc.uberfamob/ (Accessed: Sep. 22, 2015)

215.   In order to qualify for UberFamily, drivers are required to pass a test after attending a required training. Drivers who attended the training were forbidden from smoking and were warned by Uber that they would be disqualified from the training and would be unable to become "UberFamily Partners" if they smelled of smoke at the car seat training.

216.   Although Uber maintains no wheelchair accessible vehicles among its New York City fleet, the company has provided its employees with detailed instructions on how to pick up and interact with passengers who have disabilities, including what specific terms to avoid when speaking with passengers with disabilities.

217.   Further, Uber's code of conduct governs waiting time. The Driver handbook instructs Uber drivers in no uncertain terms how to wait for a passenger, stating: "If the user is

not waiting at the pick-up location: *Wait at least 10 minutes *Call the user twice within the 10-minute wait period."

218. The handbook gives detailed directions on exactly when a Driver can start charging for wait time. Drivers are instructed that, if the customer answers a phone call and requests the Driver to wait longer than ten minutes, the Driver should ask if the customer agrees to pay for wait time, and start the in-app meter at the ten-minute point.

219. Drivers who start the in-app meter too early can be subject to low ratings and/or discipline.

220. More recently, Uber informed its drivers that it had adjusted the recommended wait time in New York from ten to five minutes. If a driver does not wait the recommended period of time, and cancels a trip that Uber believes should not have been cancelled, he or she can be subject to discipline by Uber.

221. Other instructions to drivers include feedback sent by email to drivers in response to customer comments and rating, such as the following:

> There were a few things your riders thought could be better. Here are some tips on how to improve: Service- Riders give the best ratings to Drivers who: *Never ask for a 5-star review but focus on providing an excellent experience. *Stay calm, patient and polite with riders and other cars on the road. *Go above and beyond to make the experience special, such as opening doors for riders when possible.

222. Other feedback includes directions to "Always use GPS until you know the city well," to "Ask if the rider has a preferred route," and that riders "prefer for Drivers not to promote other businesses during the trip."

223. In discussing the consequences of failing to heed this "feedback," an article posted in the "Newsroom" section of Uber's website reads, "Real-time feedback about Drivers

means Uber can correct for issues big and small- while ensuring only the best Drivers stay on the road....Have partner Drivers been deactivated for consistently poor ratings? You bet."

224. The handbook then details a list of behaviors that lead to one-star ratings and five star ratings, respectively. Actions that lead to 1-star ratings include: calling a rider unnecessarily, asking for five star ratings, asking for tips, taking an inefficient route, or accepting cash. Actions that lead to 5-star ratings include: asking if the passenger has a preferred radio station, communicating throughout the trip, always asking for the passenger's preferred route, and politely greeting the passenger and asking their name.

225. Although, in conveying the above rules, Uber has, more recently, labeled its direction to drivers as "tips" and "suggestions," this choice of words makes no practical difference to drivers; when these expectations are not met, Uber may discipline and even terminate the driver's employment completely.

226. Drivers also received consistent instruction throughout the term of their employment by way of mass e-mails sent by Uber to all drivers, reminding them, for example, that not accepting trips would lead to being locked out of the app, or that drivers could be deactivated for recommending that riders take trips with other transportation services.

**Uber Exercises Strict Control as to Type of Vehicle**

227. Uber maintains a substantial interest not only in the behavior of its drivers, but also the presentation of its cars and level of service. Uber sets vehicle standards and color requirements not required by any state or local regulations in New York. *See, Full Vehicle List*, available at http://www.driveubernyc.com/full-list (Accessed Sep. 22, 2015)

228. Cars used in Uber Black service must be "black on black," that is painted black, with black upholstery.

229.    Further, a video on how to be a five-star Driver tells Uber drivers to maintain cars above the levels required to pass TLC-mandated inspection: "Your contract with Uber requires that you keep your vehicle in great mechanical condition at all times. That means no visible body damage, no squeaky brakes." *How to Be a Five-Star Uber Driver*, video, available at https://www.youtube.com/watch?v=5-GEn_WsMl4 (Accessed Sep. 29, 2015)

230.    Moreover, Uber maintains relationships with a number of "Uber-approved" car dealers and urges drivers to contract with those dealers for new cars and upgrades in order to be eligible for certain classes of service.

231.    In the on-boarding instructional video, Uber even suggests that the car dealerships they recommend will provide the drivers with the best financial deals. See Apr. 2015 Onboarding video, available at https://vimeo.com/125046223.

232.    Uber acts as a guarantor for drivers without a credit history to lease cars at these affiliated dealerships and even finances the down payment when necessary.

233.    Uber has urged drivers to buy or lease a particular car for a particular class of service and then unilaterally changed the cars eligible for such service, to Drivers' detriment.

234.    To those drivers of Yellow or Green Taxis who drove under Uber T (Uber's service which dispatches trips to licensed Yellow and Green Taxis for a flat $1 or $2 booking fee), Uber sent a barrage of messages urging them to purchase a Black Car and sign up to drive for UberX rather than drive a Taxi, apparently in an effort to bolster the more profitable side of Uber's business.

**Dispatch and Acceptance of Fares**

235.    Uber's control extends to its dispatch of rides, which it does in order of preference based on drivers' acceptance rate and star rating, in addition to a Driver's proximity to the customer.

236.    Based on passenger-provided positive ratings, Uber rewards drivers by upgrading their status to allow drivers more opportunities to pick up passengers, and to pick up more lucrative classes of passengers; these opportunities are not available to drivers with lower ratings.

237.    Drivers who achieve higher ratings are automatically classified as "UberVIP" drivers. Drivers who achieve this status/ranking will be eligible for trips with Uber passengers who select UberVIP service, knowing that they will be driven by a top-rated Uber Driver. The passenger rating system rewards drivers who follow Uber's customer service expectations by providing them with more fares than non-VIP drivers would receive.

238.    In one week in August of 2016, for example, 15 of the 44 trips Plaintiff Parmar performed for Uber were classified as VIP trips.

239.    Since November 2016, Uber Black drivers were required to maintain a 4.8 star rating in order to qualify for Uber Black. VIP drivers were also singled out by Uber to receive dispatches for lucrative trips in the Hamptons during the summer months, at rates roughly twice those Uber charges in New York City. Uber marketed these trips as an exclusive opportunity, despite the fact that Uber is not authorized to provide service in the Hamptons, and over twenty drivers were ultimately arrested for illegal operations.

240.    Further, on airport dispatches, Uber will dispatch drivers from the Black Car lot in the order they arrive. Given the distances and traffic at the airport, sometimes it takes twenty minutes to reach the passenger pick-up point at a terminal, and often the passenger will have

34

cancelled, having taken another service. Nonetheless, Uber requires the drivers to return to Black Car Lot, in order to get another airport fare.

241. Once a Driver receives a dispatch, Uber specifies the pick-up location, but withholds the drop-off location until the passenger has entered the vehicle.

242. Drivers are instructed that they will be penalized should they not accept an Uber dispatch.

243. A page on Uber's website titled "How to Use Uber," instructs drivers that "you should accept a least 80% of trip requests to retain your account status."

244. More specifically, all of the individual Plaintiffs were told they had to accept at least 90% of the dispatches offered, and had to maintain at least a 4.5-star rating of customer satisfaction in order not to be deactivated/terminated.

245. All of the individual Plaintiffs were told that if they declined two dispatches in a row, they would be locked out of the Uber app for a period of time.

246. When drivers do not comply, Uber reprimands drivers for cancelling too many trips during the course of a week, sending e-mails that read, "Please reduce your cancellation rate if you want to continue using the Uber platform."

247. All individual Plaintiffs were informed that if they were deactivated based on a low rating, in order to be reinstated they would have to take a course from Uber and pay a fee for the course.

**Direction of the Route**

248. Uber's control extends even to the routes taken by its drivers.

249. While the Driver contract requires drivers to accept responsibility for the effectiveness and efficiency of Uber rides, Uber unilaterally decides what route a Driver should

35

take or, after the fact, should have taken, and will reduce a Driver's pay accordingly, without first consulting the Driver, or even examining the surrounding traffic conditions.

250.    All of the individual Plaintiffs were instructed to follow the GPS route, if they were unfamiliar with the area, and to deviate only if the customer preferred a different route.

**Drop Off Order**

251.    Similarly, drivers who accept dispatches pursuant to Uber's "Uber Pool" service, in which drivers pick up more than one passenger from various pick-up points, are directed not only with respect to route but also the order in which they drop off passengers.

252.    Uber materials for drivers, such as instructional videos, explicitly state to drivers, "You need to drop off the riders in the order provided by the app." See Apr. 2015 Onboarding video, available at https://vimeo.com/125046223.

253.    The video provides instructions on how, when a Driver responds to a second pick-up, the Uber app will automatically reroute the Driver, directing them to the second pick-up point.

254.    Even if the Driver thinks it would be more convenient to drop off one rider first, or would want to make sure the first rider picked up is the first dropped off, Uber's control trumps the Driver's independent judgment, and instructs the Driver not to do so.

255.    The video also "suggests" that drivers wait one-minute before calling a second passenger who is not present when the Driver arrives; this is a significant difference from the five-minute suggestion for other Uber trips.

256.    Like all of Uber's suggestions, these "suggestions" carry the force of work rules as not following such "suggestions" leads to discipline by Uber.

**Deactivation for Non-Compliance**

257.    In pursuit of maintaining consistent five-star service, Uber reserves the right to deactivate drivers based on passenger ratings, and indeed encourages passengers to offer feedback on its drivers to create a more uniform experience.

258.    On information and belief, in addition to deactivating for failing to accept 90% of dispatches or failing to maintain a 4.5-star rating, Uber's practice is to deactivate its drivers in the bottom 5% of its ratings, regardless of whether drivers' activity has prompted any specific complaints.

259.    Deactivated drivers must take an Uber-mandated re-training course before Uber will reactivate their accounts and continue to dispatch jobs to them. Drivers who attended such classes were made to watch training videos and discuss actions that they should take or avoid when transporting passengers.

260.    Uber states that it may permanently deactivate drivers for actions that would not warrant suspension or revocation under TLC's regulatory framework, such as accepting cash from riders.

**Uber, Not Drivers, Unilaterally Controls the Opportunity for Profit Or Loss**

261.    Although Uber could have chosen to operate merely as a dispatch service open to customers and for use by a variety of Black Car bases, or to more broadly offer its Uber T service which passengers use to find Taxis via their smartphone app, Uber chose to organize itself as a joint enterprise car service consisting of the above-listed licensed Defendant Black Car bases.

262.    As opposed to a mere dispatch service, by choosing to become a Black Car service, Uber benefits from the control over profit and loss it may exercise by raising fares,

lowering Drivers' commission rates and increasing the number of cars it affiliates with, none of which it could do if it chose merely to register as a TLC-licensed e-hail or e-dispatch provider.

263. All aspects of the business affecting the bottom line are set by Uber, in its sole discretion, not the purported "partner" drivers.

**Uber Sets the Fare and Fees and Accepts Payment**

264. When the passenger completes the trip, Uber's control extends to all aspects of the financial transaction.

265. That is, Uber unilaterally sets fares. When fares were slashed in New York in August 2014 and again in January 2016, it was good for Uber, increasing its market share, but bad for drivers, as drivers had to work more trips to make the same gross pay.

266. Drivers are denied all independent judgment or control about what fare to set to meet their bottom line.

267. Further, as Uber has slashed fares it has also increased its own fees unilaterally.

268. When Uber entered the New York market on or about December 31, 2011 it took a fee of 10% on fares in the lowest class of service. Today its lowest fee is 20% (for drivers who Uber hired before April 13, 2015) and is as high as 28% in the highest classes of service. Drivers who sign up to work for Uber today will pay a minimum of 25% of gross earnings to Uber, before Uber takes further deductions for sales tax and the BCF surcharge.

269. Uber collects all monies from passengers and disburses such monies according to its own accounting procedures and policies.

270. Drivers' opportunity to challenge any accounting errors pursuant to the contract is limited to three days.

**Incentive Pay**

271.    Periodically, Uber offers drivers various incentives to work in specific locations and at specific times. Uber will often multiply a driver's pay rate for working in certain quadrants of the city at certain hours.

272.    At one time, Uber offered certain Plaintiffs $20 in additional pay to complete a pick-up in Manhattan between 5:00-5:59 PM.

273.    At other times, Uber offered hourly pay guarantees simply for being online at certain times, in certain locations, and for accepting a minimum number of trips.

274.    Uber did not offer these incentives uniformly to all drivers, but tailors incentives to specific drivers, as Uber sees fit. For example, one driver was offered 1.4 times the normal rate to work in a specific location at a specific time, while another driver would be offered twice the normal rate to work in a specific location at a specific time.

**Goodwill Accrues to Uber Not Drivers**

275.    Just as Uber's control of the bottom line is inconsistent with drivers' operation of an independent business, so too is Uber's requirement that customer goodwill flow to it, not to drivers.

276.    That is, New York City Uber drivers do not operate independent businesses, but work to serve the interests of their employer.

277.    Drivers working for Uber provide a branded service; most drivers place a small sign in a front window that reads "Uber" or a black square with a large "U" for Uber in their front windshields. Uber e-mails drivers who have not picked up such signs from the office, encouraging them to do so.

278.    Consistent with this Uber branding, the Uber website provides conversation topics to broach with passengers, all serving to inure to Uber's goodwill as a brand.

279.    Further, Uber drivers are encouraged to promote Uber and increase Uber's business, acting not only as third-party drivers, but as promoters of Uber's business and brand. The Driver handbook encourages drivers to "grow your business" by promoting Uber.

280.    For example, drivers are encouraged to give cards to passengers in a group who may not have used Uber yet, and to teach people how to use Uber "at large events or busy areas" when drivers are offline. Although such corporate promotion may increase the overall number of Uber riders, drivers are not creating more direct business for themselves by promoting Uber.

281.    Meanwhile, drivers are barred from promoting other businesses to passengers, which would include their own services as an independent Black Car driver on a future trip. See Feb. 2014 onboarding video available at:  https://vimeo.com/87769425.

**Uber Directs Drivers To Purchase Vehicles to Uber's Specifications**

282.    In order to drive for Uber, drivers must purchase or lease a vehicle that meets Uber's specifications. Drivers have no opportunity to receive profits directly from Uber's business. Rather, the amount of their earnings, like other employees, depends solely on the amount of time that they work, and the number of rides that Uber dispatches to them during that time.

283.    Further, with respect to drivers' investment in vehicles, these are largely directed by Uber.

284.    Uber specifies the brand and class of car that is eligible for each level of service.

285.    Even in the lowest level of service, UberX, Uber representatives at the Jackson Avenue and Manhattan Offices direct drivers as to which entry-level vehicle to purchase.

286.     Uber specifies where to purchase and lease these vehicles and is involved in the financing terms and guaranteeing of such loans where needed. While signing up for Uber, drivers are shown a video that refers them to "Uber-approved" brokers of vehicles who, drivers are told, offer special deals for Uber drivers.

287.     After significant investments, Uber drivers' only way to gain higher earnings is to work longer hours, similar to any other employee.

## Uber Drivers Require No Special Skill Or Independent Initiative To Perform Their Work

288.     While some of the representative Plaintiffs are experienced, longtime drivers, driving for hire has not been considered a skilled occupation, even where it may require brief additional training or additional state or municipal licensure.

289.     In New York City, other than a TLC License, no qualifications are required, or preferred, for Uber drivers to perform their work.

290.     Indeed, Uber's recruitment platform to potential drivers is that *anyone* with a car can become an Uber drivers. In New York City, anyone with a valid Driver's license, who can pass a drug test and criminal background check (required to receive a TLC-issued FHV Driver's license) can work for Uber.

291.     Uber does not require a skilled workforce, as it can better impose its branded service through extensive rules and ceaseless monitoring and supervision.

292.     Uber drivers are subject to supervision by Uber, whether the work is done with or without a passenger.

293.     Uber's app maintains constant GPS contact with the drivers. Indeed, this constant tracking is required in order for Uber to match potential customers with its drivers based on proximity.

41

**Drivers' Working Relationship With Uber Is Indefinite and Often Long Lasting**

294.    Uber Drivers' contracts are indefinite and not renewed on a job-to-job basis.

295.    Indeed, Uber's guaranteed payment model is based on drivers working multiple trips during set blocks of time. Those contracts, which promise drivers guaranteed net income amounts if a driver works a full three, or six or twelve-month period (and satisfies all conditions), envision drivers entering into long-term engagements with Uber.

296.    Likewise, the "Uber-approved" vehicle dealers that Uber markets to new drivers offer long-term vehicle financing of commercial vehicles for use with Uber.

297.    Uber has been in operation in New York City for several years.

298.    Measured by this timeframe, the individual Plaintiffs, members of the FLSA collective action and upon information and belief, the members of the class action have had a long-lasting relationship with Defendants, many working for the majority of the time that Uber has been in business in New York.

**Drivers Are Integral To Uber's Business**

299.    Despite its claims that it is merely a technology company, Uber is in the transportation business, and depends entirely on its drivers to operate its business.

300.    Indeed, Uber's corporate motto described Uber as "Everyone's Private Driver," a marketing tag that could well apply to another car service, but would make little sense as a description of Microsoft or Google.

301.    Specifically, in New York City, Uber is a Black Car service operating under the regulatory framework established for a Black Car Service by the New York City TLC. In New York, "Uber" operates a Black Car company made up of 27 subsidiary LLCs, which are FHV bases, licensed by and registered with the TLC, to provide transportation services.

302.    As a car service, Uber simply could not be in business without its drivers. A video available on the Uber website admits as much, saying: "Drivers are the engine of the Uber network. Without you, we just wouldn't get anywhere." *Uber, Preferred Financing Program*, available at https://vimeo.com/103542779 (Accessed, May 26, 2016).

**Uber's Pay Structure Also Demonstrates The Existence Of An Employment Relationship**

303.    Although Uber's basic structure for drivers' payments is based on per-trip payments, Uber's formula differs from those of other Black Car companies in that Uber bases its pay to the drivers on the time and mileage covered rather than merely charging passengers a flat rate.

304.    While New York Black Car companies traditionally set fare prices with their passengers in a binding flat rate quote for a specific distance or trip, Uber does not do so.

305.    Rather, Uber offers a potential passenger a "fare estimate" before the trip has been agreed to, and then Uber bases the amount of the fare on the distance travelled and the travel time.

306.    Uber then measures the fare amount by using a virtual meter that assesses a per-minute charge for every minute of the trip, regardless of the vehicle's speed.

307.    That Uber pays its drivers for the time they work, rather than by the job, is most evident in how Uber compensates its drivers for UberPool trips.

308.    When a driver works an UberPool trip during flat-rate promotion periods he/she is paid solely based on the time and distance, regardless of the fact that the passenger pays a flat rate.

309.    If, for example, a driver transports one passenger who has requested UberPool service, the passenger may pay Uber a flat rate of $5, but the driver is paid based on the time

and distance calculation used for UberX trips. In such cases, regardless of the price of the fare that the passenger has contracted for, the driver is paid for the time he works for Uber.

310. Further, Uber's fare and wage payment structure regularly compels drivers to work exclusively for Uber for set blocks of time if they wish to earn an adequate amount of gross bookings, by qualifying for hourly minimum earnings.

311. That is, periodically, Uber will offer drivers a certain amount of guaranteed net fare income if they sign in to work during specified hours and meet certain conditions. To meet these conditions, drivers must, effectively, work exclusively for Uber.

312. For example, Uber makes similar earnings guarantees based on a year, or remainder of a year. Uber guaranteed $25,000 in annual income for any driver who signed up to work with Uber before September 10, 2015, so long as the driver stayed logged in for at least 200 hours per month (roughly a minimum 45-hour work week), accepted 90% of trips in each month, and completed at least 200 trips within New York City in that month. Requiring drivers to work so many hours per week, and to complete so many trips for Uber, effectively requires drivers to work exclusively for Uber to qualify for Uber's minimum earnings payments.

313. Other income plans clearly restrict where Uber drivers may work. For example, a long-term guaranteed income agreement that applied to the last months of 2014 required drivers to stay in Manhattan south of 110th Street, and in nearby neighborhoods in Brooklyn, such as Williamsburg and Park Slope to qualify for monthly minimum earnings. A more recent promotion offers an additional payment to any driver who makes a pick-up in Manhattan on a weekday between 5:00 and 5:59 PM.

44

314.   Although Uber expanded its opportunities for wage payments unrelated to actual fare revenue after it cut its fare rates in January 2016, these rates only apply if drivers meet other conditions. For example, if Uber cannot provide enough work (namely, 1.3 trips per hour), a driver will not qualify for the guarantees, and with the new lower rates, is much more likely to earn below the minimum wage.

315.   As Uber wrote to its drivers in or about late January 2016: "Beginning Friday, we will be reducing UberX and UberXL prices to get more riders on the road and increase your hourly earnings."

316.   After making these fare cuts, during select weeks during 2016, Uber has offered a minimum guarantee of $1500 for 50 hours worked, which required the following conditions be met by drivers:

> This offer is for Driver-partners only who directly received this message. Be logged in online in the Uber app in New York City at least 50 hours, 15 of those hours within the time periods specified above. Maintain the above required trips per hour. Trips per hour (TPH) is calculated by taking your total number of completed trips in a given incentive period divided by the total hours that you were online during that same incentive period. Repeat trips with the same riders will not be counted toward your completed trips for the guarantee. Maintain a 90% acceptance rate over all hours driven. Acceptance rate is calculated by taking the total number of trip requests that you accepted during the incentive period divided by the total number of trip requests that were sent to you during that same incentive period. Maintain a completion rate of 25%. Completion rate is calculated by taking your total number of completed trips in a given incentive period divided by the total number of trip requests that you received in the given incentive period. Qualification parameters reset at the beginning of each new incentive period. Guaranteed amounts are weekly net fares, based on hours online per incentive period. Net earnings are net of Uber service fee, Black Car Fund, and sales tax. We reserve the right to withhold or deduct payments that we determine or believe were in error, fraudulent, illegal, or in violation of Driver terms or these terms. Guarantee available for a limited time only. Terms are subject to change.

45

317.    As part of its promotion of these guarantees, Uber admits that it has failed to pay any wages for many hours worked. One driver received an email stating, "In the last month, you spent 176 hours online waiting for a trip request, not earning money. Our goal is to turn your unpaid time online into paid time."

318.    For Plaintiffs, all time spent online (i.e. time during which Plaintiffs are logged-on to the Uber App) is compensable time during which Plaintiffs are driving in or near where Uber's map shows passengers are available, or driving to pick up customers or waiting for customers to enter the vehicle.

319.    This "on duty" work time is unpredictable with respect to when it will occur and duration and during such time, Defendants expected Plaintiffs to be immediately available to work. Further, Plaintiffs must remain with their vehicles during this time and are significantly constrained in how they may use this time. Plaintiffs and the members of the class they seek to represent are unable to engage in personal activities during this time between trips as they are required to be "on call" so that they can immediately pick up a passenger.

320.    All of the work time spent by Plaintiffs and members of the Class they seek to represent "online" or "on-app" is compensable work time.

321.    In sum the above factors establish the basis on which Plaintiffs allege misclassification.

## COMMON ALLEGATIONS RELATED TO DEFENDANTS' MISCLASSIFICATION OF DRIVERS

### On-App Time Is Compensable Time

322.    All allegations regarding hours worked include all hours spent "online" or "on-app," which are thus compensable.

323.    As admitted by Defendant Mohrer, in an interview regarding the company's September 2014 fare cuts, "When you're in your car you're working even if the time between jobs is longer or shorter. That's all work"

324.    Further in 2013 Uber included all time on the app under the heading "hours worked" in its driver payment statement.

325.    As a result of this misclassification Plaintiffs rights as employees to lawful wages have been violated as follows.

**Uber's Minimum Wage and Overtime Violations**

326.    The individual representative Plaintiffs and members of the Class they seek to represent at times and frequently worked in excess of forty (40) hours per workweek, without overtime pay.

327.    Each of the individual Plaintiffs except Plaintiff Carrasco had at least one workweek, whereby their wages fell below minimum wage.

328.    Defendants unlawfully failed to pay Plaintiffs and the Class they seek to represent in accordance with minimum wage requirements of federal and state law.

329.    Defendants failed to provide Plaintiffs and members of the Class they seek to represent with a statement with each payment of wages as required by the NYLL.

**Wage Notice and Record Keeping Violations**

330.    Defendants violated NYLL §195(3) by failing to furnish Plaintiffs and the Class they seek to represent with a statement with every payment of wages, listing hours worked, gross wages, hourly rate, deductions and net wages. In addition, Defendants failed to furnish an explanation of how such wages were computed.

331.    That is Defendants have violated notice-and-recordkeeping requirements by failing to provide statements along with wages listing the name of employee, name of employer, address and phone number of employer, rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other, gross wages, deductions, allowances, if any, claimed as part of the minimum wage, and net wages. Defendants have further violated the requirement that they provide, upon employee request, explanations of how wages were calculated in violation of NYLL §195(3).

332.    All individual Plaintiffs are paid on a weekly basis. Online records go back only until May 2014. Further, until recently, Uber has not included a drivers' weekly hours worked and weekly earnings in a single e-mailed document.

333.    Nonetheless Defendants have violated notice-and-recordkeeping requirements by failing to provide employees with wage notices as required on February 1 of every year in violation of NYLL § 195(1).

334.    Defendants violated NYLL §195(1) by failing to provide Plaintiffs with a yearly notice which includes rates of pay including straight time and overtime; how and when Plaintiffs are paid; the official name of Plaintiffs' employer and any other names used for business; the address and telephone number of the employer's main office or principal location.

335.    Defendants committed the foregoing acts against the individual Plaintiffs and the Class they seek to represent.

**Uber's Unlawful Equipment and Tools Deductions**

336.    Federal regulations prohibit employers from requiring a minimum wage employee to purchase the tools of their trade or give any money back to his or her employer, if the cost of

such tools would bring the employee's pay below the established minimum wage and overtime rate. 29 C.F.R. §531.35.

337.    The NYLL prohibits employers from making any deductions from an employee's wages except those permitted by law. N.Y. Lab. Law §193.

338.    Defendants required Plaintiffs to purchase vehicles and other supplies at their own expense for use in fulfilling their duties as Uber drivers, including but not limited to vehicular expenses, car leases, car insurance, gas, insurance, i-Phone lease, snacks, and other miscellaneous items Uber required drivers to stock in their vehicles.

339.    Defendants deducted the cost of an Uber iPhone lease, vehicle financing or lease expenses, and fuel payments directly from the wages of some of the individual Plaintiffs and members of the Class they seek to represent. Such deductions caused the wages of the individual Plaintiffs and members of the Class they seek to represent to fall below the prevailing lawfully required minimum and/or overtime wages.

340.    Defendants also unlawfully directed Plaintiffs to engage in passenger pick-ups in violation of state law and local regulations, which resulted in Plaintiffs potentially being subjected to fines from law enforcement agents in jurisdictions outside of New York City, such as Nassau County.

341.    For example, Defendants have consistently dispatched trips to its New York City TLC-licensed drivers that begin and end within Nassau County, despite the fact that Nassau County laws prohibit drivers and vehicles not registered with the Nassau County Taxi & Limousine Commission ("Nassau County TLC") from doing such work.

342.    When Defendants directed Plaintiffs to make illegal pickups, Uber knew that such trips were illegal trips as customers had already input their destination information. Unlike

Defendants, drivers were not able to learn of the unlawful destination of such trips until they had already accepted the trips, and the passengers were seated in the vehicle. At the time it dispatched these trips, Uber was aware that the trips neither began nor would end in New York City, making these dispatches illegal under local regulations and New York State Vehicle and Traffic Law §498.

343.    The maximum fine for such a violation, as assessed by the Nassau County TLC is $1500.

344.    Additionally, Uber required drivers who were deactivated for a low rating or any reason whatsoever to pay $100 for instructional classes, which were required in order to be reactivated.

345.    The expenses described in the preceding paragraphs were exclusively for the benefit of Defendants and constituted *de facto* deductions from Plaintiffs' wages.

346.    With respect to the fines resulting from unlawful passenger pickups, not only were these unlawful actions for Defendants' benefit, but also they were at Defendants' behest.

347.    Drivers were not reimbursed for any expenses by Defendants.

348.    These deductions were not permitted deductions under N.Y. Lab. Law §193 and brought Drivers at various times to earn wages that were under prevailing minimum wage standards.

**Uber's Unlawful Tax and Surcharge Deductions**

349.    The NYLL prohibits employers from making any deductions from an employee's wages except those permitted by law. N.Y. Lab. Law §193.

50

350.    Drivers' rates of pay were set forth in the form of fare rates published on its website and its app, and by the commission rates/Uber fees charged to drivers, established by Defendants.

351.    At all times relevant, Defendant made additional deductions from Drivers' pay to cover the cost of taxes and contributions to a drivers Workers' Compensation Fund, the Black Car Fund.

352.    In order to receive Uber dispatches, all Plaintiffs and similarly situated persons were required to either sign a paper copy, or electronically "accept" a "Software License and Services Agreement" (hereafter "contract") on their phones to use the Uber App.

353.    Uber's Contract is over twenty pages long, but these Agreements did not specify the trip fare schedule set by Uber, a percentage of which Plaintiffs received as consideration for driving.

354.    The trip fare schedule pertaining to a given Territory is set forth in a separate "Driver Addendum Related to Uber Services" and the "City Addendum" that drivers did not view or sign at the time they accepted.

355.    Trip fare schedules were subject to unilateral change by Uber and percentages due to drivers under the Agreement could be changed unilaterally by Uber in subsequent addendums offered to drivers.

356.    In order to receive dispatches after a new Contract, a driver was required to agree to the new contract, which appeared on his or her phone, before any new dispatch could come in.

357.    All drivers were bound by contract with Uber to provide driving services in exchange for receipt of a percentage of the fare collected by Uber from passengers.

358.     Pursuant to the Agreements in force from at least June 2013 until November 10, 2014, Uber, defined the word "Fare" as "the amount (including applicable taxes and fees) that the [Driver] is entitled to charge the User for the Ride, based on the recommended fares for the City as set out on http://www.uber.com or on the App."

359.     That is, "Fare" meant the total amount Uber charged its passengers for a ride.

360.     Uber's Agreements from at least June 2013 until November 10, 2014, at Section 5.2.1 states that the driver will pay Uber a fee per ride, that is "calculated as a percentage of each Fare," subject to change by Uber and set forth in a City Addendum for each city or market.

361.     During this time, drivers contracted with Uber to pay fees of 10%, 20%, 25% or 28%, depending on the service offered and the period during which services were offered.

362.     The 2013 and 2014 Agreements state that the driver (referred to as "Transportation Company" or "Customer"), agrees that Uber will "deduct its Fee payable on all Fares earned by the Transportation Company and remit the remainder of the Fare to the Transportation Company."

363.     Quite simply, the Agreements require Uber to collect the gross fare, and remit the fare to drivers, minus Uber's Service Fee.

364.     Nothing in these Agreements empowers Uber or any of its subsidiaries to remove any additional amounts from the fare.

365.     Yet, at all relevant times, Uber and its subsidiaries collected the entire Fare from passengers, and remitted to drivers the Fare minus Uber's fee, and additionally, minus sales tax and BCF surcharge amounts.

52

366.    The Agreements plainly did not permit Uber to take the taxes and BCF surcharge amounts entirely from the Driver's portion, on top of the Service Fee that Uber states will be the only deduction from driver-earned fares.

367.    By so doing, Uber violated the Agreement to Plaintiffs' detriment.

368.    Pursuant to the Agreements in force from November 10, 2014 up to and including the present, the Contracts likewise defined "Fare" to mean the total amount charged to the customer. Section 4.1 of these Agreements states that the Fare would be "calculated based upon a base fare amount plus/mileage and/or time amounts, as detailed for the applicable Territory."

369.    From November 10, 2014 to the present, Section 4.1 of Uber's Agreements has stated that the striver will "pay Uber a service fee on a per Transportation Services transaction basis calculated as a percentage of the Fare … as provided or otherwise made available by Uber from time to time for the applicable Territory."

370.    Section 4.4 of Uber's more recent Agreements states that Uber will remit to drivers the Fare minus Uber's Service Fee. As with its earlier Agreements, nothing in Uber's 2014 and 2015 Agreements entitles Uber to take any additional amounts from driver earnings aside from Uber's percentage commission or "Service Fee."

371.    While the more recent Agreements state that, in addition to charging a passenger for the "Fare," the driver is "also entitled" to charge User for taxes, and that the driver is responsible for collecting and remitting taxes, Uber knows that under the New York Tax Law, black car bases are the vendor for sales tax purposes with a non-delegable to duty to collect and remit sales taxes.

372.    At all times relevant, by dispatching under this Agreement, Uber, jointly with Uber's subsidiary Black Car bases, were the vendors of transportation services under applicable New York Tax Law.

373.    As the vendor, Uber and its subsidiary Black Car bases were responsible to collect and remit the tax.

374.    At all times relevant, Uber was required to, and acknowledged that it was responsible for, complying with the Tax Law.

375.    Indeed, as Uber completely controls the electronic payment process, and drivers are forbidden from accepting cash, there would be no way for the driver to collect additional amounts independently.

376.    At all times, Uber has itemized its receipts to show that every part of the Fare charged to the customer represents part of the consumer sales price for transportation services, broken down into separate charges for the base fare, the charge for distance, and the charge for time, respectively.

377.    While payment for trips would be made from the passenger to Uber, consumer receipts state that rides were dispatched by an Uber subsidiary FHV base.

378.    Further state, law and regulations do not permit a black car base to treat the sales tax as part of the cost of services, but require such amounts to be charged separately on top of the fare. N.Y. Tax L. § 1132 (a); 20 N.Y.C.R.R. § 532.1 (b)

379.    The N.Y. Tax Law requires sales tax to be charged to the customer and stated separately on receipts. At all times, Uber has treated the sales tax as included within price that Uber lists as the cost for transportation services. The Tax Law, however, does not allow vendors

54

to use such a tax-included method, and does not allow for tax to be passed on to a party other than the consumer.

380.   Quite simply, because the Tax Law does not allow the tax to be included as part of the Fare, it is improper to make a deduction from within driver pay (calculated as a portion of the Fare), when such tax amounts should have been assessed, as amounts distinct from the price for services, on top of the Fare.

381.   Uber and its subsidiaries, treating the tax as included within the fare charged to the passenger, then paid its drivers the fare minus Uber's Service Fee and sales tax amounts.

382.   Similarly, the N.Y. Executive Law, does not allow for the Black Car Fund surcharge to be assumed within the cost of a black car trip. N.Y. Exec. L. 160-jj(2). Rather, the statute explicitly requires for the charged to be "added to" the invoices for services. The Black Car Fund's Operating Plan likewise makes clear that such charges must be added on top of the gross fare amount listed as the cost for transportation services.

383.   Uber and its subsidiaries also treat the BCF surcharge as included within the fare charged to the passenger, then paid its drivers the fare minus Uber's commission and the BCF surcharge amount.

384.   At all times, by deducting sales tax and BCF amounts from driver earnings, Uber and its subsidiary Black Car bases made unlawful deductions from Plaintiffs' wages.

385.   As the payor of sales tax monies, the Defendant subsidiary Uber FHV bases unlawfully deducted tax amounts from driver wages, in order to remit these amounts to the state.

386.   As the payor of BCF contributions, the Defendant subsidiary Uber FHV bases unlawfully deducted BCF surcharge amounts from driver wages, in order to remit these amounts to the BCF.

387.    Alternatively, although the Contract defines "Fare" to mean the total amount charged to the passenger (a combination of separate charges for a base fare amount, distance, and time, respectively), even if Defendants were to claim that the "Fare" referred to in the contract is the total charged fare, minus the portions that Uber has removed for sales tax and BCF surcharges, or that the Agreement somehow authorized Uber to deduct sales tax and BCF amounts from the Fare, Defendants would still have violated its Agreement by allowing the assessment of the Service Fee on the gross fare, including tax and BCF surcharges.

388.    From November 10, 2014 to the present, the Agreements explicitly state that if the Fare includes any taxes, then Uber will assess its Service Fee on the Fare net of taxes. However, payment records state that Uber continued to assess its Service Fee on the gross fare, including amounts for tax and the BCF surcharge.

389.    Since November 14, 2014, by Defendants apparently, at times, choosing to define the "Fare" as less than the amount Uber charged the passenger, Uber has not complied with its Agreement as it is assessing its commission on the gross fare, inclusive of sales tax and the Black Car Fund surcharge not received by the driver.

390.    Under this interpretation of "Fare" to mean an apparent implied base fare, Defendants also increased its commission by assessing the New York State sales tax, not only on the amount that Uber seemed to designate as the fare for sales tax purposes, but on the Black Car Fund surcharge, a non-taxable item.

391.    Under any interpretation of the term "Fare," Uber has unlawfully deducted from driver pay by profiting on the assessment of sales tax and a surcharge intended to benefit injured workers.

392.    Although the Agreement at all times clearly defines "Fare" to mean the total charges for base fare, distance and time charged to the passenger, regardless of how Uber might try to define the term, Uber has violated its Agreement by unlawfully deducting amounts from driver pay that the Agreement did not allow for.

393.    Regardless of Plaintiffs' employment status, Defendants owe Plaintiffs and the class they seek to represent the amount calculated to be wrongfully withheld from their wages.

**Uber's Unlawful Kickback**

394.    At all time Defendants have calculated Plaintiffs' wages as the passenger fare, unilaterally set and calculated per ride by Uber on a base, time and distance formula, minus a percentage of that fare that Uber takes as its "Service fee."

395.    As Uber has not provided Plaintiffs with minimum wage and overtime free and clear of payments to the employee, Uber's Service Fee constitutes an unlawful kickback from Plaintiff's wages.

**Uber Unlawfully Underreports On App Time**

396.    Additionally, since sometime during the pendency of this litigation, on information and belief, Uber has begun falsely underreporting Plaintiff's on app time. For example on one occasion Plaintiff Jallow turned on the app at or about 6am and logged off at or about 11pm. With a two hour break logged off he expected to see approximately 15 hours of on app time recorded on his payment statement. His statement however reflected fewer hours. Various other drivers have discussed with him that they have had similar experiences of finding their records reflecting truncated on app time.

**Uber Acted Systematically And Knowingly, Intentionally And Willfully.**

397.    On information and belief, all of the above common allegations as to Uber's treatment of the individual Plaintiffs are typical of the way all Uber drivers in New York were hired, instructed, and/or disciplined.

398.    Defendants committed the acts alleged in this complaint knowingly, intentionally and willfully.

399.    On information and belief, Travis Kalanick authorized and was involved in the development of all policies and practices relating to the terms and conditions of Plaintiff's employment by Uber.

400.    As CEO of Uber, Kalanick made frequent trips to New York to set up Uber's FHV licensed bases, serving as CEO and Manager of Unter Base, President of Hinter base, and the CEO of Weiter.

401.    In such capacity he was involved in overseeing the day-to-day operation of these bases.

402.    Further, Defendant Kalanick has assumed personal liability for liabilities arising from the operation of Unter, as required by the TLC.

403.    Upon information and belief, Defendant Kalanick substantially controls Uber's operations and business in New York, personally oversees the hiring or appointment of key personnel for Uber's operations and business in New York and/or Uber bases.

404.    Defendants Camp and Gurley played a similar role as Kalanick with respect to the operation of the Unter base.

405.    Josh Mohrer, as General Manager of Uber New York, developed, authorized and implemented all policies and practices relating to the terms and conditions of Plaintiffs' employment by Uber.

406.    During the relevant time period, Defendant Mohrer did personally oversee and direct the day-to-day operations of Uber's New York Black Car operation, dispatching more than 30,000 drivers, along with Defendant Chapin.

407.    Upon information and belief, during his tenure in New York, Defendant Andrew Chapin substantially controlled Uber's operations and business in New York, personally oversaw the hiring or appointment of key personnel for Uber's operations and business in New York and/or the Uber bases.

408.    Upon information and belief, during his tenure in New York, Defendant Chapin personally oversaw and directed the day-to-day operations of Uber's New York Black Car operation, dispatching more than 30,000 drivers along with Defendant Mohrer.

409.    Defendants knew that the nonpayment of minimum wage would economically injure Plaintiffs and violate federal and New York State laws.

410.    Defendants knew that the nonpayment of overtime would economically injure Plaintiffs and violate federal and New York State laws.

411.    Defendants knew that the taking of unlawful deductions would economically injure Plaintiffs and violate federal and New York State laws.

412.    Defendants knew that the taking of unlawful deductions would economically injure Plaintiffs and violate federal and New York State laws.

## COMMON ALLEGATIONS RELATING TO DEFENDANTS' COMMON LAW VIOLATION PLEADED IN THE ALTERNATIVE TO ITS WAGE CLAIMS

**Uber Shifts Passengers Sales Taxes to Drivers In Violation of the Contract**

413.    Defendants' unlawful passenger sales deductions from drivers pay amount (discussed *supra* at paragraphs 349-293) in the alternative, amount to Defendants' breach of its contract with drivers.

**Uber's 'Upfront Pricing Scheme Violates Drivers Rights to Compensation Pursuant to the Contract And Or Amounts to Unjust Enrichment**

414.    Upon information and belief Uber in the fall of 2016 launched a pricing scheme called upfront pricing whereby the customer receives a fare quote in advance of the trip. Drivers continue to receive a fare based on the base charge, plus time, plus distance formula. See https://newsroom.uber.com/upfront-fares-no-math-and-no-surprises/

415.    On information and belief Uber processes the monies to drivers as though the fare is the base charge, time plus distance fare, subjecting only such fare to the contractual split.

416.    On information and belief inasmuch as the Upfront Price quoted to customers is greater than the base charge, plus time, plus distance fare, Uber solely retains the excess without sharing such monies with drivers. http://www.latimes.com/local/lanow/la-me-uber-drivers-lawsuit-20170429-story.html

417.    That is Uber uses two definitions of a fare: an oftentimes higher fare which unbeknownst to drivers, it quotes to customers, and a separate, often lower fare to drivers, which appears on drivers weekly statement.

418.    The contract does not permit multiple definitions of the fare.

419.    Pursuant to Section 4.1 of Uber's contract with drivers the "Fare" is defined as "the amount charged to the passenger." Section 4.1 states that the driver charges the rider a fare for each ride, based on the Fare as listed at uber.com/cities.

420.   Uber's failure to pass on to the driver the fare charged to the passenger minus its service fee is a violation of the contract.

421.   Plaintiffs and all similarly situated persons, driving for Uber in the relevant period when the Upfront pricing scheme is in force, have been harmed by Defendant's violation of the contract in the amount of 80% to 72% of the difference between the fare reported on Plaintiffs statements and the fare charged to customers.

422.   Alternatively, Defendants' upfront pricing amounts to Uber's unjust enrichment of itself at the expense of all drivers subject to this uniform policy.

423.   That is through their use of Upfront Pricing Defendants benefitted by charging the customer a sum in excess of the amount it reported as the fare on drivers pay statement. Defendants kept the difference between the two fares to its benefit, excluding Plaintiffs from any share in such monies, and thus failing to adequately compensating plaintiff therefor.

## INDIVIDUAL ALLEGATIONS

**Bigu Haider**

424.   At all times relevant Haider has worked for Uber as a driver for at least 30 hour per week.

425.   To perform work for Uber he ordinarily incurred expenses of approximately $435 per week, including vehicle lease, insurance, inclusive of maintenance and fluctuating gas costs of at least $240 per week.

426.   In 2013, at the encouragement of Uber's New York operations manager Kyle (LNU), Haider purchased a Lincoln Town Car to satisfy the luxury vehicle requirement for Uber's luxury service fleet known as Uber Black. Drivers could earn substantially more with the higher fares charged to customers ordering the Uber Black service.

427.    The purchase of a Lincoln Town Car, a luxury vehicle, as compared to a midrange sedan that could be used for Uber's basic service, UberX, was a significant additional expense that Haider undertook in reliance on the assurances made by Uber's manager regarding his ongoing eligibility for Uber Black dispatches. Haider received absolutely no reimbursement from Uber for this expense.

428.    Haider financed his purchase of the Lincoln Town Car, making monthly payments of $509.17. Initially, he paid $3800 for liability insurance and an additional $1500 for full coverage, annually. Currently, Haider only has liability coverage, for which he pays $294.25 per month. Haider affiliated this vehicle with the Defendant For-Hire Vehicle ("FHV") base, Unter, LLC.

429.    In or about May of 2014, after incurring this hefty expense, Uber unilaterally changed its rules and determined that Lincoln Town Cars were no longer acceptable vehicles for the Uber Black service.

430.    Subsequent to this rule change, Haider was locked into making these high monthly payments on the Lincoln Town Car that Uber had urged him to obtain although now, according to Uber, he could only accept lower categories of service, such as UberX, which command much lower fares. After Uber downgraded the status of his vehicle, Haider worked for Uber's UberX service, which he could have done using a much less expensive mid-range sedan such as a Toyota Camry.

431.    The following chart demonstrates the hours worked for individual plaintiff Bigu Haider during weeks in which he worked over 40 hours. It is not an exhaustive list:

| Name | Pay Period | Hours Worked |
|------|-----------|--------------|

| Haider, Bigu | 10/21/13-10/28/13 | 58.8 |
|---|---|---|
| Haider, Bigu | 11/4/13-11/11/13 | 46.7 |
| Haider, Bigu | 11/11/13/-11/18/13 | 41.5 |
| Haider, Bigu | 12/2/13-12/9/13 | 62.4 |
| Haider, Bigu | 12/9/13-12/16/13 | 44.1 |
| Haider, Bigu | 1/20/14-1/27/16 | 43.0 |
| Haider, Bigu | 1/27/14-2/2/14 | 50.8 |
| Haider, Bigu | 2/10/14-2/16/14 | 41.3 |
| Haider, Bigu | 2/17/14-2/23/14 | 44.9 |
| Haider, Bigu | 2/24/14-3/2/14 | 51.6 |
| Haider, Bigu | 3/17/14-3/24/14 | 50.8 |
| Haider, Bigu | 3/24/14-3/30/14 | 59.3 |
| Haider, Bigu | 3/31/14-4/6/14 | 46.7 |
| Haider, Bigu | 4/7/14-4/13/14 | 45.3 |
| Haider, Bigu | 4/28/14-5/4/14 | 44.2 |
| Haider, Bigu | 5/19/14-5/25/14 | 69.3 |

432.    As demonstrated above, Haider at times worked over forty hours per workweek for Uber. At no time, did he receive overtime pay.

433.    When Haider's expenses were accounted for, there were weeks when he did not earn the minimum wage as well as overtime.

434.    For example in the week ending on July 7, 2014 Haider earned $649.70 for 30.4 hours worked. After average weekly expenses of $435.15 incurred to perform his work for Uber his net pay was $196.04 for an hourly rate of $6.44.

435.    At all times relevant Haider was never reimbursed for his expenses incurred driving for Uber.

436.    At all times relevant Uber unlawfully deducted sales tax on the trips in addition to its fee, even as it did not charge customers for the tax and thus by Uber's unlawful deduction Haider effectively paid the customer's sales tax out of pocket.

**Diogenes Carrasco**

437.    Plaintiff Carrasco typically drove for Uber approximately 50 hours per week.

438.    In order to be eligible to provide UberX services, Carrasco bought a Toyota Venza. His monthly payment for the Venza is $455. Additionally, Carrasco pays $325 per month for vehicle insurance. Carrasco received no reimbursement for these expenses.

439.    In or about late October 2016, Carrasco stopped working for Uber because Uber unilaterally cut the fares it charges to Uber customers. Thereafter, plaintiff Carrasco realized that he would have to work approximately 12-14 hours a day, 6 days a week in order to maintain the same level of gross earnings he had before Uber cut its fare rates.

440.    The following chart demonstrates the hours worked for Uber by individual plaintiff Diogenes Carrasco during weeks in which he worked over 40 hours. It is not an exhaustive list:

| Name | Pay Period | Hours Worked |
|---|---|---|
| Carrasco, Diogenes | 5/19/14-5/25/14 | 59.9 |
| Carrasco, Diogenes | 5/26/14-6/1/14 | 43.9 |
| Carrasco, Diogenes | 6/2/14-6/8/14 | 53.7 |
| Carrasco, Diogenes | 6/9/14-6/15/14 | 47.3 |
| Carrasco, Diogenes | 6/16/14-6/22/14 | 50.0 |

| Carrasco, Diogenes | 6/23/14-6/29/14 | 55.3 |
| Carrasco, Diogenes | 6/30/14-7/6/14 | 57.0 |
| Carrasco, Diogenes | 7/14/14-7/20/14 | 54.8 |
| Carrasco, Diogenes | 7/21/14-7/27/14 | 55.4 |
| Carrasco, Diogenes | 7/28/14-8/3/14 | 49.8 |
| Carrasco, Diogenes | 8/4/14-8/10/14 | 49.4 |
| Carrasco, Diogenes | 8/11/14-8/17/14 | 42.3 |
| Carrasco, Diogenes | 8/18/14-8/24/14 | 50.8 |
| Carrasco, Diogenes | 9/1/14-9/7/14 | 49.5 |
| Carrasco, Diogenes | 9/29/14-10/5/14 | 45.6 |
| Carrasco, Diogenes | 10/6/14-10/12/14 | 44.5 |
| Carrasco, Diogenes | 10/20/14-10/26/14 | 44.3 |
| Carrasco, Diogenes | 11/10/16-11/16/14 | 42.1 |
| Carrasco, Diogenes | 12/1/14-12/8/14 | 48.2 |
| Carrasco, Diogenes | 12/8/14-12/15/14 | 47.6 |
| Carrasco, Diogenes | 2/9/15-2/16/15 | 47.3 |
| Carrasco, Diogenes | 4/27/15-5/4/15 | 41.8 |
| Carrasco, Diogenes | 6/815-6/15/15 | 41.1 |
| Carrasco, Diogenes | 7/20/15-7/27/15 | 40.9 |
| Carrasco, Diogenes | 8/3/15-8/10/15 | 40.3 |
| Carrasco, Diogenes | 8/24/15-8/31/15 | 47.0 |
| Carrasco, Diogenes | 9/28/15-10/5/15 | 42.6 |

441.    As demonstrated above, Carrasco at times worked over forty hours per workweek for Uber. At no time, did he receive overtime pay.

442.    At all times relevant Carrasco was never reimbursed for his expenses incurred driving for Uber including gas, which expense varied according to the number of miles travelled.

443.    At all times relevant Uber unlawfully deducted sales tax on the trips in addition to its fee, even as it did not charge customers for the tax and thus by Uber's unlawful deduction Carrasco effectively paid the customer's sales tax out of pocket.

444.    Carrasco was never reimbursed for his expenses incurred driving for Uber.

**Cherno Jallow**

445.    Plaintiff Jallow typically drives for Uber approximately 60 hours per week.

446.    Jallow leased a car from an "Uber-approved" dealer for one month and then financed a Toyota Venza in order to qualify to provide UberX services. His monthly payment for the Venza is $925. Additionally, for full insurance coverage, he paid $527 per month until his insurance provider stopped offering full coverage. He now has lesser coverage for $294 per month.

447.    In addition to his car payment Jallow incurred additional expenses droving for Uber for which he was never reimbursed. His weekly expenses exclusive of leashing Vehicle and Insurance was $277.79 including $180 in gas.

448.    In order to make the car payments and to afford the other associated expenses, Jallow must work between 12 to 15 hours per day, sometimes all seven days of the week.

449.    The following chart demonstrates the hours worked for individual plaintiff Cherno Jallow during weeks in which he worked over 40 hours. It is not an exhaustive list:

| Name | Pay Period | Hours Worked |
|------|------------|--------------|
| Jallow, Cherno | 9/1/14-9/7/14 | 78.0 |
| Jallow, Cherno | 11/10/14-11/16/14 | 88.3 |
| Jallow, Cherno | 11/24/14-12/1/14 | 43.8 |
| Jallow, Cherno | 12/8/14-12/15/14 | 42.6 |
| Jallow, Cherno | 12/15/14-12/22/14 | 85.5 |
| Jallow, Cherno | 1/5/15-1/12/15 | 55.1 |
| Jallow, Cherno | 11/30/15-12/7/15 | 54.0 |
| Jallow, Cherno | 1/4/16-1/11/16 | 52.3 |
| Jallow, Cherno | 2/22/16-2/29/16 | 57.0 |
| Jallow, Cherno | 2/29/16-3/7/16 | 89.3 |
| Jallow, Cherno | 3/7/16-3/14/16 | 63.7 |

450.   Thus, Jallow, as demonstrated above at times worked over forty hours per workweek for Uber. At no time, did he receive overtime pay.

451.   When Jallow's expenses were accounted for, there were weeks he did not earn the minimum wage as well as overtime.

452.   Jallow incurred regular weekly expenses of $559.10 inclusive of gas, vehicle lease and insurance, licensing costs, maintenance and other sundry. Further in the week ending January 11, 2016, Jallow worked 52.3 hours and received $1013.08 in gross pay, or $453.98 after accounting for expenses, for an hourly rate of $8.68, and thus less than the minimum wage.

453.   Jallow was never reimbursed for his expenses incurred driving for Uber.

454.    At all times relevant Uber unlawfully deducted sales tax on the trips in addition to its fee, even as it did not charge customers for the tax and thus by Uber's unlawful deduction Jallow effectively paid the customer's sales tax out of pocket.

**Vijay Shanti**

455.    From in or about October 2013 to the present, Plaintiff Shanti was working part-time for Uber as a driver typically for approximately thirty (30) hours per week.

456.    In or about May of 2014, Uber informed Mr. Shanti that his Lincoln Town Car was no longer eligible to receive Uber Black dispatches.

457.    Previously, Uber had informed Plaintiff Shanti that, on account of his tenure with Uber, he would not have to accept UberX (lower fare) dispatches as long as he kept his star rating up, but Uber did not keep its word.

458.    In or about September 2015, Shanti bought a new Lexus for use in Uber Black service. His monthly payments for the Lexus are $512. Additionally, he pays $500 per month for full coverage insurance.

459.    Shanti did not save all the emails that form the basis of the allegations of time and pay which his co-plaintiffs have.

460.    Nonetheless when Shanti's expenses were accounted for, there were many weeks he did not earn the minimum wage.

461.    In the week ending on January 11 2016 Shanti earned $93.72 pay for 12.13 hours on app for an hourly rate of $7.72, which is less than minimum wage. Additionally Shanti incurred expenses such as gas in this week for which he was unreimbursed.

462.    In the week ending on January 4, 2016 Shanti earned $135.32 pay for 21.7 hours on app for an hourly rate of $6.23, which is less than minimum wage. Additionally Shanti

incurred expenses such as gas in this week for which he was unreimbursed.

463.   In the week ending on December 28, 2016 Shanti earned $59 pay for 9.28 hours on app for an hourly rate of $6.36, which is less than minimum wage. Additionally Shanti incurred expenses such as gas in this week for which he was unreimbursed.

464.   In the week ending on October 19, 2015 Shanti earned $100.75 pay for 15.3 hours on app for an hourly rate of $7.24, which is less than minimum wage.

465.   Shanti was never reimbursed for his expenses incurred driving for Uber.

466.   Additionally, at all times relevant Uber unlawfully deducted sales tax on the trips in addition to its fee, even as it did not charge customers for the tax and thus by Uber's unlawful deduction Shanti effectively paid the customer's sales tax out of pocket.

467.   Further Shanti became aware that he may not have been receiving his contractual percentage of the full fare charged to passengers when in or about November 2016 he found that fares of ostensibly the same amount each of $15.00 each had different tax rates attached. That is, the differing tax amounts raised the question in his mind of whether Uber had charged different fares to the customer than the fare reflected on Shanti's weekly payment statement.

468.   On information and belief the reason for the differing taxed amounts on each fare was that while each fare appeared on Shanti's statement as $15.00, the customers were each charged different amounts and the differing taxes corresponded to the higher amount charged to the customer.

**Inderjeet Parmar**

469.   Parmar typically drives for Uber approximately fifty-five (55) hours per week.

470.   In addition to gas, vehicular lease and insurance Parmar incurs approximately $105 per week in maintenance and car washes.

69

471.    When he first signed up to work for Uber, Parmar owned a Lincoln MKT, which qualified him to accept Uber Black dispatches. His monthly payment for the MKT was $800 per month. Additionally, he paid $600 per month for vehicle insurance. Parmar's vehicle was affiliated with Defendant FHV base Unter. At this time Parmar incurred gas expenses of $180 weekly. Thus while driving the Lincoln MKT his weekly expenses were $635.

472.    Parmar then leased a Toyota Camry and started driving for UberX. The cost to lease the Camry was $440 per week, including insurance and TLC registration costs. At this time Parmar incurred gas expenses of $120 weekly. Thus while driving the Lincoln MKT his weekly expenses were $335.

473.    In the fall of 2015, Parmar began driving a Chevrolet Suburban in order to qualify again for Uber Black and Uber SUV. He rents this vehicle by paying a portion of his fare revenue to the vehicle's owner. At this time Parmar incurred gas expenses of $240 weekly and he paid no leasing fee until May 2016 when he purchased his own Chevrolet Suburban at a cost of $10,000 down plus $800 a month plus $500 in insurance. Thus while driving the Chevrolet Suburban his weekly expenses were $345 before May 2016 and $670 after May 2016, not including Parmar's down payment.

474.    At all times relevant Parmar was not reimbursed for any expenses associated with such vehicle purchases and leases.

475.    The following chart demonstrates the hours worked for individual plaintiff Inderjeet Parmar during weeks in which he worked over 40 hours. It is not an exhaustive list:

| Pay Period | Hours Worked | Actual Gross Pay minus Tolls | Hourly Rate Pre Expenses | Weekly Expense | Gross Pay Minus Expenses | Hourly Rate After Expenses |
|---|---|---|---|---|---|---|
| | | | | | | |

| 10/12/15-10/19/15 | 43.9 | $703.03 | $16.01 | $345 | $358.03 | $8.16 |
| 10/26/15-11/2/15 | 53.4 | $1,071.36 | $20.06 | $345 | $726.36 | $13.60 |
| 11/2/15-11/9/15 | 47.3 | $763.36 | $16.14 | $345 | $418.36 | $8.84 |
| 11/9/15-11/16/15 | 58.2 | $1,069.88 | $18.38 | $345 | $724.88 | $12.45 |
| 11/16/15-11/23/15 | 59.6 | $1,425.47 | $23.92 | $345 | $1,080.47 | $18.13 |
| 11/23/15-11/30/15 | 42.3 | $450.41 | $10.65 | $345 | $105.41 | $2.49 |
| 11/30/15-12/7/15 | 55.6 | $1,181.80 | $21.26 | $345 | $836.80 | $15.05 |
| 12/14/15-12/21/15 | 57.1 | $1,773.79 | $31.06 | $345 | $1,428.79 | $25.02 |
| 12/21/15-12/28/15 | 57 | $959.85 | $16.84 | $345 | $614.85 | $10.79 |
| 12/28/15-1/4/16 | 59.4 | $1,558.22 | $26.23 | $345 | $1,213.22 | $20.42 |
| 1/4/16-1/11/16 | 51 | $273.77 | **$5.37** | $345 | ($71.23) | ($1.40) |
| 1/11/15-/1/18/16 | 56.2 | $497.87 | $8.86 | $345 | $152.87 | $2.72 |
| 1/18/16-1/25/16 | 43.8 | $482.80 | $11.02 | $345 | $137.80 | $3.15 |
| 1/25/16-2/1/16 | 47.9 | $783.69 | $16.36 | $345 | $438.69 | $9.16 |
| 2/1/16-2/8/16 | 58.3 | $865.70 | $14.85 | $345 | $520.70 | $8.93 |
| 2/8/16-2/15/16 | 48 | $1,078.50 | $22.47 | $345 | $733.50 | $15.28 |
| 2/15/16-2/22/16 | 45.7 | $532.02 | $11.64 | $345 | $187.02 | **$4.09** |
| 2/22/16-2/29/16 | 41 | $532.80 | $13.00 | $345 | $187.80 | $4.58 |
| 2/29/16-3/7/16 | 44.8 | $483.21 | $10.79 | $345 | $138.21 | $3.09 |
| 3/7/16-3/14/16 | 41.5 | $494.33 | $11.91 | $345 | $149.33 | $3.60 |
| 3/21/16-3/28/16 | 48 | $471.59 | $9.82 | $345 | $126.59 | $2.64 |
| 3/28/16-4/4/16 | 51.7 | $291.74 | $5.64 | $345 | ($53.26) | ($1.03) |
| 4/4/16-4/11/16 | 41.2 | $307.42 | $7.46 | $345 | ($37.58) | ($0.91) |

476.   Thus, Parmar, as demonstrated above, at times worked over forty hours per workweek for Uber. At no time, did he receive overtime pay.

477.   For several weeks, notably in 2016, Parmar earned less than the minimum wage after deducting all expenses.

478.   For example as show above in the week ending on January 11, 2016 Parmar earned $273.77 pay for 51 hours worked for an hourly rate of $5.36 before expenses, which is less than minimum wage. Additionally Parmar incurred expenses such as gas in this week for which he was not reimbursed.

479.   In other period, such as the week ending February 22, 2016 Parmar earned $532.02 pay for 45.7 hours worked, but after expenses his hourly rate was only $4.09.

480.   Parmar was never reimbursed for his expenses incurred driving for Uber.

481.   At all times relevant Uber unlawfully deducted sales tax on the trips in addition to its fee, even as it did not charge customers for the tax and thus by Uber's unlawful deduction Parmar effectively paid the customer's sales tax out of pocket.

**Timothy Cavaretta**

482.   Cavaretta typically drove for Uber approximately 30 hours per week.

483.   Prior to his employment with Uber, Cavaretta worked as a Yellow Taxi and street-hail livery (Green Taxi) driver.

484.   Cavaretta first worked for UberX while driving his Green Taxi, which he leased at a rate of $1750 per month while providing UberX service.

485.   In or about January 2015, Cavaretta bought a Chrysler Town & Country for use in UberX and XL service, which he affiliated with the Defendant FHV base Schmecken, LLC. The monthly payment for the Chrysler is $317.08. Additionally Cavaretta paid $356.51 per month for

72

liability insurance and he paid $1312 in a lump sum for collision insurance during 2015. He was not reimbursed for any of these expenses by Uber.

486.   Additionally, Cavaretta incurred total average weekly expenses of $425.97 in connection with his work for Uber, including $189.27 for fuel.

487.   The following chart demonstrates the hours worked for individual plaintiff Timothy Cavaretta during weeks in which he worked over 40 hours:

| Pay Period | Hours Worked | Actual Gross Pay Minus Tolls | Average Hourly Rate Before Expenses | Average Weekly Expenses | Gross Pay After Expenses | Hourly Rate After Expenses |
|---|---|---|---|---|---|---|
| 12/8/15-12/15/14 | 44.9 | $1,178.43 | $26.25 | $425.97 | $752.46 | $16.76 |
| 1/12/15-1/19/15 | 48.9 | $1,101.94 | $22.53 | $425.97 | $675.97 | $13.82 |
| 4/20/15-4/27/15 | 55 | $1,727.33 | $31.41 | $425.97 | $1,301.36 | $23.66 |
| 4/27/15-5/4/15 | 40.1 | $1,460.15 | $36.41 | $425.97 | $1,034.18 | $25.79 |
| 8/3/15-8/10/15 | 45 | 797.95 | $17.73 | $425.97 | $371.98 | $8.27 |

488.   Thus, Cavaretta at times worked over forty hours per workweek for Uber. At no time, did he receive overtime pay.

489.   For several weeks, Cavaretta earned less than the minimum wage after deducting all expenses, including in the week ending on August 10, 2015 shown above.

490.   Cavaretta was never reimbursed for his expenses incurred driving for Uber.

491.   At all times relevant Uber unlawfully deducted sales tax on the trips in addition to its fee, even as it did not charge customers for the tax and thus by Uber's unlawful deduction Cavaretta effectively paid the customer's sales tax out of pocket.

## FLSA COLLECTIVE ACTION ALLEGATIONS

492.   The individual representative Plaintiffs bring their First, Second, Fifth, and Seventh claims for relief pursuant to the Fair Labor Standards Act ("FLSA") §216(b) on behalf of themselves and all other similarly situated persons (the "FLSA collective action Plaintiffs"), who are/were employed by Defendants as drivers in New York and who were improperly classified as independent contractors and not employees, and who were either not paid enough wages to meet the prevailing minimum wage with our without accounting for "tools of the trade" or who did not receive overtime premium pay, at the rate of one and one-half of their regular pay for all hours they worked in excess of forty in a work week ("overtime premium pay") for the period of in or about May 2011, to the date of the final disposition of this matter (hereafter the "collective action period.") and who have formally opted out of the arbitration provision of Uber's contract.

493.   All Plaintiffs and the FLSA Collective Plaintiffs have been subject to Defendants' policies and practices of misclassifying them as independent contractors.

494.   All Plaintiffs and the FLSA Collective Plaintiffs have been subject to Defendants' policies and practices of willfully failing to pay them in accordance with minimum wage requirements in violation of FLSA, 29 U.S.C. § 206.

495.   All Plaintiffs and the FLSA Collective Plaintiffs have been subject to Defendants' policies and practices of failing to reimburse them for all tools of the trade deductions, which expenses brought their wages below minimum wage.

496.   All Plaintiffs and the FLSA Collective Plaintiffs have been subject to Defendants' policies and practices of taking the Uber Service fee as a kickbacks on Plaintiffs' wages without first providing that Plaintiffs received their compliant wages free and clear.

497.    At all times relevant to this complaint, and upon information and belief, Plaintiffs and the FLSA Collective Plaintiffs are and/or have been similarly situated, and have had substantially similar compensation provisions. Thus, the claims of Plaintiffs are essentially the same as those of the FLSA Collective Plaintiffs.

498.    For notice and all other purposes related to claims brought under FLSA, 29 U.S.C. § 216(b), the names and addresses of the FLSA Collective Plaintiffs are available from Defendants' records. Notice can be provided via first class mail to the last address known to Defendants for each of the FLSA Collective Plaintiffs.

## CLASSWIDE FACTUAL ALLEGATIONS

499.    Defendants committed the acts alleged in this complaint knowingly, intentionally and willfully.

500.    Defendants knew that misclassification would economically injure Plaintiffs and violate federal and New York State laws.

501.    Defendants knew that the nonpayment of overtime would economically injure Plaintiffs and violate federal and New York State laws.

502.    Plaintiffs and Class members regularly worked in excess of forty (40) hours per workweek.

503.    Defendants unlawfully failed to pay Plaintiffs and Class members in accordance with minimum wage requirements of federal and state law.

504.    Defendants unlawfully failed to pay Plaintiffs and Class members at the overtime rate as provided by FLSA for all hours in excess of forty (40) in a workweek.

505.    Defendants violated NYLL § 195(3) by failing to furnish Plaintiffs and Class members with a statement with every payment of wages, listing gross wages, deductions and net

wages. In addition, Defendants failed to furnish an explanation of how such wages were computed when Plaintiffs requested such an explanation.

506.    Defendants violated NYLL § 195(1) by failing to provide Plaintiffs and Class members with a yearly notice which includes rates of pay including straight time and overtime; how and when Plaintiffs are paid; the official name of Plaintiffs' employer and any other names used for business; the address and telephone number of the employer's main office or principal location.

507.    Defendants violated NYLL § 193 by making unlawful deductions and kickbacks from Plaintiffs' and Class members' wages;

508.    In the alternative, Defendants breached their contract with drivers by deducting passenger sales tax and other expenses from Drivers' portion of the fare without authorization under the contract to do so.

509.    In the alternative, Defendants breached their contract with drivers by their use of upfront pricing as described in this complaint.

510.    In the alternative, Defendants breached their duty of good faith and fair dealing with drivers by their use of upfront pricing as described in this complaint.

511.    Defendants committed the foregoing acts against Plaintiffs and members of the Class.

## NYLL/ CONTRACT CLASS ACTION ALLEGATIONS PURSUANT TO FRCP 23

512.    Individual Plaintiffs Bigu Haider, Vijay Shanti, Inderjeet Parmar, Diogenes Carrasco, Timothy Cavaretta, and Cherno Jallow, opted out of the arbitration provision in the employment contract between Uber and themselves, as permitted by Uber. Plaintiffs Haider, Shanti, Parmar, Carrasco, Cavaretta and Jallow bring claims on behalf of themselves and a class

of Uber Drivers who have also formally opted out of the arbitration provision (hereinafter the "class action Plaintiffs").

513.   Plaintiffs' claims are brought pursuant to Rule 23 of the Federal Rules of Civil Procedure (Fed. R. Civ. P.) so as to remedy (1) violations of Article 6, §§190 *et seq.*, and Article 19 §§650 *et seq.* of the New York Labor Law and the supporting New York State Department of Labor regulations (collectively referred to herein as "NYLL"); or alternatively (2) violations of the contract discussed above. Plaintiffs bring this case on behalf of themselves and on behalf of all others similarly situated in New York, hereafter, the "class action Plaintiffs." They seek to represent a class of New York Uber drivers who have been subject to misclassification as independent contractors, as well any actionable violation of the NYLL,  and contract violations set forth in this complaint for the period of in or about May 2011 to the date of the final disposition of this matter (hereafter the "class action period.") and who have opted-out of the arbitration provisions of the contracts between Uber and Uber drivers like the putative class members.

514.   Defendants, in violation of the NYLL, have also unlawfully made deductions from the class action Plaintiffs' wages since at least on or about May 31, 2011.

515.   The class action Plaintiffs, at various times, electronically accepted Uber's contract in order to receive Uber dispatches.

516.   The class action Plaintiffs alternatively bring various common law claims for breach of contract, arising from Defendants' violations of their contractual obligations

517.   The class action Plaintiffs are readily ascertainable since the identity, addresses, time records, work schedules, positions and rates of pay for each such Class member are

determinable from the Defendants' records that were required to have been kept under FLSA and NYLL. Notice can be provided pursuant to Rule 23 of the Fed. R. Civ. P.

518.    Joinder of all Class members is impracticable. Upon information and belief, there are at least four thousand (4000) Uber drivers in New York who could potentially be in the Class.

519.    The representative Plaintiffs' claims are typical of those claims that could be alleged by any member of the class. The relief sought by the Plaintiffs is typical of the relief that would be sought by each member of the Class in separate actions. All class action Plaintiffs were subject to the same policies and practices alleged herein, including being misclassified as independent contractors, failure to pay minimum wages, failure to pay overtime, failure to pay spread of hours, or failure to provide wage statements and notices, as well as Defendants' taking of unlawful deductions through retention of portions of Plaintiffs' wages. The aforesaid policies and practices of Defendants similarly affect all of the representative Plaintiffs and the class action Plaintiffs. The Plaintiffs and members of the class have sustained similar injuries and damages as a result of Defendants' unlawful acts and/or omissions.

520.    The representative Plaintiffs are fit to fairly and competently represent and protect the interests of the class action Plaintiffs. For the purposes of this action, the named Plaintiffs have no interests that conflict with those of the class action Plaintiffs. Representative Plaintiffs' attorneys have considerable experience in the field of employment litigation as well as class action litigation.

521.    Disposition of the claims as a class action is superior to any other available means of adjudication for the foregoing reasons:

- Class members are workers who individually lack the necessary resources to effectively litigate against a corporate defendant;

- A class action is in the interests of judicial economy as individual litigation would result in the expenditure of considerable public resources;

- Injuries suffered by each Class member individually are small in comparison to the cost of individual litigation, dissuading and precluding redress of their claims;

- The claims shared by Class members involve important public policy interests that would otherwise go unaddressed due to aforesaid barriers to and limitations of individual litigation, and;

- A class action will provide anonymity for those Class members whose fear of retaliation would otherwise dissuade them from asserting their rights as many Class members are still employed by Defendants.

- Numerous questions of law and fact are common to all Class members and predominate over those of any individual Class member, including:

  o Whether Plaintiffs and Class members were misclassified as independent contractors;

  o Whether Plaintiffs and Class members were paid the amounts they should have received as employees including minimum wage and overtime - one and one half times their hourly rate for all hours worked in excess of (40) per workweek;

  o Whether Defendants complied with the record-keeping requirements of the NYLL;

  o Whether Defendants complied with the requirements for tools of the trade;

- o Whether Defendants complied with the requirements for taking deductions or reimbursing expenses;

- o Whether Defendants Service Fee was an unlawful kickback from the Class Members wages; and

- o Whether Defendants breached its contract and covenant of fair dealing with these workers regardless of whether they were misclassified.

## PROMISSORY ESTOPPEL CLASSWIDE FACTUAL ALLEGATIONS

522.    Throughout the period covered by the applicable statute of limitations, Defendants made a clear and unambiguous promise to Plaintiff Haider and those similarly situated to allow such Promissory Estoppel Class Plaintiffs to provide certain levels of service if they had a specific type of vehicle.

523.    Plaintiff Haider and Promissory Estoppel Class Plaintiffs, in reasonable and foreseeable reliance by them on Defendants' promise, purchased various specific types of vehicles.

524.    Defendants subsequently changed the type of vehicle necessary to provide the particular service in question and thus, Plaintiffs and Promissory Estoppel Class Plaintiffs had purchased vehicles which are no longer eligible to provide the service level and thus, had higher monthly car payments than were necessary as they could have avoided the purchase or lease of certain vehicles. Thus, Promissory Estoppel Class Plaintiffs were injured by reason of their reliance on Defendants' promises.

525.    Defendants committed the foregoing acts against Plaintiff Haider and members of the Promissory Estoppel Class.

## PROMISSORY ESTOPPEL CLASS ACTION ALLEGATIONS PURSUANT TO FRCP 23

526.    Individual plaintiff Bigu Haider opted-out of the arbitration provision in the employment contract between Uber and himself, as permitted by Uber.

527.    Plaintiff Haider, brings claims on behalf of himself and a class of New York Uber drivers who, in the period of in or about May 2011 to the date of the final disposition of this matter (hereafter the "class action period."), have also formally opted out of the arbitration provision and who have purchased Uber Black eligible vehicles in reliance on statements by Defendants and whom subsequently were harmed when Defendants changed the Uber Black policy such that vehicles they purchased or leased were no longer eligible for Uber Black (hereinafter the "Promissory Estoppel Class Members")

528.    Plaintiff Haider brings this claim on his own behalf and on behalf of the Promissory Estoppel Class Members pursuant to Rule 23 of the Federal Rules of Civil Procedure (Fed. R. Civ. P.).

529.    The class action Plaintiffs are readily ascertainable since the identity, addresses, and time records, are determinable from the Defendants' records and records of Defendants' partner dealerships. Notice can be provided pursuant to Rule 23 of the Fed. R. Civ. P.

530.    Joinder of all Class members is impracticable. Upon information and belief, there are more than one hundred (100) Uber drivers in New York who could potentially be in the Class.

531.    The representative Plaintiff's claim is typical of those claims that could be alleged by any member of the class. The relief sought by the Plaintiff is typical of the relief that would be sought by each member of the Class in separate actions. All class action Plaintiffs were

subject to the same policies and practices alleged herein, received the same promises in accord with such policies and relied on them to their detriment. The aforesaid policies and practices of Defendants similarly affect the representative Plaintiff and the class action Plaintiffs. Plaintiff Haider and members of the class have sustained similar injuries and damages as a result of Defendants' unlawful acts and/or omissions.

532.     The representative Plaintiff is fit to fairly and competently represent and protect the interests of the class action Plaintiffs. For the purposes of this action, Plaintiff Haider has no interests that conflict with those of the class action Plaintiffs. Representative Haider's attorneys have considerable experience in the field of employment litigation as well as class action litigation.

533.     Disposition of the claims as a class action is superior to any other available means of adjudication for the foregoing reasons:

- Class members are workers who individually lack the necessary resources to effectively litigate against a corporate defendant;

- A class action is in the interests of judicial economy as individual litigation would result in the expenditure of considerable public resources;

- Injuries suffered by each Class member individually are small in comparison to the cost of individual litigation, dissuading and precluding redress of their claims;

- The claims shared by Class members involve important public policy interests that would otherwise go unaddressed due to aforesaid barriers to and limitations of individual litigation, and;

- A class action will provide anonymity for those Class members whose fear of retaliation would otherwise dissuade them from asserting their rights as many Class members are still employed by Defendants.

534.    Numerous questions of law and fact are common to all Class members and predominate over those of any individual Class members, including:

- Whether Uber made clear and unambiguous  promises regarding eligibility for Uber Black services; and

- Whether Uber could have foreseen  reliance by Promissory Estoppel Class Members.

### FIRST CLAIM FOR RELIEF

**(FLSA Minimum Wage Claim, 29 U.S.C. §§201 *et seq.*, Brought by the Individual Plaintiffs, Except Carrasco, on Behalf of Themselves and the FLSA Collective Action Plaintiffs)**

535.    Plaintiffs, on behalf of themselves and the FLSA Collective Action Plaintiffs, repeat, reallege and incorporate each and every preceding paragraph as if set forth fully herein.

536.    At all times relevant, each Defendant has been, and/or continues to be, an "employer" engaged in interstate "commerce" and/or in the production of "goods" for "commerce," within the meaning of FLSA, 29 U.S.C. §203.

537.    At all times relevant, Defendants employed Plaintiffs and FLSA Collective Action Plaintiffs as "employees" within the meaning of FLSA, 29 U.S.C. §203.

538.    Defendants were required to pay Plaintiffs and the FLSA Collective Action Plaintiffs at a rate not less than the minimum wage rate under the FLSA for all hours worked.

539.    Upon information and belief, Defendants knowingly failed to pay Plaintiffs and FLSA Collective Action Plaintiffs the required minimum wage under the FLSA for all hours worked and paid them only for the time on trip, not the time on the app.

## SECOND CLAIM FOR RELIEF

**(FLSA Overtime Claim, 29 U.S.C. §201 *et seq.* Brought by Plaintiffs, Except Shanti, on Behalf of Themselves and the FLSA Collective Action Plaintiffs)**

540.    Plaintiffs, on behalf of themselves and the FLSA Collective Action Plaintiffs, repeat, reallege and incorporate each and every preceding paragraph as if set forth fully herein.

541.    Throughout the period covered by the applicable statute of limitations and upon information and belief, Plaintiffs and other FLSA Collective Action Plaintiffs regularly worked in excess of forty (40) hours per workweek.

542.    At all times relevant, and upon information and belief, Defendants have repeatedly and willfully failed to pay the named Plaintiffs and the FLSA Collective Action Plaintiffs in accordance with the overtime provisions of the FLSA for work performed in excess of forty (40) hours per workweek.

543.    Plaintiffs, on behalf of themselves and the FLSA Collective Action Plaintiffs, seek and are entitled to recover damages for their unpaid overtime compensation, liquidated damages as provided by the FLSA, attorneys' fees and costs along with such other relief as this Court deems just and proper.

## THIRD CLAIM FOR RELIEF

**(New York State Minimum Wage Act Claim, NYLL Article 19 §§650 *et seq.,* Brought by Plaintiffs, Except Carrasco, on Behalf of Themselves and the Class)**

544.    Plaintiffs, on behalf of themselves and those similarly situated, repeat, reallege and incorporate each and every preceding paragraph as if set forth fully herein.

545.    Upon information and belief, Defendants knowingly failed to pay Plaintiffs and those similarly situated, the required minimum wage as required by NYLL and the supporting

regulations of the New York State Department of Labor for all hours worked, and paid them only for the time on trip, not the time on app.

546.    Upon information and belief, Defendants' failure to pay Plaintiffs the minimum wage was willful within the meaning of the NYLL.

547.    Plaintiffs seek to recover their unpaid compensation, liquidated damages pursuant to NYLL, Article 6, §198, attorneys' fees, costs, pre- and post-judgment interest along with such other relief as this Court deems just and proper.

### FOURTH CLAIM FOR RELIEF

**(New York State Minimum Wage Act - Overtime Claim, NYLL §650 *et seq.*, Brought by Plaintiffs, Except Shanti on Behalf of Themselves and the Class)**

548.    Plaintiffs, on behalf of themselves and those similarly situated, repeat, reallege and incorporate each and every preceding paragraph as if set forth fully herein.

549.    Throughout the period covered by the applicable statute of limitations and upon information and belief, Defendants willfully and repeatedly failed to pay Plaintiffs at the overtime rate for hours worked in excess of forty (40) hours per workweek as required by NYLL.

550.    Plaintiffs seek and are entitled to recover their respective unpaid compensation, damages pursuant to NYLL, Article 6, §198, attorneys' fees, costs, pre- and post-judgment interest along with such other relief as this Court deems just and proper.

551.    Plaintiffs have been damaged in an amount to be determined, plus liquidated damages.

### FIFTH CLAIM FOR RELIEF

**(Recovery of Equipment Costs, Brought by Plaintiffs, Except Carrasco, on Behalf of Themselves and the FLSA Collective Action Plaintiffs)**

85

552.   Plaintiffs, on behalf of themselves and the FLSA Collective Action Plaintiffs, repeat, reallege and incorporate each and every preceding paragraph as if set forth fully herein.

553.   Throughout the period covered by the applicable statute of limitations, Defendants required Plaintiffs and the FLSA Collective Action Plaintiffs to pay, without reimbursement, the costs and expenses for purchasing, insuring and maintaining equipment required to perform their jobs, at times reducing their wages below the minimum wage in violation of the FLSA. 29 U.S.C. §206(a); 29 C.F.R. §531.35.

554.   Because of Defendants' willful violation of the FLSA, Plaintiffs and the FLSA Collective Action Plaintiffs are entitled to recover from the Defendants, jointly and severally, all monies paid for the "tools of the trade" used in furtherance of the Defendants' enterprise, plus liquidated damages, as well as reasonable attorneys' fees and costs of the action, including pre-judgment interest, all in an amount to be determined.

## SIXTH CLAIM FOR RELIEF

**(Unlawful Deductions For Taxes and Surcharges, or Deductions of Any Kind Including iPhone Leases, Fines for Unlicensed Operation at Uber's Behest, Fuel Cards or Car Payments, Uber Service Fee Kickbacks in Violation of NYLL §§193, Brought by All Plaintiffs on Behalf of Themselves and the Class)**

555.   Plaintiffs, on behalf of themselves and the FLSA Collective Action Plaintiffs and the class action Plaintiffs or any subclass, repeat, reallege and incorporate each and every preceding paragraph as if set forth fully herein.

556.   Throughout the period covered by the applicable statute of limitations, Defendants required Plaintiffs to pay from their wages, without reimbursement, taxes and surcharges for which Defendants were responsible to collect and remit, in addition to the fare, in violation of N.Y. Lab. Law §§193.

557.    Throughout the period covered by the applicable statute of limitations, Defendants required all Plaintiffs and all similarly situated persons to kick 20-28% of their compensation back to Uber as a Service Fee, in violation of N.Y. Lab. Law §193.

558.    Because of Defendants' willful violation of the NYLL, Plaintiffs are entitled to recover from the Defendants, jointly and severally, all monies paid in furtherance of the Defendants' enterprise, plus liquidated damages, as well as reasonable attorneys' fees and costs of the action, including pre-judgment interest, all in an amount to be determined.

## SEVENTH CLAIM FOR RELIEF

**(Illegal Kick-Backs In Violation of 29 C.F.R. § 531.35 -)**
**(Brought by Plaintiffs on Behalf of Themselves and the FLSA**
**Collective Action Plaintiffs)**

559.    Plaintiffs, on behalf of themselves and the FLSA Collective Action Plaintiffs, repeat, reallege and incorporate each and every preceding paragraph as if set forth fully herein.

560.    Throughout the period covered by the applicable statute of limitations, Defendants required Plaintiffs and the FLSA Collective Action Plaintiffs to kick 20-28% of their compensation back to Uber.

561.    The kickback here to Uber by the Plaintiffs is a clear violation of 29 C.F.R. § 531.35.

562.    Because of Defendants' willful violation of the FLSA, Plaintiffs and the FLSA Collective Action Plaintiffs are entitled to recover from the Defendants, jointly and severally, all such amounts, liquidated damages, prejudgment interest, attorneys' fees and costs.

## EIGHTH CLAIM FOR RELIEF
**(Notice-and-Recordkeeping Requirements, NYLL § 195(1), Brought by all Plaintiffs on**
**Behalf of Themselves and the Class)**

563.     Plaintiffs, on behalf of themselves and those similarly situated, repeat, reiterate, and incorporate each and every preceding paragraph as if set forth fully herein.

564.     Defendants have failed to provide Plaintiffs with wage notices as required on February 1 of every year in violation of NYLL § 195(1).

565.     Plaintiffs have been damaged in an amount to be determined, plus liquidated damages.

### NINTH CLAIM FOR RELIEF
**(Notice-and-Recordkeeping Requirements, NYLL § 195(3), Brought by all Plaintiffs on Behalf of Themselves and the Class)**

566.     Plaintiffs, on behalf of themselves and those similarly situated, repeat, reiterate, and incorporate each and every preceding paragraph as if set forth fully herein.

567.     Defendants have failed to provide Plaintiffs with wage statements or explanations of how their wages were calculated in violation of NYLL § 195(3).

568.     Plaintiffs have been damaged in an amount to be determined, plus liquidated damages.

### TENTH CLAIM FOR RELIEF
**(Violation of the NYLL Spread-of-Hours Provision)**

**(Brought by All Plaintiffs on Behalf of Themselves and the Class)**

569.     Plaintiffs, on behalf of themselves and those similarly situated, repeat, reiterate, and incorporate each and every preceding paragraph as if set forth fully herein.

570.     At all times relevant Defendants has failed to pay Plaintiffs one hour of pay those days the Plaintiffs worked in excess of 10 hours per day under the New York Labor Law ("Spread-of-Hours" pay) as required by 12 N.Y.C.R.R. § 142-2.4.

571.    By Defendants' failure to pay spread-of-hours, Defendants willfully violated the New York Labor Law Article 19, §§ 650 et seq., and the supporting New York State Department of Labor Regulations, including but not limited to the regulations in 12 N.Y.C.R.R. Part 142.

572.    Because of Defendants' willful violation of the FLSA, Plaintiffs and the FLSA Collective Action Plaintiffs are entitled to recover from the Defendants, jointly and severally, all such amounts, liquidated damages, prejudgment interest, attorneys' fees and costs.

### ELEVENTH CLAIM FOR RELIEF
### Breach of Contract
**(Brought by All Plaintiffs on Behalf of Themselves and the Class in the alternative)**

573.    Plaintiffs, on behalf of themselves and those similarly situated, repeat, reiterate and incorporate each and every preceding paragraph as if set forth fully herein.

574.    Throughout the period covered by the applicable statute of limitations, Defendants' action and omissions, as alleged above, to constituted independent and separate breaches of the contract entered into by Plaintiffs and those similarly situated and Defendants. These violations include the unlawful deductions made to Plaintiffs' contractually due share of fares, and Defendants deprivation, by its Upfront Pricing Scheme, of Plaintiffs' right to their contractually due share of the full fare charged to the passenger.

575.    As a direct and proximate result of Defendants' breaches, Plaintiffs and others similarly situated, have been damaged in an amount as yet to be determined.

### TWELFTH CLAIM FOR RELIEF
### Unjust Enrichment

**(Brought by All Plaintiffs on Behalf of Themselves and the Class, in the alternative)**

576.   Plaintiffs on behalf of themselves and those similarly situated, repeat, reiterate and incorporate each and every preceding paragraph as if set forth fully herein.

577.   From in or about fall 2016 to the present by their Upfront Pricing Program Defendants have charged higher fares to passengers than they have reported to drivers, and failed to pay drivers their contractually required share of such monies in excess of the fare reported to drivers.

578.   This was done at Plaintiffs' expense and equity and good conscience require restitution.

579.   As a result of Defendants' acts Plaintiffs have been damaged in an amount to be determined at trial.

**THIRTEENTH CLAIM FOR RELIEF**
**Breach of The Covenant of Fair Dealing**
**(Brought by All Plaintiffs on Behalf of Themselves and the Class, in the alternative)**

580.   Plaintiffs, on behalf of themselves and those similarly situated, repeat, reiterate and incorporate each and every preceding paragraph as if set forth fully herein.

581.   From in or about Fall 2016 to the present by their Upfront Pricing Program Defendants have charged higher fares to passengers than they have reported to drivers, and failed to pay drivers their contractually required share of such monies in excess of the fare reported to drivers.

582.   Defendants have entered into agreements with Plaintiff and the Class members by which Plaintiff and the Class members provide driving services in exchange for a certain portion of the entire fare paid by passengers.

583.    Defendants' actions with respect to Upfront Pricing, excluding Plaintiffs from their share of the entire fare charged to customers, constitutes a breach of the covenant of good faith and fair dealing implied in every contract under New York law.

584.    As a result of Defendants acts Plaintiffs have been damaged in an amount to be determined at trial.

**FOURTEENTH CLAIM FOR RELIEF**
**(Promissory Estoppel)**
**(Brought by Plaintiff Haider on Behalf of Himself and the Promissory Estoppel Class)**

585.    Plaintiff Haider, on behalf of himself and those similarly situated, repeats, reiterates and incorporates each and every preceding paragraph as if set forth fully herein.

586.    Throughout the period covered by the applicable statute of limitations, Defendants made a clear and unambiguous promise to Plaintiff Haider and those similarly situated to allow such Plaintiffs to provide certain levels of service if they had a specific type of vehicle.

587.    Plaintiffs and those similarly situated, in reasonable and foreseeable reliance by them on Defendants' promise, purchased various specific types of vehicles.

588.    Defendants subsequently changed the type of vehicle necessary to provide the particular service in question and thus, Plaintiffs had purchased vehicles that are no longer eligible to provide the service level and thus, had higher monthly car payments than were necessary as they could have avoided the purchase or lease of certain vehicles. Thus, Plaintiffs were injured by reason of their reliance on Defendants' promises.

**RELIEF SOUGHT**

**WHEREFORE**, Plaintiffs on behalf of themselves and the FLSA Collective Action Plaintiffs and the class action Plaintiffs, request relief as follows:

A. Designation of this action as a collective action for the purposes of the claims brought on behalf of the FLSA Collective Action Plaintiffs, along with prompt issuance of opt-in notice pursuant to 29 U.S.C. §216(b) to all similarly situated members of the opt-in class;

B. Designation of Plaintiffs as representatives of the FLSA Collective Action Plaintiffs;

C. Designation of this action as a class action pursuant to Rule 23 of the Fed. R. Civ. P. for the purposes of the claims brought on behalf of the class action Plaintiffs;

D. An order declaring that Plaintiffs are employees and not independent contractors;

E. An order declaring that Defendants violated the FLSA in the manners stated in this complaint;

F. An order declaring that Defendants' violations of the FLSA were willful;

G. An order declaring that Defendants violated the NYLL in the manners stated in this complaint;

H. A declaration that, based on violations of law, Defendants were not entitled to take deductions for tools of the trade and an award of deductions pursuant to the FLSA ;

I. An order declaring that Defendants' violations of the NYLL were willful;

J. An award of overtime compensation under the FLSA and NYLL;

K. An award of minimum wage compensation under the FLSA and NYLL;

L. An award of spread of hours compensation under the NYLL;

M. An award of tools of the trade and unlawful deductions and kickbacks under the FLSA and NYLL;

N. An award of liquidated damages pursuant to the FLSA;

O.  An award of damages for violations of NYLL;

P.  Alternatively, an award of damages for all breach of contract and covenant of fair dealing claims;

Q.  An award of damages for all promissory estoppel injuries suffered by any of the Plaintiffs, the class action Plaintiffs,

R.  All penalties available under the applicable laws;

S.  Attorneys' fees pursuant to 29 U.S.C. §216, NYLL §663 and all other applicable statutes;

T.  Interest as provided by law;

U.  Such other relief as this Court deems just and proper.

**JURY TRIAL**

Plaintiffs demand a jury trial for all causes of action and claims for which they have a right to a jury trial.

Dated: New York, New York
      May 12, 2017

                    Respectfully submitted,

                    MIRER MAZZOCCHI SCHALET JULIEN & CHICKEDANTZ, PLLC

                    By: Jeanne E. Mirer
                    *Attorney for Plaintiffs*
                    150 Broadway, 12th floor
                    New York, NY 10031
                    (212) 231-2235
                    Jmirer@mmsjlaw.com