UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

BIGU HAIDER, VIJAY SHANTI, INDERJEET
PARMAR, DIOGENES CARRASCO, TIMOTHY
CAVARETTA, CHERNO JALLOW, Individually,
on Behalf of All Others Similarly Situated, and as
Class Representatives,

                Plaintiffs,

            -against-

UBER TECHNOLOGIES, INC., UBER LOGISTIK,
LLC, UBER USA LLC, ACHT-NY, LLC,
ACHTZEHN-NY, LLC, GARRET CAMP,
ANDREW CHAPIN, DANACH-NY, LLC,
DREIST-NY, LLC, DREIZEHN-NY, LLC,
DRINNEN-NY, LLC, EINS-NY, LLC, ELF-NY,
LLC, EINUNDZWANZIG-NY, LLC, FUNF-NY,
LLC, FUNFZEHN-NY, LLC, GRUN, LLC, J.
WILLIAM GURLEY, HINTER, LLC, TRAVIS
KALANICK, JOSH MOHRER, NEUN-NY, LLC,
NEUNZEHN-NY, LLC, SCHMECKEN, LLC,
SECHS-NY, LLC, SECHZEHN-NY, LLC,
SIEBEN-NY, LLC, SIEBZEHN-NY, LLC, UNTER,
LLC, VIER-NY, LLC, VIERZEHN-NY, LLC,
WEITER, LLC, ZEHN-NY, ZWANZIG-NY, LLC,
ZWEI-NY, LLC, ZWOLF-NY, LLC, jointly and
severally,

            Defendants.
_____

**Civil Action No.: 16-cv-04098 (AKH)**


**ORAL ARGUMENT REQUESTED**


**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR
CONDITIONAL CERTIFICATION**

David M. Wirtz
Andrew M. Spurchise
Kevin R. Vozzo
Maayan Deker
LITTLER MENDELSON, P.C.
900 Third Avenue
New York, New York 10022
Tel: 212.583.9600
*Attorneys for Defendants*

## <u>TABLE OF CONTENTS</u>

**Page(s)**

I.     PRELIMINARY STATEMENT ...................................................................................1

II.    RELEVANT FACTS ...................................................................................................2

    A.     Uber's business model in New York City ...................................................2

        1.     Drivers vary with respect to the products they use ......................2

        2.     The Taxi & Limousine Commission heavily regulates for-hire transportation in New York City.............................................................3

        3.     How drivers in New York City use the Uber app ........................4

        4.     Drivers vary with respect to their sign-up experience and contracts ..........6

    B.     Drivers' varying experiences using the Uber app in support of their independent transportation businesses ..................................................... 7

III.   PLAINTIFFS' BID FOR CONDITIONAL CERTIFICATION SHOULD BE DENIED...................................................................................................................10

    A.     Although lenient, the standard for conditional certification requires more than conclusory allegations of a common practice .................................10

    B.     Plaintiffs have failed to demonstrate they are similarly situated with respect to an *unlawful* policy .....................................................................11

        1.     The multi-factor, interdependent test for determining independent contractor status under the FLSA ............................................11

        2.     The mere classification of drivers as independent contractors is insufficient to warrant conditional certification...........................12

    C.     Plaintiffs are not similarly situated to each other, or to other drivers, with respect to the FLSA economic realities test, because the nature of drivers' operations are driven entirely by their choices ......................................17

    D.     Variations in liability and potential exposure also preclude conditional certification .............................................................................................18

    E.     The *Hood* action precludes conditional certification ...............................20

    F.     The proposed notice and distribution plan, if any, must be fair and impartial ..................................................................................................22

IV.    CONCLUSION.........................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alvarez v. Gold Belt, LLC*,
    2011 U.S. Dist. LEXIS 38034 (D.N.J. Apr. 7, 2011) ............................................21

*Andel v. Patterson-UTI Drilling Co. LLC*,
    280 F.R.D. 287 (S.D. Tex. 2011)............................................................................13

*Anglada v. Linens 'N Things, Inc.*,
    2007 WL 1552511 (S.D.N.Y. April 26, 2007) ......................................................23

*Armour & Co. v. Wantock*,
    323 U.S. 126 (1944)................................................................................................19

*Armstrong v. Wheels Assured Delivery Sys.*,
    2016 WL 1270208 (S.D. Ind. Mar. 31, 2016)........................................................18

*Bah v. Shoe Mania*,
    2009 U.S. Dist. LEXIS 40803 (S.D.N.Y. May 13, 2009) ......................................24

*Bamgbose v. Delta-T Group, Inc.*,
    684 F. Supp. 2d 660(E.D. Pa. 2010) ......................................................................13

*Barfield v. New York City Health & Hosps. Corp.*,
    2005 U.S. Dist. LEXIS 28884 (S.D.N.Y. Nov. 17, 2005)......................................10

*Blaney v. Charlotte-Mecklenburg Hosp. Auth.*,
    2011 WL 4351631 (W.D.N.C. Sept. 16, 2011) ....................................................18

*Bouthner v. Cleveland Const., Inc.*,
    2012 WL 738578 (D. Md. Mar. 5, 2012)...............................................................10

*Bowens v. Atl. Main Corp.*,
    546 F. Supp. 2d 55 (E.D.N.Y. 2008) .....................................................................24

*Castillo v. Taco Bell of Am., LLC*,
    960 F. Supp. 2d 401 (E.D.N.Y. 2013) ...................................................................21

*Christianson v. Newpark Drilling Fluids, LLC*,
    2015 WL 1268259 (S.D. Tex. Mar. 19, 2015), *reconsideration denied*, 2015
    WL 1505834 (Apr. 1, 2015) ............................................................................12, 18

*Colon v. Major Perry St. Corp.*,
    2013 U.S. Dist. LEXIS 93021 (S.D.N.Y. Jul. 2, 2013)..........................................24

*Costello v. Kohl's Illinois, Inc.*,
    2014 U.S. Dist. LEXIS 124376 (S.D.N.Y. Sep. 4, 2014) ....................................22

*Demauro v. Limo, Inc.*,
    2011 WL 9191 (M.D. Fla. Jan. 3, 2011) ....................................................12

*Diaz v. Elecs. Boutique of Am., Inc.*,
    2005 U.S. Dist. LEXIS 30382 (W.D.N.Y. Oct. 17, 2005) .............................20

*Dybach v. Fla. Dep't of Corrections*,
    942 F.2d 1562 (11th Cir. 1991) ..............................................................14

*England v. New Century Fin. Corp.*,
    370 F. Supp. 2d 504 (M.D.La. 2005)........................................................20

*Fu v. Mee May Corp.*,
    2016 U.S. Dist. LEXIS 53199 (S.D.N.Y. Apr. 20, 2016).............................10

*Garcia v. Spectrum of Creations, Inc.*,
    102 F. Supp. 3d 541 (S.D.N.Y. 2015).......................................................23

*Gillian v. Starjem Rest. Corp.*,
    2011 U.S. Dist. LEXIS 115833 (S.D.N.Y. Oct. 3, 2011) .............................19

*Gjurovich v. Emmanuel's Marketplace, Inc.*,
    282 F. Supp. 2d 101 (S.D.N.Y. 2003).......................................................24

*Gortat v. Capala Bros., Inc.*,
    2010 WL 1423018 (E.D.N.Y. Apr. 9, 2010) ..............................................14

*Guzelgurgenli v. Prime Time Specialists Inc.*,
    883 F. Supp. 2d 340 (E.D.N.Y. Aug. 8, 2012) ...........................................24

*Hoffman-LaRoche, Inc. v. Sperling*,
    493 U.S. 165 (1989)................................................................................20

*Hood v. Uber Techs., Inc.*,
    No. 16-cv-998 (M.D.N.C.)........................................................................20

*J.S. v. Attica Central Schools*,
    2006 U.S. Dist. LEXIS 12827 (W.D.N.Y. Mar. 7, 2006)..............................25

*Lewis v. Wells Fargo & Co.*,
    669 F. Supp. 2d 1124 (N.D. Cal. 2009) ....................................................25

*Lugo v. Farmer's Pride Inc.*,
    737 F. Supp. 2d 291 (E.D. Pa. 2010) ......................................................18

*McGillis v. Uber*,
    2017 Fla. App. LEXIS 1114 (Feb. 1, 2017) ...........................................................................14

*Medina v. Bros. Behrman Hwy., Inc.*,
    2015 U.S. Dist. LEXIS 80874 (E.D. La. June 12, 2015) ........................................................21

*Morales v. Plantworks, Inc.*,
    2006 U.S. Dist. LEXIS 4267 (S.D.N.Y. Feb. 1, 2006) ...........................................................11

*Myers v. Hertz Corp.*,
    624 F.3d 537 (2d Cir. 2010) .............................................................................................10, 20

*Neff v. Flowers Foods, Inc.*,
    2016 U.S. Dist. LEXIS 183025 (D. Vt. Nov. 7, 2016) ..........................................................22

*Parker v. Rowland Express, Inc.*,
    492 F. Supp. 2d 1159 (D. Minn. 2007) ..................................................................................14

*Pennington v. Integrity Communs., LLC*,
    2013 WL 357516 (E.D. Mo. Jan. 29, 2013) ...........................................................................12

*Pfaahler v. Consultants for Architects, Inc.*,
    2000 WL 198888 (N.D. Ill. Feb. 8, 2000) ..............................................................................12

*Rojas v. Uber Techs., Inc.*,
    2017 WL 2790543 (S.D. Fla. June 27, 2017) ...................................................................12, 14

*Romero v. La Revise Assocs., L.L.C.*,
    968 F. Supp. 2d 639 (S.D.N.Y. 2013) ....................................................................................23

*Rutherford Food Corp. v. McComb*,
    331 U.S. 722 (1947) ................................................................................................................12

*Saleem v. Corp. Trans. Group, Ltd.*,
    854 F.3d 131 (2d Cir. 2017) ......................................................1, 11, 12, 13, 14, 15, 24

*Sanchez v. JMP Ventures, L.L.C.*,
    2014 U.S. Dist. LEXIS 14980 (S.D.N.Y. Jan. 27, 2014) .......................................................16

*Schucker v. Flowers Foods, Inc.*,
    2017 U.S. Dist. LEXIS 136178 (S.D.N.Y. Aug. 24, 2017) ..............................................21, 22

*Sheffield v. Orius Corp.*,
    211 F.R.D. 411 (D. Or. 2002) ................................................................................................20

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944) ................................................................................................................19

*Strait v. Belcan Engineering Group, Inc.*,
    911 F. Supp. 2d 709 (N.D. Ill. 2012) .......................................................................11

*Whitehorn v. Wolfgang's Steakhouse, Inc.*,
    767 F. Supp. 2d 445 (S.D.N.Y. Feb. 8, 2011).................................................22, 25

## I.      PRELIMINARY STATEMENT

Relying on little more than the bare allegation that they were misclassified as independent contractors, Plaintiffs move to conditionally certify a collective under the Fair Labor Standards Act ("FLSA") and send notice to over fifteen-hundred drivers who have used Uber Technologies, Inc.'s ("Uber") application (the "Uber app") in New York City.   While the standard for conditional certification is "lenient," it is not non-existent, and the Court's approval is not a rubber stamp.   Plaintiffs must first show they are **similarly situated** to the collective with respect to a **common, unlawful practice** under the FLSA.   Plaintiffs fail to meet their burden.

First, Plaintiffs' moving papers are devoid of competent evidence suggesting that they – or any members of the proposed collective for that matter – were **actually** misclassified under the multi-factor legal standard set forth in binding Second Circuit precedent holding that black car drivers are independent contractors as a matter of law under the FLSA.   *See Saleem v. Corp. Trans. Group, Ltd.*, 854 F.3d 131 (2d Cir. 2017).

Second, the record demonstrates that it is the drivers who use the Uber app, and the drivers alone, who decide **whether**, **when**, **where**, and **how** they use that app to generate revenue, and make a profit or suffer a loss.   The choices made by drivers in New York City, their circumstances, and their experiences using the app, create what is truly a wealth of diverse circumstances that definitively point to independent contractor status for some drivers, while requiring a more detailed analysis under the FLSA for others, thereby rendering collective treatment inappropriate.

Finally, because a district court in North Carolina has already conditionally certified a **nationwide** collective of drivers in a case against Uber, an order granting Plaintiffs' motion in this case would improperly result in the issuance of **two different notices**, to the **same individuals**, in **two different cases**.   Accordingly, though Plaintiffs may proceed with their

individual claims, the Court should not order a second notice to be issued, regardless of the fact that Plaintiffs have not met their burden of showing conditional certification is appropriate.

For these reasons, and those set forth below, Plaintiffs' bid for conditional certification should be denied.

## II.    RELEVANT FACTS

### A.    Uber's business model in New York City

Uber is a San Francisco-based technology company.  (Declaration of Chad Dobbs in Opposition to Plaintiffs' Motion for Conditional Certification ["Dobbs Decl."], ¶ 3.)  Uber's technology products enable people in need of a variety of services to connect with individuals and businesses offering those services via an online marketplace accessible through a smartphone or tablet.  (*Id*.)  The most well-known products Uber offers are those that enable individuals in need of a ride ("riders") to connect with nearby, available independent, third-party transportation providers ("drivers") and their vehicles using the Uber app.  (*Id*.)

#### 1.    Drivers vary with respect to the products they use

In the New York City metropolitan area, the technology products available to drivers and riders include: (1) uberX—cost-efficient, everyday vehicles; (2) uberXL—large, everyday vehicles to carry more riders; (3) uberPOOL—riders can share a ride with someone heading to the same general location; (4) UberBLACK—more expensive, higher-end, luxury vehicles; and (5) UberSUV—more expensive, higher end, luxury SUVs.  (Dobbs Decl., ¶ 4.)  Other products include UberWAV, which connects wheelchair-bound riders with wheelchair accessible vehicles driven by specially-trained drivers.  (*Id*.)  Each product gives riders the options to connect with a different type of vehicle at a different price.  If drivers operate eligible vehicles, they are free to toggle between the different Uber products as they deem fit, taking into account, among other things, demand and pricing.  (*Id*. at ¶ 10; *see also* Kayumbi Decl. ¶ 6.) The difference in prices

between the products can be significant.  For example, the default pricing (discussed below) for a trip completed using UberSUV is more than two times the default pricing for a trip completed using uberX.  (*Id*.)

### 2. The Taxi & Limousine Commission heavily regulates for-hire transportation in New York City

The New York City Taxi & Limousine Commission ("TLC") comprehensively regulates the provision of for-hire transportation services in New York City.  (Dobbs Decl., ¶ 6.)  As a result, individuals and entities that provide for-hire transportation services, and entities that arrange for the completion of such services, must comply with various rules and regulations issued by the TLC.  (*Id*.)

Specifically, the TLC requires that all for-hire vehicle transport be pre-arranged, and "dispatched" (i.e., offered) by an entity registered with the TLC.  (Dobbs Decl., ¶ 7.)  Further, every driver must obtain a commercial for-hire vehicle license from the TLC, take a defensive driving and medical exam, get fingerprinted, complete a drug test, take a wheelchair accessible vehicle class, and take a 24-hour for-hire vehicle course.  (*Id*.)  TLC rules have, over time, also prohibited drivers from, among other things, soliciting tips, and canceling a "dispatch" or refusing to transport any person who has prearranged a trip, except under limited circumstances. (*Id*.)  "Bases" – the term used to refer to entities registered with the TLC that pre-arrange trips offered to for-hire drivers – are required to file a "Rate Schedule" with the TLC, setting forth the rates and applicable pricing policies for all trips they dispatch.  (*Id*.)

In order to comply with the TLC rules requiring all for-hire transportation services in New York City to be pre-arranged by an entity registered with the TLC, Uber previously established several subsidiary and affiliated entities to serve as bases, including Defendants Acht-NY, LLC, Achtzehn-NY, LLC, Danach-NY, LLC, Dreist-NY, LLC, Dreizehn-NY, LLC,

Drinnen-NY, LLC, Eins-NY, LLC, Elf-NY, LLC, Einundzwanzig-NY, LLC, Funf-NY, LLC, Funfzehn-NY, LLC, Grun, LLC, Hinter, LLC, Neun-NY LLC, Neunzehn-NY, LLC, Schmecken, LLC, Sechs-NY, LLC, Sechzehn-NY, LLC, Sieben-NY, LLC, Siebzehn-NY, LLC, Unter, LLC, Vier-NY, LLC, Vierzehn-NY, LLC, Weiter, LLC, Zehn-NY, Zwanzig-NY, LLC, Zwei-NY, LLC, and Zwolf-NY, LLC.  (Dobbs Decl., ¶ 8.)  There is no requirement that drivers maintain an affiliation with an Uber-related "base" in order use the Uber app to generate leads, and many drivers elect not to do so.  (*Id*. at ¶ 9.)

### 3.    How drivers in New York City use the Uber app

Drivers in New York City use the Uber app—as one of several different means to generate leads for riders—in exchange for which they agree to pay Uber a service fee for each successfully generated lead (*i.e.*, each completed trip). (*See* Dobbs Decl. ¶ 10.)  The service fee is a portion of the amount charged to the rider for the completed trip, and can vary depending on which Uber product the rider requests.  (*Id*. at ¶ 10.)

Uber does not prohibit drivers from using other lead generation applications, like Lyft, Juno, and Via (Uber's direct competitors).  (Dobbs Decl., ¶ 32.)  In fact, many drivers report that they do use both Uber and another lead generation application, and that they often have multiple applications running at the same time.  (*Id*.; *see also see also* Kayumbi Decl. ¶ 8; Khachatryan Decl. ¶ 5; Jansone De Torres Decl. ¶ 10.)  Drivers may also receive lead generation from more traditional black car companies, such as Corporate Transportation Group, Ltd.  Drivers may also develop private clients through their own marketing efforts, such as word-of-mouth referrals and arrangements with other drivers to handle their "overflow" work (rides for private clients that drivers are too busy to handle).  (*Id*. at ¶ 32.)

Drivers have sole and complete discretion as to whether, when, and where to use the Uber app.  (Dobbs Decl., ¶ 11; *see also* Gour Dec., p. 4; Khachatryan Dec. ¶¶ 8-10; Dyer Dec. ¶¶

4

12-14; Hassan Dec. ¶¶ 10-11.)  Uber does not require that drivers go online or offline at any time, or otherwise make themselves available to complete trips, at any particular time or on any particular day.  (*Id*.)  Uber also does not require drivers to go online in any particular location, or to otherwise be available to accept trip requests in any particular location.  (*Id*.)

When a rider sends a request for a driver using the Uber app, it is routed to the nearest online driver, who has the right to accept or decline the ride.  (Dobbs Decl., ¶ 12.)  Drivers have discretion whether to transport riders and may decline or – after accepting – cancel a request for any number of reasons, including, for example, if a rider is unruly or intoxicated.  (*Id*.; *see also* Jansone De Torres Decl. ¶¶ 19-20; Kayumbi Dec. ¶ 10; Hassan Decl. ¶ 17; Khachatryan Decl. ¶ 10.)

Following completion of a ride, the rider is charged based on, among other things, a base amount, ride distance, and time spent in transit, and then the Uber app processes the transaction on behalf of the driver, per the agreement between drivers and Uber (or its subsidiaries, as applicable).  (Dobbs Decl., ¶ 13.)  Uber may from time to time offer promotions in the form of increased rates or additional flat fees if a driver agrees to drive at a particular time or in a particular location, such as sporting events or concerts.   However, these promotions are completely optional and a significant majority of drivers do not participate.  (*Id*. at ¶¶ 14; 35; *see also* Hassan Decl. ¶ 11; Jansone De Torres Decl. ¶ 17.)

While drivers have control over the price at which their services are offered by, among other things, choosing when and where to use the Uber app, Uber does maintain default prices (*i.e.*, pricing before negotiation, promotions, and/or surge)—which are required by the TLC and established in conjunction with feedback from drivers and riders alike—for each product in the New York City market.  (Dobbs Decl., ¶ 15.)

Drivers are also free to follow whatever navigational route they choose when traveling between pick-up and drop-off locations, subject only to rider preferences.  (Dobbs Decl., ¶ 30; *see also* Dyer Dec. ¶ 16; Gour Dec., p. 5..)  In addition, drivers are not subject to any uniform, dress code or personal appearance requirements when using the Uber app.  (*Id.* at ¶ 30; *see also* Gour Decl., p. 5; Jansone De Torres Decl. ¶ 23; Kchachatryan Decl. ¶ 13; Kayumbi Decl. ¶  13; Hassan Decl. ¶ 19; Dyer Decl. ¶ 17.)

Drivers have the right to, and do, engage subcontractors or hire their own employees to drive on their behalf on the Uber app.  (Dobbs Decl., ¶ 31.)  If a driver decides to add a subcontractor or employee to their Uber account, that subcontractor or employee can use the app just as the driver would, but the earnings generated by that subcontractor or employee are paid directly to the original driver, who then has a separate arrangement with the subcontractor or employee with respect to how the subcontractor or employee is paid.  (*Id.*; *see also see also* Gour Dec., pp. 3.)  Uber has no involvement in these kinds of payment arrangements, or the scheduling or other working conditions worked out between drivers and their subcontractors or employees.  (*Id.*)

### 4.    Drivers vary with respect to their sign-up experience and contracts

To gain access to the Uber app, drivers need to sign-up for an account, submit certain paperwork, including their vehicle registration and proof of TLC licensure, and accept the applicable online services agreement (discussed below). (Dobbs Decl., ¶ 18.)    They do not submit an "application."  (*Id.*)  Drivers are not required to complete what Plaintiffs refer to as "on-boarding" sessions with Uber, and any information relayed to drivers before they begin using the Uber app is for informational purposes only, and need not be followed.  (Dobbs Decl. at ¶ 19.)    Some drivers participate in such informational sessions before using the Uber app, whereas others do not.  (*Cf.* Dyer Decl. at ¶ 7; Hassan Decl. at ¶ 8).  Further, although such

information sessions were previously offered only in-person, drivers can now obtain the same information by simply watching a video, if they so choose, and even watching the video is entirely up to them.  (Dobbs Decl. at ¶ 19.)  Some drivers may have received informational packets, while others did not.  (*Id*.)

Before drivers can gain access to the Uber app, they must enter into the applicable technology services agreement.  (Dobbs Decl., ¶¶ 18, 20.)  These agreements govern drivers' use of the Uber app, and their relationship with Uber.  During Plaintiffs' proposed notice period, Uber and its subsidiaries have used 8 technology service agreements and several driver addenda to contract with drivers.  (*Id*. at ¶ 22.)

Contrary to Plaintiffs' representations, these agreements are not identical, and they have changed over time, creating further factual variance within the putative collective.  For example, the August 2011 Partner/Driver Terms and Conditions do not address negotiation of fares with riders, whereas later iterations address this in detail. Similarly, some agreements expressly state that drivers are solely responsible for determining the most effective, efficient and safe manner of their performance of transportation services arranged through the Uber app, whereas others do not.  Some agreements grant Uber the right to adjust driver fares under certain circumstances, while others are silent on this issue.  (Compare Dobbs Exs. A, B, D, F(a), F(b), H, J, K.)  Some drivers have only operated under one or two agreements, whereas others have operated under a number of different agreements.  (Dobbs Decl., ¶ 23.)

**B.**   **Drivers' varying experiences using the Uber app in support of their independent transportation businesses**

Drivers' practices and experiences using the Uber app vary greatly depending upon their personal choices and business objectives.

Some drivers operate corporations or LLCs.  Others operate as sole proprietors.  (Dobbs

Decl., ¶ 29; *Compare* Gour Decl. pp. 2-3 and Khachatryan Decl. ¶ 2 with Dyer Decl. ¶ 6 and Jansone De Torres Decl. ¶ 5.)  Some drivers own and operate one vehicle, which they drive on their own behalf.  Others purchase and operate multiple vehicles and use them on different Uber products (*e.g.,* a Toyota Prius on uberX; and a Cadillac Escalade on UberBLACK and UberSUV).  (Dobbs Decl., ¶ 29; *see also* Jansone De Torres Dec. ¶ 9; Gour Dec. p. 3; Kayumbi Dec. ¶ 5.) Some drivers use the Uber app to expand their transportation business, or to use as a side business in support of their primary occupation.  (Dobbs Decl., ¶ 29; Gour Decl. pp. 1-3; Hassan Decl. ¶ 2; Kayumbi Dec. ¶7; Khachatryan ¶¶ 2, 8.)

Some drivers in New York City earn millions of dollars in fares each year through rides arranged through the Uber app.  Others earn considerably less.  (Dobbs Decl., ¶ 29; Gour Decl. p. 1; Dyer Decl. ¶ 12; Hassan Dec. ¶¶ 13-14.)  Some drivers use the Uber app for a few weeks or months, and then never log-on again.   Others have used the Uber app—sporadically or regularly—for years, and have grown their businesses as a result.  (Dobbs Decl., ¶ 29; Gour Dec. pp. 1-3; Dyer Decl. ¶ 5; Hassan Dec. ¶¶ 13-14.)

Some drivers engage employees or subcontractors to perform transportation services on their behalf, whereas others personally transport their clients.  (Dobbs Decl., ¶ 29; Dyer Decl., ¶ 4; Gour Decl., p. 3; Hassan Decl., ¶ 4; Kayumbi Decl., ¶¶ 4–5; Jansone De Torres Decl., ¶ 7; Khachatryan Decl., ¶ 2.)  While some drivers work directly with Uber competitors (*e.g.*, Lyft, Juno, etc.), and/or transport private clients, others have decided only to use the Uber app to generate leads. (Dyer Decl., ¶ 9; Gour Decl., p. 4; Hassan Decl., ¶ 3; Kayumbi Decl., ¶ 8; Jansone De Torres Decl., ¶ 10; Khachatryan Decl., ¶¶ 5; 12.)

Some drivers prefer to drive in the morning.  Others prefer to drive on the weekends. (Jansone De Torres Decl. ¶ 11; Dyer Decl. ¶ 12; Hassan Dec. ¶ 13.)  Some drivers prefer airport

8

trips, whereas others prefer to drive in certain geographic areas.  (Jansone De Torres Decl. ¶¶ 11, 14; Dyer Decl. ¶ 12; Hassan Decl. ¶ 11; Khachatryan Decl. ¶ 9.)  Some drivers exclusively use higher end products.  Some stick to uberX.  Some use both.  (Gour Decl. p. 3; Dyer Decl. ¶ 8; Jansone De Torres Decl. ¶ 9;  Kayumbi Decl. ¶ 6; Hassan Decl. ¶ 5.)  Some drivers like to drive during "surge" pricing, whereas others avoid it.  (Dyer Decl. ¶ 14; Jansone De Torres Decl. ¶ 18; Khachatryan Decl. ¶ 6; Hassan Dec. ¶ 12.)

Ara Khachatryan, for example, prefers to drive in Manhattan, as he has found that riders in Manhattan generate the most leads to the airport, and he likes to do airport trips because he is typically able to pick up a rider on the way back from the airport and maximize his earnings. (Khachatryan Decl. at ¶ 9).  Outside of rush hour, Mara Jansone De Torres prefers to accept leads where riders are taking long-distance trips going to New Jersey, Connecticut, and all over the Tri-State area from New York City, because these leads result in higher earnings.  (Jansone De Torres Decl. at ¶ 15).  She also does not like to accept leads during afternoon rush hour because of the heavy traffic.  (Jansone De Torres Decl. at ¶ 16).  Trevor Dyer, Jr. prefers to login around 4:00 a.m. on regular business days so that he can catch airport rides.  (Dyer Decl. at ¶¶ 12–13).  On one occasion, while at his son's basketball game, he set JFK airport as a "destination" on his Uber App, because it would be financially worthwhile if a trip to JFK airport was requested; otherwise, he preferred to watch his son's game.  (Dyer Dec. at ¶ 13).  He generally does not take advantage of "surge pricing," because he finds that by the time he arrives at the location that is surging, it may be already finished.  (Dyer Decl. at ¶ 14).

Some drivers, like Mr. Dyer, remain patient when looking for leads and remain in the same area, whereas others, such as Mara Jansone De Torres, drive around until they find a lead. (Dyer Decl. at ¶ 14; Gour Decl. at p. 5; Jansone De Torres ¶ 14).  Some drivers choose to wear

casual clothes while using the Uber app, while others, such as Bizi Kayumbi, choose to wear a suit and tie.  (Kayumbi Decl. at ¶ 13; Dyer Decl. at ¶ 17; Gour Decl. at p. 5; Jansone De Torres Decl. at ¶ 23; Khachatryan Decl. at 13).

The duration and frequency with which drivers utilize the Uber app also varies.  (*See* Dobbs Decl., ¶ 34 [discussing drivers' varying usage of the Uber app]).

## III.   PLAINTIFFS' BID FOR CONDITIONAL CERTIFICATION SHOULD BE DENIED

### A.   Although lenient, the standard for conditional certification requires more than conclusory allegations of a common practice

Plaintiffs have failed to make even the modest factual showing necessary for conditional certification.  "[D]istrict courts have discretion, in appropriate cases ... [to] facilit[ate] notice to potential plaintiffs."  However, they "are not ***required*** to do so by [the] FLSA."  *Myers v. Hertz Corp.*, 624 F.3d 537, 554 (2d Cir. 2010) (emphasis added).  In determining whether to exercise this discretion, a district court can consider whether facilitating notice "may be a useful 'case management' tool."  *Myers*, 624 F.3d at 555, n. 10.  However, "[w]hen sufficient evidence in the record at the initial 'notice' stage makes it clear that notice is not appropriate, ... a court can ... deny certification outright."  *Bouthner v. Cleveland Const., Inc.*, 2012 WL 738578, at *4 (D. Md. Mar. 5, 2012) (citation omitted).

Before notice can be deemed appropriate, plaintiffs must demonstrate they are similarly situated to members of the putative collective.  *Myers*, 624 F.3d at 554-55.  Plaintiffs must establish "similarly situated" status through at least a modest factual showing; conclusory allegations and unsupported assertions are insufficient.  *Id.* at 555 ("the 'modest factual showing' cannot be satisfied simply by 'unsupported assertions'"); *Barfield v. New York City Health & Hosps. Corp.*, 2005 U.S. Dist. LEXIS 28884, at *3 (S.D.N.Y. Nov. 17, 2005) (rejecting "anecdotal hearsay" allegations in complaint); *Fu v. Mee May Corp.*, 2016 U.S. Dist. LEXIS

53199, at *5 (S.D.N.Y. Apr. 20, 2016) ("'certification is not automatic.  This modest showing must 'still be based on some substance,' and 'a plaintiff must provide some actual evidence of a factual nexus between him and the rest of the class he seeks to represent; conclusory allegations will not suffice'") (citations omitted).

To meet their burden, Plaintiffs must put forth evidence "sufficient to demonstrate that [they] and potential collective members were victims of a common scheme or plan *that violated the law*."  *Morales v. Plantworks, Inc.*, 2006 U.S. Dist. LEXIS 4267, at *6 (S.D.N.Y. Feb. 1, 2006) (emphasis added).  Moreover, though a common question may exist among putative collective members, the Court must determine whether that common question can be "answered without individual inquiries."  *Strait v. Belcan Engineering Group, Inc.*, 911 F. Supp. 2d 709, 720 (N.D. Ill. 2012).

> **B.      Plaintiffs have failed to demonstrate they are similarly situated with respect to an *unlawful* policy**
>
> > **1.      The multi-factor, interdependent test for determining independent contractor status under the FLSA**

When tasked with evaluating a worker's independent contractor status under the FLSA, courts apply the "economic realities" test.  Under this test, the "ultimate concern … [is] whether, as a matter of economic reality, the workers depend upon someone else's business for the opportunity to render service or are in business for themselves."  *Saleem v. Corp. Trans. Group, Ltd.*, 854 F.3d 131, 139 (2d Cir. 2017) (quoting *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1059 (2d Cir. 1988)).

Courts in the Second Circuit use several interdependent factors as aids to "elucidate the 'economic reality' of the arrangement at issue."  *Saleem,* 854 F.3d at 139-40.  Specifically, courts may consider: "(1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of

skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business." *Id*. at 140, n. 19 (quoting *Brock*, 840 F.2d at 1058-59).  What matters under the first factor is the "***actual exercise of control***," not the mere right to control.  *Saleem*, 854 F.3d at 149, n. 37 (emphasis supplied).  In addition, the presence (or absence) of any one factor is not dispositive on employee status; such a determination depends "upon the circumstances of the whole activity."  *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947).

Thus, any challenge to independent contractor status under the FLSA necessarily involves a fact-intensive inquiry that does not typically lend itself to collective treatment.  *See, e.g., Pfaahler v. Consultants for Architects, Inc.*, 2000 WL 198888, *2 (N.D. Ill. Feb. 8, 2000) (denying motion for conditional certification and noting that independent contractor analysis requires "a fact-intensive, individual determination" regarding plaintiffs' relationship with defendant); *Demauro v. Limo, Inc.*, 2011 WL 9191, *3-4 (M.D. Fla. Jan. 3, 2011) (denying conditional certification of limo drivers classified as independent contractors).

## 2.    The mere classification of drivers as independent contractors is insufficient to warrant conditional certification

Plaintiffs appear to believe that notice should issue based solely on drivers' classification as independent contractors.  They are wrong.  *See Pennington v. Integrity Communs., LLC*, 2013 WL 357516, *2 (E.D. Mo. Jan. 29, 2013) (conditional class certification denied where plaintiffs failed to support claim for misclassification of independent contractors with sufficient evidence); *Christianson v. Newpark Drilling Fluids, LLC*, 2015 WL 1268259, *2-4 (S.D. Tex. Mar. 19, 2015), *reconsideration denied*, 2015 WL 1505834 (Apr. 1, 2015) (denying conditional certification based on variations among putative collective members under the economic realities

test); *see also, generally, Rojas v. Uber Techs., Inc.*, 2017 WL 2790543, at *3 (S.D. Fla. June 27, 2017) (order denying motion for conditional certification of collective action alleging independent contractor misclassification under the FLSA).

In *Colson v. Avnet, Inc*., an exemption misclassification case, the court explained that "sound public policy [considerations] and basic common sense" make clear that: "the mere classification of a group of employees – even a large or nationwide group – as exempt under the FLSA is not by itself sufficient … If it were, in every instance where an employer is accused of misclassifying a large group of employees, the district court would then somehow be required to order collective action notification, irrespective of the quality or quantity of evidence that had been produced[.]" 687 F. Supp. 2d 914, 927 (D. Ariz. 2010).[1]

Instead, before even reaching the question of whether Plaintiffs are similarly situated to those they seek to represent, Plaintiffs must first show a ***viable*** theory of independent contractor misclassification – the entire basis upon which they premise their lawsuit.  Plaintiffs have failed to do so.

In *Saleem v. Corp. Trans. Group, Ltd.*, 854 F.3d 131 (2d Cir. 2017), the Second Circuit affirmed a decision from Judge Furman of the Southern District, finding black car drivers in New York City—similar to the drivers Plaintiffs seek to represent here—to be independent contractors under the FLSA as a matter of law.  854 F.3d at 149.  Like drivers who use the Uber app, the drivers in *Saleem* decided when, where, and how often to provide transportation services,

---

[1] *See also Bamgbose v. Delta-T Group, Inc.*, 684 F. Supp. 2d 660, 669(E.D. Pa. 2010) (denying conditional certification in independent contractor misclassification case where the court found that it would have been required to "examine the …. workers' distinct relationships with [the defendant] and its various clients"); *Andel v. Patterson-UTI Drilling Co. LLC,* 280 F.R.D. 287, 294-296 (S.D. Tex. 2011) (adopting report and recommendation denying motion for conditional certification in independent contractor misclassification case where individualized analyses would have been required to ascertain independent contractor status).

invested in their businesses, decided how best to obtain business, and were free to, and often did, provide services for others and/or their own clients. *Id*. at 148. The Second Circuit reached this finding notwithstanding the fact that the drivers were subject to a "Rulebook," and were required to "dress neatly in specified business attire." *Id*. at 136. Rather than acknowledge this binding authority, which is directly on-point, Plaintiffs baldly and inaccurately claim, that "other Black Car companies … have already been recognized as employers," (Mtn. p. 6.), citing literally nothing to support their assertion.

Given the relevant legal standard, and this binding precedent, Plaintiffs' four virtually identical boilerplate declarations[2] fall far short of suggesting that Plaintiffs, or any other members of the putative collective, were subject to a common, ***unlawful*** policy of misclassification.[3]

Specifically, the declarations distill to the following assertions: the declarants (i) used the Uber app, pursuant to a written agreement; (ii) were classified as independent contractors; (iii) were responsible for their own business expenses; (iv) did not receive overtime pay, spread-of-hours pay, and/or minimum wage for every hour during which they were logged-on to the App;

---

[2] Only four of the six named Plaintiffs submitted declarations in support of Plaintiffs' motion for conditional certification. Moreover, although Plaintiffs speculate that other drivers "would want to opt in to this action" (see Mirer Aff., Exs. 3-5), Plaintiffs Carrasco and Jallow have not even filed a consent form, and no other driver has shown interest in participating in this case, further undermining Plaintiffs' assertion that notice should issue. *See Dybach v. Fla. Dep't of Corrections*, 942 F.2d 1562, 1567 (11th Cir. 1991); *Rojas*, 2017 WL 2790543 at \*3; *Parker v. Rowland Express, Inc.*, 492 F. Supp. 2d 1159, 1165-66 (D. Minn. 2007) (denying conditional certification in independent contractor misclassification case due to lack of interest from potential opt-ins); *but see Gortat v. Capala Bros., Inc.*, 2010 WL 1423018, at \*10 (E.D.N.Y. Apr. 9, 2010) ("Although some district courts outside of the Eleventh Circuit have adopted *Dybach*'s 'desire to opt in' requirement, no other Circuit Court has done so, and it is not the law of this Circuit.").

[3] As of this date, the only court to reach a conclusion on the employment status of drivers who utilize the Uber app to generate leads for riders found that drivers were *not* employees for purposes of Florida's re-employment assistance program. *McGillis v. Uber*, 2017 Fla. App. LEXIS 1114, \*12 (Feb. 1, 2017).

(v) did not receive wage statements or wage notices; (vi) had sales tax and Black Car fund fees "deducted" from their earnings; and (vii) believed they were subject to Uber's "control [of their] job[s] as drivers." (*See* Mirer Aff., Exs. 3-6.)

The first six of these assertions either ***support*** independent contractor status, or are neutral. *See Saleem*, 854 F.3d at 131, 142, n. 22 (noting facts that written agreement disclaimed existence of employment relationship, plaintiffs did not receive employment benefits, and CTG did not reimburse drivers for business expenses, all supported independent contractor status).[4] The last assertion regarding Uber's purported control over "[their] job[s] as drivers" lacks proper evidentiary support.[5]  Plaintiffs' vague assertions of control are (i) conclusory, (ii) based on hearsay, (iii) lack foundation and personal knowledge, and/or (iv) otherwise inconsistent with objective evidence in the record.[6]  For example, although Plaintiffs state in conclusory fashion that they "know of no New York City Uber driver who was able to" negotiate over Uber's service fee percentage, Plaintiffs fail to provide any details as to the drivers with whom they

---

[4] Several assertions in Plaintiffs' Third Amended Complaint ("TAC") also support independent contractor status under the FLSA.  For instance, Plaintiffs readily admit that drivers make "***significant investments***" in their operations (TAC, ¶ 287) (emphasis supplied), a factor considered in *Saleem*.  In addition, several of the named Plaintiffs admit that they have extensive experience in the transportation industry outside of using the Uber app (TAC, ¶¶ 36, 40, 48), suggesting that they possessed skill and expertise in this field, providing support for yet another factor considered under the economic realities test.

[5] Many of the declarations are notarized by a lawyer for the New York Taxi Workers' Alliance.  As such, it appears that these individuals are associated with the New York Taxi Workers' Alliance, an organization that primarily, and ironically, represents ***independent contractor*** taxi drivers and is committed to doing whatever it can to reduce the disruptive impact the Uber app has had on the taxi industry in New York City.  *See generally* http://www.nytwa.org/. Accordingly, even putting Defendants' evidentiary objections aside, Plaintiffs' boilerplate declarations should be taken with more than a dash of salt.

[6] The assertions in Plaintiffs' declarations regarding the minimum wage, overtime, and/or spread-of-hours violations they allegedly suffered are likewise stated in conclusory fashion. Plaintiffs simply fail to provide any ***evidence*** of the days or weeks in which the violations allegedly occurred.  Simply alleging an unlawful policy, without more, is insufficient to warrant conditional certification.

spoke, when they spoke with them, and what was specifically discussed, including whether they, or the drivers with whom they allegedly spoke, ever even attempted to negotiate.  (*See* Mirer Aff., Exs. 3-6.)   What's more, drivers can and do negotiate over Uber's service fee (*see* Dobbs Decl., ¶ 25), further undermining Plaintiffs' conclusory allegations.

Other "facts" Plaintiffs rely upon to support their claims of misclassification appear exclusively in the unsubstantiated TAC, and are similarly inconsistent with the record evidence. For instance, citing to the TAC, Plaintiffs assert that "Uber's guaranteed payment model is based on drivers working multiple trips during set blocks of time."  (Mtn. p. 8.)   However, in their declarations, Plaintiffs fail to even assert that they, or any members of the putative collective with whom they allegedly spoke, ever participated in promotions offering increased rates or additional flat fees.  Further, as discussed above, most drivers choose not to participate in such promotions.

Plaintiffs also resort to making allegations without citing to ***any*** documents or pleadings for support.  (*See, e.g.,* Mtn. p. 15 [erroneously asserting, without ***any*** support, that "Uber directs and sets the terms and conditions of the drivers' work" by, among other things, controlling "what to wear."]; *cf.* Gour Decl., p. 5 (no uniform or dress code); Jansone De Torres Decl. ¶ 23; Kchachatryan Decl. ¶ 13 (no uniform or dress code); Kayumbi Decl. ¶  13 (same); Hassan Decl. ¶ 19 (no attire or dress restrictions); Dyer Decl. ¶ 17 (no uniform, dress code, or appearance requirements).)   These kinds of unsupported assertions are insufficient to warrant conditional certification.  *See generally Sanchez v. JMP Ventures, L.L.C.*, 2014 U.S. Dist. LEXIS 14980, at *5-6 (S.D.N.Y. Jan. 27, 2014) (rejecting reliance upon a "list of generalized allegations that [were] molded into a declaration which read[] similarly to the complaint"… as they constituted "the kind of unsupported assertions and conclusory allegations that Courts in this District have

found to be insufficient to conditionally certify a class under § 216(b).").

To put it plainly, conditional certification is not appropriate, because Plaintiffs' have failed to provide sufficient evidence, even at this stage, of an ***unlawful*** policy as applied to them individually, much less as applied to over fifteen-hundred other drivers who comprise the putative collective.

    **C.**    **Plaintiffs are not similarly situated to each other, or to other drivers, with respect to the FLSA economic realities test, because the nature of drivers' operations are driven entirely by their choices**

As explained above, drivers utilize the Uber app in a variety of different ways, under a variety of different circumstances, and pursuant to different contractual terms.  They each alone decide ***whether***, ***when***, ***where***, and ***how*** they use the app to generate revenue, resulting in significant variance with respect to, among other things: the duration and frequency with which they use the app, their engagement of subcontractors and/or employees, their use of different Uber products, their establishment of formal business entities, their use of competitor lead-generation services, their work with private clients, and their strategies for satisfying clients and maximizing profits.  (*Compare* Gour, Dyer Jr., Hassa, Jansone De Torres, Khachatryan, and Kayumbi Decls.)

Plaintiffs simply can proffer no explanation for how drivers such as: (i) Avi Gour, the Chief Executive Officer of Limo Diamond, LLC, whose transportation business generates millions of dollars in revenue each year, rents office and garage space, owns over 100 different vehicles, and employs an administrative assistant (Gour Decl. pp. 1, 3, 6), (ii) Sarfaraz Hassan, who works a full-time job at a construction firm and only uses the Uber app on the weekends for a few hours as part of a side transportation business to bolster his main source of income (Hassan Decl. ¶¶ 2-3), or (iii) Ara Khachatryan, a full time student who owns and operates AK 33, Inc., a corporation through which he performs transportation services arranged through the Uber and

17

Juno applications, and occasionally completes "private transportation jobs" (Khachatryan Decl. ¶¶ 2, 5, 8), could conceivably be "similarly situated" to one another, to them, or to the other drivers Plaintiffs characterize as Uber "pawns" (TAC, ¶ 10), tirelessly "working 60-80 hour weeks" without "the basic rights of employees." (TAC, ¶ 3.)

Where, as here, "the parties' briefing and evidence demonstrate that the putative class members' circumstances are significantly dissimilar with respect to the economic realities that will later need to be analyzed for FLSA coverage," the "need for individualized analysis eviscerates all notions of judicial economy that would otherwise be served by conditional certification." *Christianson*, 2015 WL 1268259 at *4; *Blaney v. Charlotte-Mecklenburg Hosp. Auth.*, 2011 WL 4351631, at *10 (W.D.N.C. Sept. 16, 2011) ("[w]here the record before the court demonstrates that there is no common policy or scheme and instead individualized questions of fact predominate, the action is not an appropriate one for certification").[7] Plaintiffs' motion should therefore be denied for this reason as well.

### D.   Variations in liability and potential exposure also preclude conditional certification

Even if Plaintiffs could articulate a common method by which to prove their misclassification claims, that would not end the analysis. Individual questions would still remain regarding whether **_liability_** exists as to each individual driver. *See Lugo v. Farmer's Pride Inc.*, 737 F. Supp. 2d 291, 303 (E.D. Pa. 2010) (decertifying collective due to possibility certain collective members were not undercompensated). In order to seek recovery, each member of the putative collective would have to first prove that he or she worked for more than 40 hours each week or earned less than minimum wage during **_compensable_** time.

---

[7] *See also Armstrong v. Wheels Assured Delivery Sys.*, 2016 WL 1270208, at *6 (S.D. Ind. Mar. 31, 2016) (conditional certification denied in independent contractor misclassification case where, among other things, resolution of claims would have required an individualized and highly fact intensive inquiry into independent contractor status).

As Defendants have demonstrated, ***even if*** Plaintiffs can prove they are misclassified, it is not the case that all drivers have suffered even a single minimum wage or overtime violation. (*See* Gour Decl., p. 6; Dyer Decl. ¶ 21; Hassan Decl. ¶ 14; *see also* Dobbs Decl., ¶¶ 34-38 [discussing drivers' average earnings per hour, and average hours per week].)   Moreover, drivers' earnings for every hour online transporting passengers vary wildly, from close to $0 to as much as $250.  (*Id.*)  Variance in potential liability exists even among the ***named Plaintiffs***, as Plaintiff Carrasco has conceded he never suffered a minimum wage violation under the FLSA, and Plaintiff Shanti has conceded he never suffered an overtime violation under the FLSA.  (*See* TAC, pp. 91-92.)

Further, neither Plaintiffs nor Uber has any way to determine what drivers do, or how they spend their time, while they are logged-on to the Uber app and not completing trips. (Dobbs Decl. at ¶ 33.)  Plaintiffs appear to assume all drivers are actively working while online. "On call" time may be compensable where an "employee was engaged to wait," but it is ***not*** compensable where the employee is merely "wait[ing] to be engaged."  *See Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944); *Skidmore v. Swift & Co.*, 323 U.S. 134, 136-37 (1944).

Here, at least some drivers have testified they are not prohibited from engaging in other pursuits, whether personal or professional, while online, including work for one or more of Uber's competitors.  (*See* Gour Decl., p. 4; Kayumbi Decl. ¶ 8; Kchachatryan Decl. ¶ 5; Dyer Decl. ¶¶ 9, 13; Jansone De Torres Decl. ¶ 10.)  Thus, whether drivers' time spent online waiting for a trip is compensable will require individualized inquiries into how ***each*** driver spent his or her time while logged-on to the App on a ***day-by-day***, and ***week-by-week*** basis.[8]   Under these

---

[8] To the extent Plaintiffs seek to recover expenses associated with mileage traveled while looking for leads (and not actively transporting passengers), this will add an additional layer of complexity and variance to the analysis, as drivers often use multiple lead-generation

circumstances, collective treatment is inappropriate. *See Gillian v. Starjem Rest. Corp.*, 2011 U.S. Dist. LEXIS 115833, at *19 (S.D.N.Y. Oct. 3, 2011) (whether the defendant's "alleged rules violated the minimum wage and overtime provisions of the FLSA depends on the number of hours each individual worked on a particular shift, as well as the number of hours each individual worked in a particular week"); *Diaz v. Elecs. Boutique of Am., Inc.*, 2005 U.S. Dist. LEXIS 30382, at *17 (W.D.N.Y. Oct. 17, 2005) (denying certification where, among other things, plaintiff's claims required factual analysis of workers' daily activities and responsibilities, and examination of when plaintiff and each class member was to work, when they actually worked).[9]

### E.   The *Hood* action precludes conditional certification

Plaintiffs' opening memorandum makes no reference to *Hood v. Uber Techs., Inc.*, No. 16-cv-998 (M.D.N.C.), a case with similar allegations and claims to those raised here. This omission was likely no mistake, as the procedural posture of the *Hood* action precludes conditional certification here. Specifically, on July 12, 2017, the court conditionally certified a *nationwide* collective of drivers who are not bound by an arbitration agreement. (*Id.* at Dkt. #126). Any collective in this case would, therefore, necessarily be subsumed by the collective in *Hood*, providing yet another reason why Plaintiffs' motion should be denied.

Conditional certification is a case management tool (*see Myers*, 624 F.3d at 555) designed to promote efficiency. *See Hoffman-LaRoche, Inc. v. Sperling*, 493 U.S. 165, 170

---

applications simultaneously, and there is no way to determine which expenses should be attributed to the Uber app, and which should be attributed to other applications.

[9] *See also England v. New Century Fin. Corp.*, 370 F. Supp. 2d 504, 511 (M.D.La. 2005) ("If liability is found, damages would necessarily require a case-by-case inquiry, thereby rendering it impossible to try this case as a collective class."); *Sheffield v. Orius Corp.*, 211 F.R.D. 411, 413 (D. Or. 2002) (denying certification where "each claim would require extensive consideration of individualized issues of liability and damages" and "be mired in particularized determinations of liability and damages, rather than collective consideration of common questions of law and fact.").

(1989) (noting that a collective action allows for the "efficient resolution in one proceeding of common issues of law and fact arising from the same alleged ... activity.")  Issuing **two different notices**, to the **same individuals**, in **different cases**, is fundamentally inconsistent with this notion.  Among other things, duplicative notice would waste resources, create a risk of confusion, and open the door to potentially inconsistent rulings.

Judge Kenneth M. Karas of this District recently denied a motion for conditional certification in an independent contractor misclassification case for these very reasons.  In *Schucker v. Flowers Foods, Inc.*, 2017 U.S. Dist. LEXIS 136178 (S.D.N.Y. Aug. 24, 2017), the plaintiffs moved for conditional certification despite the fact that an overlapping collective had already been certified, and notice had already issued, in different proceedings.  The court denied the motion, reasoning that conditional certification would not be a "prudent and reasonable exercise of the Court's discretion."  *Id*. at *16.  The court further found that "no purpose would be served by allowing the FLSA claims to proceed as a collective action considering the concurrent cases and the attendant increased expense for Defendants, the risk of confusing potential collective members about their legal options, the possibility of inconsistent rulings, and the waste of judicial resources."  *Id*. at *19.

Several other courts have reached similar conclusions, or dismissed duplicative FLSA actions outright.  *See Alvarez v. Gold Belt, LLC*, 2011 U.S. Dist. LEXIS 38034, at *5-6 (D.N.J. Apr. 7, 2011) (denying motion for conditional certification and noting the importance of having one court handle claims to avoid conflicting decisions and reduce "havoc"); *Castillo v. Taco Bell of Am., LLC*, 960 F. Supp. 2d 401, 405 (E.D.N.Y. 2013) ("[d]efendants should not be required to send a second class notice to individuals who have already received such notice but have elected not to participate … [I]t is precisely such concerns that have led courts here and in other

21

jurisdictions to dismiss or transfer second filed FLSA actions in favor of an earlier filed similar action"); *Medina v. Bros. Behrman Hwy., Inc.*, 2015 U.S. Dist. LEXIS 80874, at *9 (E.D. La. June 12, 2015) ("Accordingly, although the FLSA does not preclude plaintiff from maintaining an independent, individual action, plaintiff is not entitled to conditional certification of a class that is entirely duplicative of the conditionally certified class in *Mejia*"); *Neff v. Flowers Foods, Inc.*, 2016 U.S. Dist. LEXIS 183025, *12 (D. Vt. Nov. 7, 2016). (finding "[t]here [was] no good reason for sending overlapping notices inviting the same people to join two lawsuits").

In this case, Defendants do not contend that Plaintiffs cannot pursue their individual claims under the FLSA in this case.  But just as in *Schucker*, "no purpose would be served" by facilitating duplicative notice to members of the putative collective.  2017 U.S. Dist. LEXIS 136178 at *19.  Accordingly, Plaintiffs' motion should be denied on this basis alone.

## F.    The proposed notice and distribution plan, if any, must be fair and impartial

Plaintiffs' proposed notice and distribution plan is flawed at virtually every level.  While Defendants have summarized some of their objections below, if the Court finds that notice should issue, Defendants request that the Court order the parties to confer in an attempt to agree upon the content, form and distribution of the notice, and, to the extent the parties are unable to reach agreement, brief any outstanding issues for resolution by the Court..  *See Costello v. Kohl's Illinois, Inc.*, 2014 U.S. Dist. LEXIS 124376, at *2 (S.D.N.Y. Sep. 4, 2014) ("The Court directs the parties to confer on both the form and dissemination of the notice … [and] to the extent the parties are unable to reach an agreement, identif[y] such disputes.").

*First*, Plaintiffs' proposed notice period is grossly overbroad.  The statute of limitations for FLSA claims is two years or three years from the date a person "opts-in" to an action.  29 U.S.C. § 255(a); 256(b).  "Because the statute of limitations runs for each individual plaintiff until he consents to join the action, courts generally permit plaintiffs to send notice to those

employed during the ***three year period prior to the date of the Order or to the mailing of the***

***notice***." *Whitehorn v. Wolfgang's Steakhouse, Inc.*, 767 F. Supp. 2d 445, 451 (S.D.N.Y. Feb. 8,

2011) (citations omitted) (emphasis supplied); *Anglada v. Linens 'N Things, Inc.*, 2007 WL

1552511, at *9 (S.D.N.Y. April 26, 2007) ("[U]sage of the three year date from the issuance of

the notice is more in keeping with § 256(b)."). Accordingly, the notice period should extend

back from the date on which notice is mailed, not the date on which the case was initiated.

Further, the notice period should certainly not encompass the ***six-year period—twice*** the

longest possible FLSA statutory period—preceding issuance of the notice. Although some

courts have allowed a six-year notice period in FLSA cases so as to coincide with the six-year

statute of limitations period under the New York Labor Law, other courts have justifiably found

this practice to be confusing, and inconsistent with the FLSA. In *Trinidad v. Pret A Manger*

*(USA) Ltd.*, for example, Judge Engelmayer of this District denied plaintiff's request for a six-

year notice period. The court noted that plaintiffs had *not* moved for certification under Rule 23,

and reasoned that its "discretion to facilitate notice of FLSA claims is premised on [the court's]

case management authority; that authority is 'distinguishable in form and function from the

solicitation of claims.'" 962 F. Supp. 2d 545, 564 (S.D.N.Y. 2013) (internal citations omitted).

The court further held that "[a]uthorizing notice for a time period twice the length of the

maximum FLSA limitations period would not serve the efficiency goal articulated in *Hoffmann*."

*Id*. (internal citations omitted); *see also Garcia v. Spectrum of Creations, Inc.*, 102 F. Supp. 3d

541, 551 (S.D.N.Y. 2015) (Magistrate Judge Gorenstein) ("Three years is the maximum time

period to join an FLSA collective action and no New York state class action has been

certified. It would be confusing to employees who are ineligible for the FLSA opt-in class to

receive the opt-in notice, which does not relate to any state law claims") (citations omitted);

*Romero v. La Revise Assocs., L.L.C.*, 968 F. Supp. 2d 639, 649 (S.D.N.Y. 2013) (Magistrate Judge Gorenstein) ("Three years is the maximum time period to join an FLSA collective action and there is no New York state class action certified as of yet.  If and when a class is certified under New York law, class members will receive notice at that time through the class action notification process."); *Colon v. Major Perry St. Corp.*, 2013 U.S. Dist. LEXIS 93021, at *22-23 (S.D.N.Y. Jul. 2, 2013) (denying request for six-year notice period); Transcript of July 31, 2017, Oral Argument, Dkt. # 63, pp. 5-7 (explaining this Court's rationale for why Plaintiffs should not be permitted to simultaneously pursue certification of a Federal Rule of Civil Procedure Rule 23 class or subclasses in addition to conditional certification under the FLSA).[10]

*Second*, although Plaintiffs propose a ninety-day opt-in period, a sixty-day period is more than sufficient in this case.  *See Bah v. Shoe Mania*, 2009 U.S. Dist. LEXIS 40803, *11 (S.D.N.Y. May 13, 2009) ("Potential plaintiffs will have 60 days from the mailing of the notice to file opt-in elections."); *Gjurovich v. Emmanuel's Marketplace, Inc.*, 282 F. Supp. 2d 101, 106 (S.D.N.Y. 2003) (same); *Bowens v. Atl. Main Corp.*, 546 F. Supp. 2d 55, 85 (E.D.N.Y. 2008) (courts "have held that a sixty (60)-day period is sufficient for the return of Consent Forms").

*Third*, Plaintiffs' request to send *two* "reminder" notices should be denied.  Reminder notices are the exception, not the rule, and should only be permitted when a plaintiff has shown that such reminders are necessary.  *See Guzelgurgenli v. Prime Time Specialists Inc.*, 883 F. Supp. 2d 340, 358 (E.D.N.Y. Aug. 8, 2012) (denying plaintiff's request for reminder notice).  As noted in *Guzelgurgenli*, "most plaintiffs do not request permission to send reminder notices, and … there has been no great harm resulting from this practice."  *Id.*

---

[10] Defendants also dispute, particularly in light of *Saleem*, that a three-year period is appropriate, given Plaintiffs' failure to show that any violations that occurred were "willful."  29 U.S.C. § 255(a).

*Fourth*, the proposed notice itself is argumentative and misleading.  Among other things, the notice improperly: (i) suggests members of the putative collective drove "for" Uber, or are "Uber" drivers; (ii) fails to indicate that Defendants dispute Plaintiffs' allegations; (iii) makes no mention of the potential opt-in plaintiffs' potential discovery obligations (*see Whitehorn*, 767 F. Supp. 2d at 450); (iv) fails to include defense counsel's contact information (*id.* at  451); and (v) emphasizes potential opt-in plaintiffs' right to opt-in to the case with bold lettering, while failing to place similar emphasis on their right ***not*** to participate.[11]   (*See* Mirer Aff., Ex. 1.)

*Fifth*, if the Court determines that notice should issue, a neutral third-party administrator should oversee the distribution of the notice.  Courts have recognized the value of using third-party administrators to provide notice, and doing so in this case will protect the privacy of members of the putative collective, and prevent intrusive communications from Plaintiffs' counsel.[12]  *See J.S. v. Attica Central Schools*, 2006 U.S. Dist. LEXIS 12827, at *21-22 (W.D.N.Y. Mar. 7, 2006) (ordering use of impartial third party to mail notice to potential class members); *Lewis v. Wells Fargo & Co.*, 669 F. Supp. 2d 1124, 1129-30 (N.D. Cal. 2009) (same).

## IV.   CONCLUSION

For all the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' motion in its entirety.

---

[11] Defendants also note that Plaintiffs' proposed notice is inconsistent with the template notice annexed to Judge Hellerstein's Individual Rules.  Not only does the format differ, but Plaintiffs' notice form fails to, among other things, include the ***45-day*** notice period set forth in the template, and to provide contact information for Defendants' counsel.

[12] Plaintiffs' request for production is cumulative and unduly burdensome, particularly within the "expedited" 15-day production window they have proposed.  Plaintiffs fail to articulate why they would need drivers' last known addresses, telephone numbers, ***and*** e-mail addresses to facilitate notice, and drivers' social security numbers are irrelevant at this stage.

Respectfully submitted,

Date:   December 4, 2017
        New York, New York

*/s/ Andrew M. Spurchise*

David M. Wirtz
Andrew M. Spurchise
Kevin R. Vozzo
Maayan Deker
LITTLER MENDELSON
A Professional Corporation
900 Third Avenue
New York, NY  10022.3298
212.583.9600

*Attorneys for Defendants*
Uber Technologies, Inc., Uber Logistik, LLC,
Uber USA, LLC, Acht-NY, LLC, Achtzehn-
NY, LLC, Garret Camp, Andrew Chapin,
Danach-NY, LLC, Dreist-NY, LLC, Dreizehn-
NY, LLC, Drinnen-NY, LLC, Eins-NY, LLC,
Elf-NY, LLC, Einundzwanzig-NY, LLC, Funf-
NY, LLC, Funfzehn-NY LLC, Grun, LLC, J.
William Gurley, Hinter, LLC, Travis Kalanick,
Josh Mohrer, Neun-NY, LLC, Neunzehn-NY,
LLC, Schmecken, LLC, Sechs-NY, LLC,
Sechzehn-NY, LLC, Sieben-NY, LLC,
Siebzehn-NY, LLC, Unter, LLC, Vier-NY,
LLC, Vierzehn-NY, LLC, Weiter, LLC, Zehn-
NY, Zwanzig-NY LLC, Zwei-NY, LLC,
Zwolf-NY, LLC